**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2155-WJM-CBS

RAYMOND LYALL,
GARRY ANDERSON,
THOMAS PETERSON,
FREDRICK JACKSON,
BRIAN COOKS, and
WILLIAM PEPPER,

      Plaintiffs,

v.

CITY OF DENVER, a municipal corporation,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION, AND CERTIFYING A RULE 23(b)(2) CLASS**

---

      Before the Court is Plaintiffs' Motion for Class Certification.  (ECF No. 15.)

Defendant "City of Denver" (in reality, the City and County of Denver, hereinafter

"Denver") opposes this motion.  (ECF No. 58.)

      For the reasons explained below, Plaintiffs' motion is granted in part and denied

in part.  More particularly, Plaintiffs' motion is denied without prejudice to the extent

Plaintiffs seek damages and/or class certification under Federal Rule of Civil Procedure

23(b)(3).  Plaintiffs' motion is granted, however, to the extent Plaintiffs seek injunctive

relief, and the Court will therefore certify a Rule 23(b)(2) class.  Finally, Plaintiffs' Motion

to Stay Proceedings Pending Adjudication of Plaintiffs' Motion for Class Certification

(ECF No. 105) is denied as moot.

## I.  BACKGROUND

Denver bans camping on public or private property without express permission from someone with authority over the property in question.  *See* Denver Muni. Code § 38-86.2.  Under this ordinance, "camp" (as a verb) means

> to reside or dwell temporarily in a place, with shelter.  The term "shelter" includes, without limitation, any tent, tarpaulin, lean-to, sleeping bag, bedroll, blankets, or any form of cover or protection from the elements other than clothing.  The term "reside or dwell" includes, without limitation, conducting such activities as eating, sleeping, or the storage of personal possessions.

*Id*. § 38-86.2(d)(1).  The public property to which this ban extends expressly includes

> any street, alley, sidewalk, pedestrian or transit mall, bike path, greenway, or any other structure or area encompassed within the public right-of-way; any park, parkway, mountain park, or other recreation facility; or any other grounds, buildings, or other facilities owned or leased by the city or by any other public owner, regardless of whether such public property is vacant or occupied and actively used for any public purpose.

*Id*. § 38-86.2(d)(3).

Plaintiffs are all homeless individuals living on Denver's streets who believe they have been unlawfully affected by this ordinance.  They do not challenge the ordinance itself as unconstitutional.  (*See* ECF No. 54 at 3 n.2 ("The constitutionality of Denver Municipal Code 38[-]86.2 is not expressly challenged here.").)  They instead challenge Denver's actions apparently to enforce the ordinance through what Plaintiffs call the "Homeless Sweeps."  (*Id*. ¶ 9.)  Plaintiffs define "Homeless Sweeps" more specifically as "where more than 10 Denver Police, workers of the [Department] of Public Works and, sadly, inmates at the local county jail, are sent in by the City of Denver to seize the

2

possessions of Plaintiffs and Plaintiff Class without regard for their rights." (*Id*. at 19 n.7.)  Plaintiffs accordingly focus on what they regard as the seizure and destruction of their personal property during the Homeless Sweeps, allegedly in violation of their Fourth Amendment right against unreasonable searches and seizures; their Fourteenth Amendment right to due process of law; and their Fourteenth Amendment right to equal protection.  (*Id*. at 31–34.)

Plaintiffs assert that Homeless Sweeps have taken place on October 24, 2015; December 15, 2015; March 8–9, 2016; July 13, 2016; and August 20, 2016.  (*Id*. ¶¶ 53–60.)  With the exception of the July 13 and August 20 incidents, Plaintiffs claim they personally witnessed these Sweeps and that persons working for or on behalf of Denver seized and discarded their property during these Sweeps.  (*See* ECF Nos. 15-7 ¶ 6 (declaration of Plaintiff Jackson discussing the December 15 Sweep), 15-8 ¶¶ 5–7 (declaration of former plaintiff Jerry Burton discussing the December 15 and March 9 Sweeps), 15-9 ¶¶ 7–10 (declaration of Plaintiff Lyall discussing the October 24, December 15, and March 8–9 Sweeps).)

Plaintiffs' information regarding the July 13 Sweep comes through non-party Terese Howard, who is not homeless, but advocates on behalf of the homeless.  (*See* ECF No. 15-11.)  Howard reports witnessing the police ticketing homeless individuals on July 13, and then hearing "from friends on the streets" that a particular encampment in the same place was cleared out, apparently later that day.  (*Id*. ¶ 7.)

It is not clear whether any Plaintiff, or any person known to Plaintiffs, witnessed the August 20 Sweep.

3

According to Plaintiffs, each Sweep follows essentially the same pattern.  Usually without warning, various individuals working on Denver's behalf (Denver Police, Department of Public Works employees, and sometimes work-release inmates from the Denver County Jail) arrive and order the homeless individuals to vacate the premises with their belongings.  If a homeless individual does not vacate, his or her possessions are allegedly seized and thrown immediately into garbage trucks brought in by the Public Works employees.[1]

Denver disputes most every aspect of Plaintiffs' story.  Denver claims that most of the Sweeps were unconnected from any organized enforcement of the camping ban ordinance, and, in any event, that Denver always provides advance notice of its intention to clean up a homeless encampment; that it only immediately disposes of obvious trash; that it preserves and stores all other unclaimed belongings; that it gives homeless individuals information on where and how to retrieve those belongings; and that Plaintiffs' own evidence demonstrates all of this.  (*See* ECF No. 58 at 2–8.)

## II.  LEGAL STANDARD

As the party seeking class certification, Plaintiff must first demonstrate that all four prerequisites of Federal Rule of Civil Procedure 23(a) are clearly met.  *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir. 2004); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013).  These threshold elements consist of the following: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of

---

[1] The parties' filings routinely refer to these trucks as "dump trucks."  From the photographs in the record, it is clear that these are typical garbage collection trucks, not the sort of open-topped dump trucks used for hauling dirt or debris.  (*See* ECF No. 54 at 21, 26.)

law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

If Plaintiffs prove they have met these threshold requirements, they must then demonstrate that the action falls within one of the three categories set forth in Rule 23(b).  *Shook*, 386 F.3d at 971.  Here, Plaintiffs seek certification pursuant to Rules 23(b)(2) and (3).

The party seeking to certify a class bears the strict burden of proving the requirements of Rule 23.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).  In determining the propriety of a class action, the question is not whether a plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.  *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir. 1982).  When deciding whether the proposed class meets the requirements of Rule 23, the Court accepts the plaintiff's substantive allegations as true, though it need not blindly rely on conclusory allegations and may consider the legal and factual issues which the complaint presents.  *Shook*, 386 F.3d at 968; *see also Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009).  The Court should not pass judgment on the merits of the case, but must conduct a "rigorous analysis" to ensure that the requirements of Rule 23 are met.  *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

The decision whether to grant or deny class certification "involves intensely practical considerations and therefore belongs within the discretion of the trial court."

5

*Tabor*, 703 F.3d. at 1227.

## III.  PROPOSED CLASS

Plaintiffs propose the following class definition: "All persons in the City of Denver who were, are, or will be homeless at any time after [August 26, 2014], whose personal belongings have been or may in the future be taken or destroyed by one or more of the Defendants."  (ECF No. 15 at 15.)[2]

## IV.  ANALYSIS

### A.    Relation to the Merits of Plaintiffs' Claims

A major portion of Denver's opposition to Plaintiffs' certification motion could be summarized as follows: "Nothing happened in the way Plaintiffs say it did and here is how we are going to prove it."  For example, Denver argues that "Plaintiffs' purported common issues of law and fact—the nature of Denver's policies, practices and conduct, whether these policies, practices and conduct violate the class members' constitutional rights, and whether injunctive relief should be ordered—are wholly dependent upon the presumed existence of this alleged policy."  (ECF No. 58 at 14.)  But, says Denver (citing much of its own evidence), every one of the alleged Sweeps took place under differing circumstances, at the direction of differing authorities, and for different reasons—so there is no common question that can generate a common answer.  (ECF

---

[2] Plaintiffs originally proposed that the class period begin on May 14, 2012, which would be well outside the two-year statute of limitations for a damages claim under 42 U.S.C. § 1983. *See* Colo. Rev. Stat. § 13-80-102(1)(g); *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1286 (D. Colo. 2009).  Plaintiffs' Amended Complaint, filed after their certification motion, clarifies that they are only seeking relief on behalf of "all homeless persons in the City of Denver from August 26, 2014 forward" (ECF No. 54 ¶ 46 (emphasis removed)), which is apparently tied to Plaintiffs' original filing date of August 25, 2016.

No. 58 at 14–17.)

Denver is simply wrong on this point.  "The class certification rule requiring a showing that questions common to the class predominate does not require that those questions will be answered, on the merits, in favor of the class."  7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1785 (3d ed., Apr. 2017 update) ("*Wright & Miller*").  Denver will receive an opportunity to put forward its evidence, at summary judgment and/or at trial.  In that context, Denver may succeed in proving that all of the alleged Sweeps were different and that no homeless person's belongings were confiscated and discarded in an unconstitutional manner.  But Plaintiffs claim to the contrary, and a number of them have submitted declarations attesting that they personally witnessed the conduct that they allege.  The Court cannot resolve that dispute through class certification proceedings, but when it does resolve the dispute, there is more than a fair chance that the resolution will generate a common answer.

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013).  None of Denver's challenges on the merits relates to the class certification standard.  Accordingly, for the remainder of this order, the Court will mostly ignore any argument from Denver that relies on proving that some event happened differently than Plaintiffs claim, or that Plaintiffs have left out important additional facts.

**B.**     **Rule 23(a)**

The Court's first task is to ensure that the Federal Rule of Civil Procedure 23(a) requirements are satisfied as to the proposed class: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  The Court will address each of these considerations in turn.

1.     Numerosity

Plaintiffs claim that the numerosity requirement is satisfied because "there are right now 5,500 homeless persons in the Denver Metro area" and the number whose property has been seized "is over 3,000."  (ECF No. 15 at 18–19.)  Denver has a number of responses.

First, it claims that "the Denver Metro area" is the wrong geographic constraint, given that the phrase normally refers to Denver itself along with the counties that surround it, yet the camping ban ordinance applies only within Denver.  (ECF No. 58 at 12.)  But a homeless person who spends tonight in, say, Arapahoe County may be in Denver tomorrow night—that is the nature of homelessness.  Thus, the homeless population within the Denver Metro area is a relevant consideration in the numerosity analysis.

Second, Denver claims that Plaintiffs' 3,000 figure contradicts Plaintiffs' expert's calculations that about 600 homeless persons per year have their property seized in the allegedly unconstitutional manner at issue here.  (ECF No. 58 at 13 (citing ECF

8

No. 15-12 ¶ 15).)  But Denver never explains why 600 is too small a group to satisfy the numerosity requirement.

Denver's real objection appears to be that a class of homeless persons is probably something that could never be accurately counted ahead of time, or during the lawsuit itself.  (*See id*. at 8 (attacking Plaintiffs' proposed definition because it would create a class "in a constant state of flux"), 12 (quoting inapposite case law for the proposition that Plaintiffs must offer "some evidence of established, ascertainable numbers" (internal quotation marks omitted)).)  But Denver also understands that such an argument is meritless, at least to the extent Plaintiffs seek to certify a Rule 23(b)(2) class, as discussed in Part IV.C.2, below.  (ECF No. 98 at 1–2 (disavowing any challenge to ascertainability).)  Indeed, a Rule 23(b)(2) class is "well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs attempt to bring suit on behalf of a shifting prison population." *Shook*, 386 F.3d at 972.

The homeless population in Denver is likewise "shifting," and the Court is satisfied that it exists in sufficient numbers to reasonably infer that a sufficiently numerous subset have been and will be exposed to enforcement of the camping ban in a way that Plaintiffs claim is unconstitutional.  For present purposes, the Court finds Plaintiffs' expert's estimate of 600 per year to be sufficiently credible.  The Court does not mean to suggest that something less than 600 would be insufficient, and the Court's ruling does not rest on the specific number alleged.  The Court finds only that Plaintiffs have met their burden at this stage to establish the Rule 23(a) numerosity requirement. *Cf*. *Pottinger v. City of Miami*, 720 F. Supp. 955, 958 (S.D. Fla. 1989) ("the numerosity

requirement has been met based upon a reasonable inference of the studies conducted of the homeless population and the nature of homelessness").

    2.   <u>Commonality</u>

Denver's commonality attack has already been summarized and rejected in Part IV.A, above.  Plaintiffs have established that common questions exist classwide, most notably, whether Denver is engaging in the Homeless Sweeps in the manner alleged.[3] *Cf. Lehr v. City of Sacramento*, 259 F.R.D. 479, 483 (E.D. Cal. 2009) ("There is no question that the instant case presents common legal issues as to whether the City has taken and destroyed the property of homeless individuals.  Thus, commonality exists because the evidentiary and legal arguments necessary to prosecute the instant claims are nearly identical as to all class members.").

Nonetheless, the Court finds that Plaintiffs' proposed class definition, without more, fails to satisfy the commonality requirement.  A class of homeless persons "whose personal belongings have been or may in the future be taken or destroyed by one or more of the Defendants" (ECF No. 15 at 15) encompasses persons who may have never been subject to the Homeless Sweeps, thus eliminating commonality.

The Court in its discretion finds that a narrower class definition would satisfy

---

[3] In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the Supreme Court analyzed the evidence put forth by the putative class of a common policy of employment discrimination and then announced that the class had "provide[d] no convincing proof of a companywide discriminatory pay and promotion policy"; therefore, "they have not established the existence of any common question." *Id*. at 359.  Contrary to Denver's suggestion (*see* ECF No. 58 at 11, 14), the *Wal-Mart* decision does not give this Court authority to examine the merits in the way Denver apparently wishes.  In *Wal-Mart*, the Supreme Court concluded that the *types* of evidence offered by the plaintiffs could never prove a common pattern of discrimination.  *See* 564 U.S. at 349–60.  It did not resolve a plain factual disagreement over whether any specific action took place as the plaintiffs alleged.

commonality, namely, "All persons in the City and County of Denver who were, are, or will be homeless at any time after August 26, 2014, whose personal belongings have been or may in the future be taken or destroyed without due process on account of the City and County of Denver's alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there."  As will become clear in the Rule 23(b) analysis, below, this definition will need further refining. For present purposes, however, Plaintiffs satisfy the commonality requirement under this class definition.

### 3.    Typicality

Plaintiffs allege that Denver has seized their property unconstitutionally, and that is the practice they challenge on behalf of all other potential class members.  Denver's contention that it may have had a lawful basis for seizing an individual Plaintiff's property in a particular instance (*see* ECF No. 58 at 18–19) is a merits question and does not destroy typicality.  Plaintiffs have met their burden on this requirement under the Court's revised class definition, above.

### 4.    Adequacy

Historically, the Tenth Circuit has framed the adequacy inquiry as follows: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).  A year after this decision, however, the Supreme Court added subdivision (g) to Rule 23, which deals specifically with the adequacy of

counsel.  *See* Fed. R. Civ. P. 23, Advisory Committee Notes to 2003 Amendments ("Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision [Rule 23(g)] will guide the court in assessing proposed class counsel . . . .").  Accordingly, the Court will address Plaintiffs' adequacy in this Part, and will defer questions regarding Plaintiffs' counsel's adequacy to the Rule 23(g) analysis in Part IV.D, below.

Denver's adequacy challenge is essentially the same as its commonality and typicality challenges (*see* ECF No. 58 at 19–20), and these challenges fail for the reasons already stated.  Moreover, the named Plaintiffs have so far shown themselves to be adequate, including appearing at hearings before the Magistrate Judge.  (*See* ECF Nos. 39, 41, 47, 49, 52.)  Plaintiffs have thus satisfied their burden to show adequacy.

## C.   Rule 23(b)

Plaintiffs must now establish that their proposed class action matches one of the scenarios described in Rule 23(b).  Plaintiffs argue that the scenarios described in Rules 23(b)(2) and 23(b)(3) are both present here.  As described in more detail below, Rule 23(b)(2) addresses situations in which classwide injunctive relief is the most appropriate remedy, while Rule 23(b)(3) requires a more complicated analysis into whether common questions predominate over individual ones and whether a class action would be superior over individual adjudication.  Importantly, Rule 23 "provides no opportunity for . . . [23(b)(2)] class members to opt out, and does not even oblige the District Court to afford them notice of the action," while 23(b)(3) class members "are

entitled to receive 'the best notice that is practicable under the circumstances' and to withdraw from the class at their option."  *Wal-Mart*, 564 U.S. at 362 (quoting Rule 23(c)(2)(B)).

      1.    <u>Effect of Seeking Certification Under Both Rules 23(b)(2) and 23(b)(3), and of Seeking Both an Injunction and Damages</u>

Plaintiffs' request for certification under Rules 23(b)(2) and 23(b)(3) raises difficulties that substantially overlap with their request both for an injunction against future unlawful property seizures and for damages based on past unlawful seizure and destruction.  (*See* ECF No. 54 at 35.)

For many years, the prevailing wisdom has been that

> if the court determines that both Rule 23(b)(2) and Rule 23(b)(3) apply, then it should treat the suit as having been brought under Rule 23(b)(2) so that all the class members will be bound.  To hold otherwise would allow the members to utilize the opt-out provision in Rule 23(c)(2), which in some cases would thwart the objectives of representative suits under Rule 23(b)(2).

7AA *Wright & Miller* § 1784.1, text accompanying nn.7 & 8 (footnotes omitted). However, Rule 23(b)(2) does not, by its terms, contemplate money damages.  Thus, courts have long wrestled with the proper treatment of money damages when Rule 23(b)(2) was the most appropriate vehicle for the class action.

The Advisory Committee Notes state that Rule 23(b)(2) it is not intended for "cases in which the appropriate final relief relates exclusively or predominantly to money damages."  Fed. R. Civ. P. 23, Advisory Committee Notes to 1966 Amendments.  Based on this, courts have developed a number of methods for deciding whether money damages "predominate" in a proposed Rule 23(b)(2) class.  *See* 7AA

13

*Wright & Miller* § 1784.1, text accompanying nn.15–42. These approaches have involved various considerations, including whether damages automatically flowed from a particular form of liability (such as statutory penalties) and whether reasonable plaintiffs would still sue if the potential to recover damages did not exist. *See id*.[4]

The Supreme Court's *Wal-Mart* decision partially resolved the question of the appropriate predominance inquiry, holding that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Wal-Mart*, 564 U.S. at 361. "[I]ndividualized monetary claims [instead] belong in Rule 23(b)(3)." *Id*. at 362.[5]

A proposed class cannot avoid this dichotomy by offering some calculation that extrapolates a supposedly representative individual damages claim to which each class member would be entitled upon a finding of common liability. *Wal-Mart* explicitly rejected such "Trial by Formula," at least where the defendant has made a case that it could have individual defenses to individual class members' claims. 564 U.S. at 367.

Here, Plaintiffs' certification motion entirely ignores the question of whether damages are individualized. For the first time in their reply brief, however, they propose "an inquiry into the average proprietary loss to Plaintiffs" because their alleged losses are "highly uniform—blankets, sleeping bags, papers—[with] some factoring in for the

---

[4] The Tenth Circuit has apparently never declared the appropriate analysis. *See Monreal v. Potter*, 367 F.3d 1224, 1237 n.12 (10th Cir. 2004) (noting competing views but avoiding the question).

[5] Even so, the number and type of individual damages issues may counsel against certification under Rule 23(b)(3). *See Stender v. Archstone-Smith Operating Trust*, 2015 WL 5675304, at *9–12 & n.5 (D. Colo. Sept. 28, 2015).

seizure and destruction of priceless belongings along with the damages for mental and emotional suffering." (ECF No. 59 at 9.) Even assuming this argument is not forfeited for untimeliness, it appears to be precisely the sort of Trial by Formula disapproved of in *Wal-Mart*. Accordingly, the Court may not consider it when evaluating Rule 23(b)(2) certification.

Nonetheless, this Court may certify a class action "with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Thus, nothing prevents the Court from considering the certifiability of Plaintiffs' request for an injunction under Rule 23(b)(2) and the certifiability of Plaintiffs' request for damages under Rule 23(b)(3). *Cf. Aho v. AmeriCredit Fin. Servs., Inc.*, 277 F.R.D. 609, 619–20 (S.D. Cal. 2011) (certifying the plaintiff's declaratory and injunctive claims under Rule 23(b)(2) and plaintiff's monetary claims separately under Rule 23(b)(3)). The Court elects that approach.

### 2.   Rule 23(b)(2)

Rule 23(b)(2) permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "[T]hese requirements demand cohesiveness among class members with respect to their injuries." *D.G.*, 594 F.3d at 1199 (internal quotation marks omitted).

> This cohesiveness, in turn, has two elements. First, plaintiffs must illustrate the class is sufficiently cohesive that any classwide injunctive relief satisfies Rule 65(d)'s requirement that every injunction state its terms specifically; and describe in reasonable detail the act or acts restrained or required. Second, cohesiveness also requires that class members' injuries are sufficiently similar that they can be remedied in a single injunction without differentiating between class members. Rule 23(b)(2)'s bottom line,

15

> therefore, demands at the class certification stage plaintiffs
> describe in reasonably particular detail the injunctive relief
> they seek such that the district court can at least conceive of
> an injunction that would satisfy Rule 65(d)'s requirements,
> as well as the requirements of Rule 23(b)(2).

*Id*. at 1199–200 (citations and internal quotation marks omitted; alterations incorporated).  Under these requirements, "[t]he fact that there is a factual dispute concerning whether the requirement that defendant acted on grounds generally applicable to the class is satisfied will not bar class certification."  7AA *Wright & Miller* § 1775.

As to the first "cohesiveness" element, the Court has no difficulty forecasting the specific terms of an injunction that would remedy Plaintiffs' alleged injury.  The injunction could flatly bar the Sweeps.  Or it could, for example, require Denver to post notices of a certain type with specific language in certain places for a specific amount of time ahead of any Sweep.  The injunction could also establish procedures for handling seized property.  Thus, the first element is satisfied.

As to the second element, Plaintiffs claim that they have had property seized without notice and/or without due process during the Sweeps.  Thus, an injunction with terms such as those just described could remedy their alleged injury and that of the class as a whole.  Plaintiffs have met their burden as to Rule 23(b)(2).  However, given that this analysis excludes retrospective relief (*i.e.*, damages), the class certified under Rule 23(b)(2) must be revised as follows: "All persons in the City and County of Denver whose personal belongings may in the future be taken or destroyed without due process on account of the City and County of Denver's alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an

16

encampment of multiple homeless persons by immediately seizing and discarding the property found there."[6]

    3.    <u>Rule 23(b)(3)</u>

Rule 23(b)(3) permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  As noted above (Part IV.C.1), the Court limits its analysis here to Plaintiffs' damages claim, meaning that any class certified under Rule 23(b)(3) would need to be defined essentially as follows: "All persons in the City and County of Denver whose personal belongings have been taken or destroyed without due process at any time after August 26, 2014 on account of the City and County of Denver's alleged custom or practice (written or written) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by seizing and discarding the property found there."

Plaintiffs proposed for the first time in their reply brief that damages may be calculated through "an inquiry into the average proprietary loss to Plaintiffs, which are highly uniform—blankets, sleeping bags, papers—[with] some factoring in for the seizure and destruction of priceless belongings along with the damages for mental and emotional suffering—all of which are easily ascertained according to testimony and proof."  (ECF No. 59 at 10.)  The Court could deem this argument forfeited.  *See United*

---

[6] Given the alleged injury and the proposed injunctive remedy, this definition need not turn on whether the affected individual is actually homeless at the time of any alleged Sweep. Therefore, the Court has excluded Plaintiffs' proposed language limiting the class definition to those who are or will be homeless.

*States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) (arguments raised for the first time in a reply brief are usually forfeited).  The Court in its discretion reaches the argument anyway and finds that it does not justify Rule 23(b)(3) certification.

Plaintiffs' proposal smacks of the "Trial by Formula" that the Supreme Court rejected in its *Wal-Mart* decision.  To be sure, *Wal-Mart* specifically dealt with certification under Rule 23(b)(2).  Nonetheless, it grounded its reasoning in the Rules Enabling Act's prohibition against federal procedural rules that "'abridge, enlarge or modify any substantive right.'"  *Wal-Mart*, 564 U.S. at 367 (quoting 28 U.S.C. § 2072(b)).  Such a prohibition would appear to apply equally well to any attempt under Rule 23(b)(3) to reduce damages to some sort of average per class member—depriving Denver of the opportunity to challenge any particular class member's claim.

Moreover, even if Plaintiffs' proposed damages formula is appropriate, it could still be overwhelmed by an antecedent question, namely, whether any particular class member actually had property seized and destroyed in one of the Homeless Sweeps— or in other words, whether a claimant actually falls within the class definition. Consistent with due process, the Court can see no legal basis for depriving Denver of an opportunity to make such a challenge.  Accordingly, on this record, individual issues would predominate in any Rule 23(b)(3) damages class, and certification is therefore inappropriate.

The Court is aware, however, that from Plaintiffs' perspective the difficulty Denver might face in challenging a particular class member's claim is due to Denver's own actions.  In other words, if Denver in fact seized and destroyed Plaintiffs' belongings, including forms of identification (as Plaintiffs allege), Denver should not

18

then be able to claim that no Plaintiff can adequately prove his or her membership in

the class for purposes of seeking damages.  If at summary judgment or trial it becomes

clear that Denver behaved as Plaintiffs allege, the Court may reconsider the potential of

a Rule 23(b)(3) damages class.  Thus, the Court's denial of certification in this respect

is without prejudice.

**D.     Rule 23(g)**

Finally, the Court must evaluate the adequacy of class counsel.  In this analysis,

the Court "must consider":

> (i) the work counsel has done in identifying or investigating
> potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other
> complex litigation, and the types of claims asserted in the
> action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing
> the class[.]

Fed. R. Civ. P. 23(g)(1)(A).  Furthermore, this Court "may consider any other matter

pertinent to counsel's ability to fairly and adequately represent the interests of the

class."  *Id.* 23(g)(1)(B).

As to items (i) and (iv) from the "must consider" list, the Court is satisfied that

Plaintiffs' counsel, Mr. Jason Flores-Williams, has spent and will continue to spend

significant time developing this case.  The task of organizing a potential class of

homeless persons is naturally challenging, but Mr. Flores-Williams has obviously put in

much effort and achieved much success, as partially evidenced by the declarations he

has obtained and the number of homeless persons who have attended court

19

proceedings in this case.  The Court is somewhat concerned about Mr. Flores-Williams's financial ability to pursue this case, for reasons explained below, but the Court has no clear evidence of inability at this point.

As for item (ii), regarding Mr. Flores-Williams's experience in class and complex litigation, he represents that he is

> well-qualified having engaged successfully in some of the most challengingly complex litigation in the federal legal system ranging from postconviction death penalty work (AEDPA, Federal Habeas Corpus), capital appeals in Post-Katrina New Orleans to numerous 42 USC Sec. 1983 actions addressing mass solitary confinement and the *ultra vires* behavior of state agencies, international whistleblower defense in which electronic discovery, wikis, metadata, ESI were at issue, lead counsel in a RICO trial with seven defendants and voluminous discovery, asset forfeiture defense, parallel civil-criminal proceedings, air piracy, first degree murder, international extradition, federal Writs of Mandamus navigating constitutional deprivations through the context of U.S. treaties, class action and complex trial work.

(ECF No. 15 at 23–24.)  Mr. Flores-Williams does not attach a resume or any documentation to back up this description, but the Court will accept his statements in the briefing as an officer of the Court.

As for item (iii), and as for the catch-all of "any other [pertinent] matter," the Court has serious concerns.  To begin, Mr. Flores-Williams has frequently displayed ignorance of or dismissiveness towards rules and procedures, as illustrated by the following:

- He filed the certification motion at issue before any attorney for Denver had made an appearance, and used that fact to justify his noncompliance with the obligation to confer under D.C.COLO.LCivR 7.1(a).  (*See* ECF

No. 15-15.)

- He again treated the duty to confer lightly with a discovery-related motion, sending a conferral e-mail to Denver's counsel on a Saturday and then filing the motion on the afternoon of the same day, claiming, "No response." (ECF No. 31 ¶ 7.)

- In the same motion, he simply announced his own interpretation of the duty to confer, with no basis in law. (*Id*.)

- Having elected to file the class certification motion so early in the case, Mr. Flores-Williams then began filing additional or "supplemental" exhibits in support of that motion, but without leave of Court. (*See* ECF Nos. 16, 28, 30.)

Although each of these, in isolation, might be considered a minor infraction, they collectively suggest that Mr. Flores-Williams sees no value in attempting to cultivate a useful working relationship with opposing counsel.

This unwillingness to work cooperatively is further illustrated by Mr. Flores-Williams's response to Denver's motion to dismiss individuals sued in their official capacities. Denver's motion cited long-standing authority for the notion that individuals sued in their official capacities are redundant if the governmental entity for whom they work is also a defendant (as Denver is here). (*See* ECF No. 61 at 3.) Denver's position was essentially irrefutable, but instead of acknowledging as much and choosing not to oppose the motion, Mr. Flores-Williams argued—entirely without relevant authority— that dismissing the individuals sued in their official capacity would mean that any victory on his clients' behalf would look less impressive (because of fewer Defendants) and

21

perhaps would reduce his attorneys' fee award under 42 U.S.C. § 1988.  (*See* ECF No. 63 ¶¶ 1–4.)

Mr. Flores-Williams's approach to that motion mirrors a problem evident in his class certification motion and causes the Court to question his ability to find and present relevant legal authorities.  The certification motion, thankfully, is not entirely devoid of relevant authority, but Mr. Flores-Williams does not help his cause when the very first case cited in his Argument section is *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214 (9th Cir. 2007), which would not be good law even if the Supreme Court had never granted certiorari on the Ninth Circuit's eventual *en banc* decision.[7]  (*See* ECF No. 15 at 15; *see also id*. at 20, 28.)  Even assuming that Mr. Flores-Williams performs his research through a resource (*e.g.*, Google Scholar) that is not integrated with an automatic cite-checking service,[8] it is difficult to conceive how anyone experienced in class action litigation—as Mr. Flores-Williams claims to be (*see id*. at 24)—could see "Dukes" and "Wal-Mart" in a pre-2011 caption and assume without further investigation that any portion of the case remains good law.

---

[7] The 2007 *Wal-Mart* decision that Mr. Flores-Williams cites was withdrawn and superseded by an amended panel opinion.  *See* 509 F.3d 1168 (9th Cir. 2007).  That amended panel opinion was later declared non-citable when the Ninth Circuit elected to hear the case en banc.  *See* 556 F.3d 919 (9th Cir. 2009).  The eventual *en banc* opinion more-or-less agreed with the amended panel opinion, *see* 603 F.3d 571 (9th Cir. 2010), but the *en banc* opinion, of course, was reversed by the Supreme Court in the decision discussed above.

[8] This is the primary reason why the Court questions Mr. Flores-Williams's financial resources.  If he had been using a service such as Westlaw or LexisNexis, it would have been nearly impossible for him to miss the red flag or stop sign icons.  These services are expensive, however, prompting the Court to wonder whether Mr. Flores-Williams has avoided paying that money and has instead relied on free online resources.  The Court cannot fault such thrift, if that is indeed the motive, but it does raise questions generally about his ability to sustain a class-action lawsuit.

The Court is reasonably convinced that all of the foregoing concerns flow from a broader problem.  From his filings, it is unmistakable that Mr. Flores-Williams is thoroughly convinced of the moral righteousness of his clients' cause.  That is not blameworthy in itself.  It is, to the contrary, evidence that he will devote the necessary time and energy to this lawsuit.  In Mr. Flores-Williams's case, however, it manifests itself in troubling ways.  A lawyer likely has no more dangerous blind spot than an inability to see the case from the opposing point of view—a paradigmatic example of "confirmation bias" if there ever was one.  A lawyer who cannot imagine losing the case stands a good chance of losing the case.  Such a lawyer tends to do what Mr. Flores-Williams does, namely, ignore or quickly pass over the opposing party's specific arguments and instead lean on rhetoric intended to shame the opposing party for choosing to oppose.

One example, out of many possible examples, will suffice.  As addressed above, Denver has argued that the proposed class is not sufficiently definite.  As also addressed above, established legal authorities demonstrate that Denver is incorrect in this instance.  But instead of citing those legal authorities, Mr. Flores-Williams responds as follows:

> . . . Defendants[] want the Court to believe that this class is impossible to cognize.
>
> This class was certainly cognizable when Defendants were meticulously planning sweeps and issuing media talking points.  This class certainly was cognizable when the City of Denver used public donations meant for their food, shelter and comfort to deprive them off [*sic*] food, shelter and comfort.  And this class was most certainly cognizable when Defendants sent out a group email saying: "We MUST Take Our River Back!!"

> From who[m]?  Systemic civil rights violations are always replete with this kind of "take-it-back" language.  It is the language of the dominant group that believes this is *their* river, *their* land, *their* country and that the minority group doesn't belong here.  When they say "take our river back" down at the border, they are talking about Latinos.  When they say "take our river back" in Denver, they are talking about the homeless.  But then when the minority group stands up for itself and says *Ya basta*, then ordinances are suddenly benign, law enforcement is class and color blind, there are no homeless people whom the city wants to sweep out of certain areas in the name of business and economic development—the law is just the law.  In the *Loving* case [*i.e.*, *Loving v. Virginia*, 388 U.S. 1 (1967), in which the Supreme Court declared laws prohibiting interracial marriage to be unconstitutional], the state attorney had the temerity to go in front of the Supreme Court and say that the Virginia's law wasn't about race.  Here, it's an attempt to spin facts in a way to make it appear that nothing has been going but the mere enforcement of the law.

> * * *

> Well, sir, it is not your river to take back.  It is the river of truth and justice that belongs to everyone, that flows throughout our best history, and waters the land with human rights and dignity.  If you stop by its banks and quietly listen, you can sometimes hear the old refrain: *this land is your land, this land is my land*….

(ECF No. 59 at 7–8, 10 (record citations omitted; emphasis and ellipses in original).)

Again, the Court does not fault Mr. Flores-Williams for believing so strongly in the righteousness of his clients' cause.  Much good and important work has been done by lawyers with such deep, authentic commitment.  But the Court is genuinely concerned that Mr. Flores-Williams will ultimately do his clients a disservice by failing to take seriously Denver's opposing arguments—or, more fundamentally, losing sight of the fact that lawsuits are decided based on the facts in evidence and legal authorities, and not on rhetoric.

24

Having said all of this, the Court is aware that most of these instances of troubling advocacy come from relatively early in this lawsuit, and Mr. Flores-Williams's more recent filings provide some hope that he is now approaching this case more professionally.  The Court repeats, moreover, that Mr. Flores-Williams has already shown substantial and commendable dedication to the undoubtedly difficult task of organizing a potential class of homeless persons.  He has developed and demonstrated experience in an area where most lawyers (including most plaintiffs' civil rights lawyers) have none.

Ultimately, this is a very close call.  If it were not for Mr. Flores-Williams's unique success in working specifically with the homeless population—in other words, if Mr. Flores-Williams had been seeking to represent a class of laborers or investors or even of prisoners—the Court would have refused to appoint him as class counsel, or at least as sole class counsel.  In these specific circumstances, however, the Court will appoint him as class counsel, trusting that he will take seriously the concerns expressed above and continue to improve his advocacy.

The Court nonetheless *strongly* encourages Mr. Flores-Williams to voluntarily seek class co-counsel now to assist him in the future prosecution of this case.  With this Order, Mr. Flores-Williams is on notice that if the quality of his representation from this point forward continues to display the sorts of deficiencies described above, the Court may *require* him to associate class co-counsel.  *See* Fed. R. Civ. P. 23(g)(1)(E) (empowering court to "make further orders in connection with the appointment [of class counsel]"); *cf. Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (approving district court's decision to remedy a potential conflict of interest by

25

appointing additional class counsel, while permitting original class counsel to remain as such in light of their experience with the case).

## V.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Plaintiffs' Motion for Class Certification (ECF No. 15) is GRANTED IN PART and DENIED IN PART to the extent stated below;

2.    The Court CERTIFIES a class under Federal Rule of Civil Procedure 23(b)(2) defined as follows: "All persons in the City and County of Denver whose personal belongings may in the future be taken or destroyed without due process on account of the City and County of Denver's alleged custom or practice (written or unwritten) of sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there";

3.    Mr. Jason Flores-Williams is APPOINTED as Class Counsel;

4.    Plaintiffs' Motion for Class Certification is DENIED WITHOUT PREJUDICE to the extent Plaintiffs seek damages and/or class certification under Federal Rule of Civil Procedure 23(b)(3); and

5.    Plaintiffs' Motion to Stay Proceedings Pending Adjudication of Plaintiffs' Motion for Class Certification (ECF No. 105) is DENIED AS MOOT.

Dated this 27th day of April, 2017.

BY THE COURT:

William J. Martínez
United States District Judge