**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-2155-WJM-CBS

RAYMOND LYALL, on behalf of himself and all other similarly situated, et al.,

     Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

     Defendant.

---

**MOTION FOR SUMMARY JUDGMENT**

---

     "They look at you with disdain and treat you like you're a third world citizen
instead of a human being with feelings and emotions, you know, wants, needs."

**Exhibit 1**, *Roy Vincent Browne Deposition*, 85:5-10.

1. **Introduction**[1]

     Plaintiff Class Members[2] are homeless residents of Defendant City and County of Denver

("Denver") who have been continuously targeted, and unconstitutionally treated, by Denver and

its officials. Since at least October 2015, Plaintiff Class Members have been subjected to

numerous sweeps, wherein Denver officials seize and discard (or destroy) their property without

adequate notice. Each sweep follows the same pattern. Usually without warning, various Denver

officials (including Denver police officers, Department of Public Works employees, park rangers,

and work-release inmates from the Denver County Jail supervised by deputies from the Denver

Sheriff's Officer) arrive and order Plaintiff Class Members to "move along" with their

---

[1] The following recitation of the facts is supported by the authority cited in Plaintiff Class
Members' Statement of Undisputed Material Facts, *infra* Section 3.
[2] This Court certified Plaintiff Class, under Fed. R. Civ. P. 23(b)(2). *See* [Doc. 106].

belongings. Any property that Plaintiff Class Members cannot carry is seized and thrown immediately into garbage trucks.[3] This has occurred innumerable times since October 2015, but the best documented, orchestrated sweeps took place on December 15, 2015, March 8, 2016, March 9, 2016, July 13, 2016, November 15, 2016, and November 28, 2016.

What is perhaps most unnerving about this case though is the callousness and disdain with which Denver has treated its homeless residents. Denver police officers regularly shouted at homeless individuals that they are not welcome in Denver[4] and should just leave town, all the while providing "protection" for other officials who were taking away Plaintiff Class Members only means of survival. Denver regularly utilized jail inmates to conduct the sweeps, pitting one set of disenfranchised residents against another. Denver police officers seized blankets (and other items necessary for surviving outside during winter) from homeless individuals on nights when temperatures have dipped below freezing and there is snow on the ground, including one of the coldest nights of last winter.[5]

---

[3] Denver continually tries to soften the harsh reality that its officials were throwing Plaintiff Class Members' property directly into the trash by referring to the garbage trucks that were used as "dump" trucks. This Court saw through Denver's marketing ploy at the Class Certification stage, *see* [Doc. 4], and Plaintiff Class Members ask this Court to call the trucks what they are: garbage trucks.

[4] For example, when homeless individuals asked Denver police officers where they should go with their possessions, the officers responded with "Who cares where you go... I don't care... Why did you even come to Denver?" **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 152:19-153:5. Also, police officers would continually taunt Plaintiff Class Members by telling them, while taking their property, that "if the homeless were gone, this would all end." **Exhibit 3**, *Thomas Peterson Deposition*, 116:2-6.

[5] The video of this incident went viral. *See* Rebecca Shapiro, *Denver Mayor Decides Police Probably Shouldn't Confiscate Homeless' Blankets While It's Freezing Out*, HUFFINGTON POST (December 12, 2016), http://www.huffingtonpost.com/entry/denver-mayor-decides-police-shouldnt-confiscate-homeless-blankets-while-its-freezing-out_us_584e685ee4b0e05aded47c52; Morgan Windsor, *Denver PD Defends Officers Who Confiscated Blankets From Homeless*¸ ABC NEWS (December 16, 2016), http://abcnews.go.com/US/denver-pd-defends-officers-confiscated-blankets-homeless/story?id=44236705; Liam Quinn, *Denver police forced to defend officers after they were filmed taking blankets from homeless people on a freezing night*, THE DAILY MAIL

During one sweep, Denver officials descended upon the homeless camped out of sight along the Platte River without notice and ordered them to leave the area, only allowing them to take the possessions that they could carry. Then, reminiscent of a scene from a dystopian science fiction novel,[6] Denver officials began burning Plaintiff Class Members' remaining property with flame throwers. Afterwards, they held a barbeque at the site as the homeless individuals they had just forcefully evicted looked on.[7] While this operation was not, the previous sweeps had been funded by money that was donated by citizens under Denver's promise that it would be used to *help the homeless*.[8] Denver's disdain for its most disadvantaged residents shines through in the undisputed facts of this case.

Plaintiff Class Members ask that this Court enter summary judgment in their favor[9] and for a summary judgment order from this Court holding: (1) Plaintiff Class Members' Fourth Amendment rights were violated by Denver officials in accordance with Denver's customs, policies, and practices; (2) Plaintiff Class Members' Fourteenth Amendment Due Process rights were violated by Denver officials in accordance with Denver's customs, policies, and practices;

---

(December 16, 2016), http://www.dailymail.co.uk/news/article-4041760/Denver-police-forced-defend-officers-took-blankets-homeless-people.html.

[6] *See* Ray Bradbury, *Fahrenheit 451*. Like Guy Montag and the other firemen in *Fahrenheit 451*, Denver is engaging in a type of censorship through the sweeps: it is attempting to wipe any indication that Denver is plagued by the problems that cause homelessness, including a lack of affordable housing, gentrification, and inadequate social programs to help those who are most in need.

[7] Of the systematic, highly coordinated sweeps, this one in particular stands out as the most egregious violation of Plaintiff Class Members' rights: the July 13, 2016 sweep, which was codenamed Operation Riverdance 3. If nothing else, Plaintiff Class Members have demonstrated that they are entitled to summary judgment in their favor based on the coordinated actions of Denver officials during Operation Riverdance 3, which was undertaken in accordance with the customary practices of Denver during the sweeps of the homeless.

[8] Brian Maas, *City Used Donation To Assist With Homeless Sweep*, CBS Denver (June 30, 2016) (uncovering that Denver used $60,000 of funds that were donated to Denver's Road Home, Denver's homeless donation fund, to pay a private contractor to assist with the sweeps).

[9] The Plaintiff Class asks that this Court set a trial on the issue of what remedy is appropriate.

and (3) Plaintiff Class Members' Fourteenth Amendment Equal Protection rights were violated by Denver officials in accordance with Denver's customs, policies, and practices. Plaintiff Class Members ask that this Court uphold that basic constitutional guarantees protect even the most disadvantaged United States citizens.

2. **Statement of Undisputed Material Facts**

   *The Sweeps Generally*

  1.  A sweep of the homeless, which is different than a simple cleanup, involves Denver police officers, and other officials, forcibly removing the homeless from certain areas of the city and seizing all items that each person cannot carry. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 82:3-83:4.

  2.  The sweeps conducted by Denver are patterned and systematic; they are essentially the same in form each time. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 86:8-21.

  3.  Denver's sweeps are pervasively utilized as a strategy of policing homelessness. **Exhibit 4**, *Dr. Anthony Robinson Expert Affidavit,* p. 6, 8-9.

  4.  During each sweep, Denver employees throw the items confiscated from the Plaintiff Class Members into dumpsters and garbage trucks. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 87:9-17.

  5.  During each sweep, members of the Denver Police Department and Denver Public Works Department are present and conducting the sweep. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 91:23-92:14.

  6.  There is almost always a large police presence at the sweeps. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 93:18-94:10.

  7.  Top Denver officials were apprised of, and involved in, the coordination and executions of the sweeps, including Denver Police Chief Robert White, City Council President

Albus Brooks, and City Attorney Scott Martinez. **Exhibit 5**, *January 15, 2016 – Evan Dreyer Email*; **Exhibit 6**, *March 8, 2016 – Jose Cornejo Email*; **Exhibit 7**, *January 21, 2016 – Evan Dreyer Email*; **Exhibit 8**, *Jose Cornejo Deposition*, 41:3-9.

8.      Multiple Denver agencies, including the Denver Police Department, Denver Public Works, and the Mayor's Office coordinated the sweeps. **Exhibit 8**, *Jose Cornejo Deposition*, 19:10-25.

9.      The Office of Denver Mayor Michael Hancock was heavily involved in the coordination of the sweeps and gave the directive to begin conducting the sweep on March 8, 2016. **Exhibit 9**, *March 9, 2016 - Evan Dreyer Email.*

10.     Plaintiff Class Members met with the Mayor Hancock in January 2017 and asked him to stop the sweeps. **Exhibit 10**, *Terese Howard Deposition*, 26:18-28:9, 35:1-6.

11.     Mayor Hancock refused to stop the sweeps and to discuss any potential compromise on the methods that were being used to conduct the sweeps. **Exhibit 10**, *Terese Howard Deposition*, 29:1-22.

12.     Denver purposefully utilized funds from the Homeless Services Donation Fund to pay a private contractor, Custom Environmental Services, $59,509.40 to assist with conducting the sweeps on March 8, 2016 and March 9, 2016. **Exhibit 11**, *February 12, 2016 – Jose Cornejo Email.*

13.     During the sweeps, only flatbed trucks were used to transport property to storage; when garbage trucks were used, they were used to discard property. **Exhibit 8**, *Joe Cornejo Deposition*, 25:10-16.

14.     Prior to a majority of the sweeps, no notice was given to Plaintiff Class Members that the sweeps were occurring. **Exhibit 10**, *Terese Howard Deposition*, 90:13-91:3.

15.     When notice signs were posted, they were posted in places were Plaintiff Class Members would not see it. **Exhibit 10**, *Terese Howard Deposition*, 81:21-82:18, 88:20-89:8.

*The December 15, 2015 Sweep*

16.     On December 15, 2015, at least fifteen Plaintiff Class Members, including named Plaintiff Raymond Lyall, were sleeping outside of the Denver Rescue Mission. **Exhibit 10**, *Terese Howard Deposition*, 184:6-21, 185:16-18.

17.     It was freezing cold and snowing on December 15, 2015. **Exhibit 10**, *Terese Howard Deposition*, 184:6-21; **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 100:15-101:15; **Exhibit 12**, *Raymond Lyall Declaration*, ¶ 8; **Exhibit 13**, *Terese Howard Deposition*, 36:16-24; **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 7.

18.     Denver officials, including Denver police officers, approached Plaintiff Class Members sleeping outside of the Denver Rescue Mission; Denver police officers told Plaintiff Class Members that they had to leave right away and that they could only take, at most, two bags with them and the rest would be taken; there was no notice prior to the sweep occurring. **Exhibit 10**, *Terese Howard Deposition*, 184:6-21, 187:21-188:8.

19.     After giving this command, Denver police officers proceeded to throw Plaintiff Class Members' belongings, including tents, tarps, sleeping bags into the trash. Anything that Plaintiff Class Members couldn't grab quickly and leave with was thrown into the trash. **Exhibit 10**, *Terese Howard Deposition*, 184:6-21, 187:21-188:8.

20.     During the December 15, 2015 sweep, there was not even the guise of storage; all of the property seized from Plaintiff Class Members was summarily discarded. **Exhibit 10**, *Terese Howard Deposition*, 36:16-24, 184:6-21, 187:21-188:8; **Exhibit 12**, *Raymond Lyall Declaration*, ¶ 8; **Exhibit 13**, *Terese Howard Declaration*, ¶ 5; **Exhibit 2**, *Sophia Nathalie*

*Lawson Deposition¸* 117:14-118:17, 125:16-25, 191:21-25; **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 7.

21.     During the entirety of the December 15, 2015 sweep, no Denver police officer checked to see if Plaintiff Class Members were warm or safe, or offered anyone useful services or assistance. **Exhibit 10**, *Terese Howard Deposition*, 186:1-6; **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 7.

22.     No Plaintiff Class Member was given a citation or arrested during the December 15, 2016 sweep. **Exhibit 10**, *Terese Howard Deposition*, 187:9-12.

23.     At least forty members of the Plaintiff Class, including named Plaintiff Raymond Lyall, had their property seized and discarded during the December 15, 2015 sweep. **Exhibit 12**, *Raymond Lyall Declaration*, ¶ 8; **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 7.

24.     Member of the Plaintiff class, Petar L/n/u, was personally effected by the December 15, 2015, sweep. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 114:8-118:17; **Exhibit 15**, *Sophia Lawson Declaration*, ¶ 2.

25.     Officer Craven, of the Denver Police Department, told Petar L/n/u that he would have to pack up all his possessions and move on, on December 15, 2015. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 118:8-17; **Exhibit 15**, *Sophia Lawson Declaration*, ¶ 2.

26.     Petar L/n/u was forced to attempt to pack up all of his belongings and move them from his location on the perimeter of Samaritan House at the corner of Park and Larimer in downtown Denver. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 104:13-107:7, 113:15-116:20.

27.     As Petar L/n/u was hurriedly attempting to pack up all his life's possessions, he was pleading with Officer Craven to please give him more time to pack his things. **Exhibit 2**,

*Sophia Nathalie Lawson Deposition¸* 117:14-118:17; **Exhibit 15**, *Sophia Lawson Declaration*, ¶ 2.

28.     As Petar L/n/u was packing up his things to the best of his ability, Officer Craven and another city worker began disposing of Petar L/n/u's property into a garbage truck. *Sophia* **Exhibit 2**, *Nathalie Lawson Deposition¸* 125:16-25, 191:21-25; **Exhibit 15**, *Sophia Lawson Declaration*, ¶ 2.

29.     Petar L/n/u was only able to pack up a small number of his property into a small bag. After he packed this small bag full of his property, Officer Craven and another city worker threw the rest of Petar L/n/u's property into a garbage truck. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 120:11-123:23, 191:21-25; **Exhibit 15**, *Sophia Lawson Declaration*, ¶ 2.

30.     Another member of Plaintiff Class, who was confined to a wheelchair, had all of his belongings seized by Denver Police Officers and discarded in a garbage truck.  **Exhibit 16**, *Carmon Romaro Declaration*, ¶ 1; **Exhibit 17**, *Carmon Romaro Deposition*, 39:19-40:16, 42:8-23, 48:19-52:8.

31.     The Plaintiff Class Member confined to the wheelchair who had his belongings seized and discarded was also arrested. When he got out of jail, none of his belongings were returned to him. **Exhibit 16**, *Carmon Romaro Declaration*, ¶ 1; **Exhibit 17**, *Carmon Romaro Deposition*, 39:19-40:16, 42:8-23, 48:19-52:8.

32.     Fred Jackson, a member of the Plaintiff Class, had a few of his blankets seized and discarded during the December 15, 2015 sweep. **Exhibit 18**, *Frederick Jackson Deposition*, 140:3-11, 148:3-8.

33.     Sophia Nathalie Lawson witnessed the aftermath of the December 15, 2015, sweep. She described seeing medication, documents (including food stamp documentation, housing applications, identification cards, birth certificates, social security cards, and social

security paperwork), wet blankets, eyeglasses, and pieces of tent shelters left in the wake of the sweep that displaced Members of the Plaintiff Class. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 104:13-110:16.

 *The March 8, 2016 and March 9, 2016 Sweeps*

 34. There were hundreds of Plaintiff Class Members present in the area near Park Avenue, Larimer Street, and Lawrence Street during the sweep that occurred on March 8, 2016. **Exhibit 10**, *Terese Howard Deposition*, 158:18-159:2; **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 137:19-23.

 35. Denver officials did not put up any notice signs in the areas where the sweeps were conducted prior to the sweeps on March 8, 2016 and March 9, 2016. **Exhibit 8**, *Jose Cornejo Deposition*, 62:20-63:11; **Exhibit 8A**, *Jose Cornejo Deposition Exhibit 24*; **Exhibit 19**, *Ligeia A. Craven Deposition*, 35:24-26:2.

 36. Denver Public Works employees and inmates from the Denver Jail seized the property of Plaintiff Class Members, including sleeping bags, blankets, and other items necessary to survive living in the streets. **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 5-6.

 37. Denver Police Department officers helped carry out the sweep on March 8, 2015. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 149:10-150:4; **Exhibit 19**, *Legeia A. Craven Deposition*, 37:1-2, 39:4-19.

 38. During the March 8, 2015 sweep, which occurred during the late morning hours, officers cordoned off the entire area surrounding Samaritan House and did not allow Plaintiff Class Members to retrieve their property. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 147:6-9, 149:10-150:151:19.

39.     Inmates were present during the March 8, 2016 sweep and participated in it in some capacity. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 158:13-18; **Exhibit 20**, *Alexandra Lynn Binder Deposition*, 30:11-18.

40.     During the sweep on March 8, 2016, Denver Police officers were observed taunting Plaintiff Class Members, saying to them "Who cares where you go... I don't care... Why did you even come to Denver?" **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 152:19-153:5.

41.     During the sweep on March 8, 2016, Denver officials were seizing the property of Plaintiff Class Members and throwing it into the back of garbage trucks. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 154:13-23; **Exhibit 10**, *Terese Howard Deposition*, 160:17-161:2.

42.     Multiple members of the Plaintiff Class had their property seized during the March 8, 2016 sweep, including named Plaintiff Thomas Peterson. **Exhibit 10**, *Terese Howard Deposition*, 1621:25-166:7.

43.     No one was issued a citation or arrested during the March 8, 2016 sweep. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 151:20-22; **Exhibit 19**, *Ligeia A. Craven Deposition*, 40:24-41:7.

44.     Denver officials seized property from Plaintiff Class Members during the March 8, 2016 sweep, including tents, backpacks, and blankets. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 167:20-23.

45.     During the March 8, 2016 sweep Denver Public Works officials threw the property they seized from Plaintiff Class Members into garbage trucks. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 167:24-168:2; **Exhibit 21**, *Michael McCown Deposition*, 9:24-10:8, 15:7-10; **Exhibit 22**, *Alexandra Binder Declaration*, ¶ 2.

46.     Questions from Plaintiff Class Members regarding how they could reclaim their property after the March 8, 2016 sweep were not answered by Denver officials, including Denver

police officers and Denver Public Works officials, during the sweep. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 171:1-172:2.

47.   Denver officials seized all of Plaintiff Class Members property that was within the vicinity of Samaritan House during the March 8, 2016, sweep, whether that property had been abandoned or not. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 175:7-176:17.

48.   During the March 8, 2016 sweep, one Plaintiff Class Member put her backpack down for a short period of time and it was seized. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 175:7-176:17. Another individual left his shopping cart with an outreach advocate; when the outreach worker turned her back to help another Plaintiff Class Member, the shopping cart was seized. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 159:6-161:2, 175:7-15.

49.   The sweeps that were executed by Denver were extremely traumatic to members of the Plaintiff class. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*, 178:1-20. One Plaintiff Class Member, Freddie L/n/u, was so distressed during one of the sweeps that he began self-harming as he spoke to an outreach worker. Freddie stated that he was so distressed because "[t]hey want me to disappear." **Exhibit 2**, *Sophia Nathalie Lawson Deposition*, 178:10-13. Another Plaintiff Class Member, Petar L/n/u, was "visibly broken" by the seizure of his belongings. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*, 192:11-193:3.

50.   A number of items were unattended during the March 8, 2016 sweep by individuals who were at work during the time that the sweep was conducted. **Exhibit 23**, *David Peachey Deposition*, 22:19-23:6.

51.   The location that the property seized during the March 8, 2015 sweep was to be kept upon its seizure was only communicated to the outreach workers tasked with communicating to the Plaintiff Class the morning of the sweep. **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 131:9-13.

52.     The discretion of what unattended items were trash to be thrown away, and what items would be sent to storage, was completely in the discretion of Denver officials who were conducting the sweeps on March 8, 2016 and March 9, 2016. **Exhibit 23**, *David Peachey Deposition,* 23:7-25, 31:13-25; **Exhibit 22**, *Alexandra Lawson Declaration*, ¶ 3. This resulted in a items that had importance to Plaintiff Class Members being thrown away, including memorabilia, paperwork needed for medical care, medicines, artwork, and personal journals. **Exhibit 12**, *Raymond Lyall Declaration*, ¶ 9.

53.     Inmates were part of the crew, which included officials from various departments of Denver (including Waste Management, Public Works, and the Denver Police Department), that conducted the sweeps on March 8, 2016 and March 9, 2016. **Exhibit 23**, *David Peachey Deposition*, 25:19-22.

54.     During the March 9, 2016 sweep, Garry Anderson, a named Plaintiff and member of the Plaintiff Class, had his property, including roughly $500 in tools that he used to woodwork for a living, seized and discarded by Denver police officers while he was out job hunting for a few hours. **Exhibit 24**, *Garry Anderson Deposition*, 110:16-117:6, 119:1; **Exhibit 25**, *Garry Anderson Declaration*, ¶ 4.

55.     The Denver Police Department participated in the March 8, 2016 and March 9, 2016 sweeps. **Exhibit 23**, *David Peachey Deposition*, 29:1-14.

56.     If unattended property was taken during the March 8, 2016 and March 9, 2016 sweeps, Denver officials would not leave a notice telling the individual how, when, and where he or she could retrieve his or her property. **Exhibit 8**, *Jose Cornejo Deposition*, 60:3-17; **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 6.

57.     Denver continued the sweep on March 9, 2016. **Exhibit 10**, *Terese Howard Deposition*, 176:8-177:10.

58.     Plaintiff Class Members were not given warning prior to the March 9, 2016 sweep that their property would be seized. **Exhibit 25**, *Garry Anderson Declaration*, ¶ 4.

59.     During the March 9, 2017 sweep, Denver police officers threatened Plaintiff Class Members by saying that if they didn't pick up all of their belongings and move on, they would seize all of the person's property. **Exhibit 10**, *Terese Howard Deposition*, 178:9-19.

60.     Denver officials seized Plaintiff Class Members property on March 9, 2016. **Exhibit 10**, *Terese Howard Deposition*, 179:4-181:7.

61.     The belongings that were seized on March 9, 2016 by Denver officials were thrown into garbage trucks. **Exhibit 10**, *Terese Howard Deposition*, 181:8-14.

62.     No one was arrested or received a citation during the March 9, 2016 sweep. **Exhibit 10**, *Terese Howard Deposition*, 182:2-8.

<u>*The March 25, 2016 Seizure of Thomas Peterson's Property*</u>

63.     On March 25, 2016, Denver officials seized Thomas Peterson's, a named Plaintiff and Plaintiff Class Member, property while he was eating breakfast at the Denver Rescue Mission. **Exhibit 26**, *Thomas Peterson Declaration*, ¶ 5; **Exhibit 3**, *Thomas Peterson Deposition*, 90:21-97:1.

64.     Mr. Peterson tracked down the Denver officials who seized his belongings. **Exhibit 3**, *Thomas Peterson Deposition*, 94:23-96:9.

65.     The Denver officials who had seized his belongings were walking down Lawrence Street, seizing other homeless individuals' belongings and throwing them into the back of a garbage truck. **Exhibit 3**, *Thomas Peterson Deposition*, 95:1-20.

66.     When Mr. Peterson asked the Denver officials who seized his belongings if he could have them back, they told him no and to just move on. **Exhibit 3**, *Thomas Peterson Deposition*, 96:6-24.

67.     Of the property that Denver officials seized on March 25, 2016, were Mr. Peterson's military records, a laptop, pictures of his children, phone, clothes, bedding, and blankets. **Exhibit 3**, *Thomas Peterson Deposition*, 97:14-21; **Exhibit 26**, *Thomas Peterson Declaration*, ¶ 5.

68.     When Mr. Peterson attempted to retrieve his property at 1221 Glenarm Place, the location that he had been told by a Denver official his property would be taken, he was told by a Denver Police Officer that they did not have his property. **Exhibit 26**, *Thomas Peterson Declaration*, ¶ 6; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*.

*The Arkins Court Sweep (31st Street-29th Street and Arkins) - Operation Riverdance 3 - July 13, 2016*

69.     After being swept out of downtown by the March 8, 2016 and March 9, 2016 sweeps, many members of the Plaintiff Class moved to the banks of the Platte River and the street adjacent, near the corner of 31st Street-29th Street and Arkins Court. **Exhibit 10**, *Terese Howard Deposition*, 127:15-128:3.

70.     The sweep that occurred on July 13, 2016 at 31st Street-29th Street and Arkins Court, and along the Platte River, was named Operation Riverdance 3. **Exhibit 21**, *Michael McCown Deposition*, 51:5-11.

71.     Prior to Operation Riverdance 3, Jeff Shoemaker, head of The Greenway Foundation, sent an email to influential members of the Mayor's Office, Denver Public Works, and the Denver City Council, stating "As I know you will endorse – we MUST take OUR River back[.]" **Exhibit 28**, *July 12, 2016 – Jeff Shoemaker Email*.

72.     There were approximately one hundred homeless individuals sleeping at Arkins Court and along the Platte River on July 13, 2016.  **Exhibit 10**, *Terese Howard Deposition*, 148:23-149:17.

73.     Plaintiff Class Members were camping on the South Platte River, between the South Platte River bike trail and the river, near the intersection of 31st Street and Arkins Court during July 2016. **Exhibit 1**, *Roy Vincent Browne Deposition*, 65:22-66:25.

74.     Specifically, at least fifty Plaintiff Class Members were camping at this location from July 1, 2016 until they were swept out of the location on July 13, 2016. **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 41:10-18, 45:10-15.

75.     At approximately 6:00 a.m., roughly one dozen Denver police officers and park rangers woke up Plaintiff Class Members and told them that they had only ten minutes to gather their property and leave the area. **Exhibit 1**, *Roy Vincent Browne Deposition*, 68:4-24.

76.     Denver police officers participated in Operation Riverdance 3. **Exhibit 19**, *Ligeia A. Craven Deposition*, 47:16-24.

77.     Denver Waste Management, which is a subdivision of Denver, dispatched employees and garbage trucks to conduct Operation Riverdance 3. **Exhibit 21**, *Michael McCown Deposition*, 18:4-11.

78.     Denver park rangers also helped conduct Operation Riverdance 3. **Exhibit 30**, *Eric Knopinski Deposition*, 31:11-32:13.

79.     One of the Plaintiff Class Members was disabled and confined to a wheelchair, making it impossible for her and her husband to gather their property beyond the "bare essentials" during Operation Riverdance 3. **Exhibit 1**, *Roy Vincent Browne Deposition*, 68:7-14; **Exhibit 31**, *Mary Dotson Declaration*, ¶ 2.

80.     The only trucks that were present at Operation Riverdance 3 were garbage trucks. **Exhibit 23**, *David Peachey Deposition*, 45:9-46:1; **Exhibit 1**, *Roy Vincent Browne Deposition*, 70:13-19; **Exhibit 19**, *Ligeia A. Craven Deposition*, 68:3-10.

81.     There were no flatbed trucks meant for storing property present at Operation Riverdance 3. **Exhibit 23**, *David Peachey Deposition*, 45:9-46:1; **Exhibit 19**, *Ligeia A. Craven Deposition*, 68:3-10.

82.     While the police officers completed the sweep (by forcing Plaintiff Class Members to leave the area and seizing their belongings), the officers told Plaintiff Class Members that they were conducting the sweeps because of complaints. The officers were rude, belligerent, and treated Plaintiff Class Members like they were "animals." **Exhibit 1**, *Roy Vincent Browne Deposition*, 71:2-8.

83.     At least one officer threatened Plaintiff Class Members with arrest if they did not quickly leave the area. **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 97:16-98:11.

84.     As Plaintiff Class Members attempted to gather the rest of their belongings, Denver police officers stopped Plaintiff Class Members and told them to leave. **Exhibit 1**, *Roy Vincent Browne Deposition*, 72:2-14, 76:6-18.

85.     Plaintiff Class Members stood by and watched as a cleanup crew took a number of their belongings and threw them into garbage trucks. **Exhibit 1**, *Roy Vincent Browne Deposition*, 72:15-22; **Exhibit 21**, *Michael McCown Deposition*, 15:7-12.

86.     Some members of the cleanup crews that conducted the sweep in July 2016, seizing Plaintiff Class Members' property and throwing it into garbage trucks, were inmates from the Denver jail who were supervised by the Denver Sheriff's Office. **Exhibit 1**, *Roy Vincent Browne Deposition*, 72:23-73:9.

87.     During the Platte River Sweep, multiple Plaintiff Class Members reported that Public Works officials were burning Plaintiff Class Members' property. **Exhibit 1**, *Roy Vincent Browne Deposition*, 73:18-74:10; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 74:9-22, 75:2-9, 80:20-85:11.

88.     During the sweep, Denver Public Works officials utilized flamethrowers that incinerated Plaintiff Class Members' property that they were not allowed to gather. **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 74:9-22, 75:2-9, 80:20-85:11; **Exhibit 31**, *Mary Dotson Declaration*, ¶ 2.

89.     Plaintiff Class Members received no notice prior to Operation Riverdance 3. **Exhibit 1**, *Roy Vincent Browne Deposition*, 74:14-17; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 74:9-22, 74:23-75:9.

90.     Denver park rangers did not distribute any notice prior to Operation Riverdance 3. **Exhibit 30**, *Eric Knopinski Deposition*, 27:5-10, 46:13-15.

91.     No one was cited for a violation of law during Operation Riverdance 3. **Exhibit 30**, *Eric Knopinski Deposition*, 46:16-17; **Exhibit 19**, *Ligeia A. Craven Deposition*, 64:17-23, 65:6-14.

92.     Property of Plaintiff Class Members that was seized (and destroyed) during Operation Riverdance 3 included a photo album (containing irreplaceable photographs of one Plaintiff Class Member's deceased mother), a necklace, blankets, tarps, and extra clothes. **Exhibit 1**, *Roy Vincent Browne Deposition*, 37:15-20, 39:17-40:20, 74:18-75:3; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 42:8-43:18, 77:22-78:2.

93.     Plaintiff Class Members were unable to retrieve the property that Denver officials had seized and thrown into garbage trucks during Operation Riverdance 3. **Exhibit 1**, *Roy Vincent Browne Deposition*, 78:2-7.

94.     During the sweep, Denver officials told Plaintiff Class Members that they were simply following the orders of Mayor Hancock in conducting the sweep, seizing Plaintiff Class Members' property, and forcing them to leave the area. **Exhibit 1**, *Roy Vincent Browne Deposition*, 101:24-102:5.

95.     Denver officials did not discuss storage of property prior to Operation Riverdance 3 among themselves or with any other city official, including Denver police officers. **Exhibit 21**, *Michael McCown Deposition*, 21:18-24, 22:21-23:4; **Exhibit 19**, *Ligeia A. Craven Deposition*, 50:13-51:23.

96.     Denver officials did not store any property in connection with Operation Riverdance 3. **Exhibit 21**, *Michael McCown Deposition*, 30:14-31:4, **Exhibit 20**, *Eric Knopinski Deposition*, 47:8-18; **Exhibit 19**, *Ligeia A. Craven Deposition*, 59:8-60:8.

97.     Denver officials affirmatively decided not to store any property that was seized during Operation Riverdance on July 13, 2016, because Denver officials believed that in the past after sweeps no one had retrieved seized items. **Exhibit 21**, *Michael McCown Deposition*, 30:14-31:4.

98.     Denver officials seized any property that was remaining after the Plaintiff Class was forced out of their location along the Platte River and discarded it, throwing it into garbage trucks with no plan to store it. **Exhibit 21**, *Michael McCown Deposition*, 32:4-23, 33:6-14; **Exhibit 19**, *Ligeia A. Craven Deposition*, 59:8-60:8, 72:22-73:10.

99.     Denver officials discarded the property that was seized during Operation Riverdance 3 because it was deemed "useless" or not "serv[ing] a purpose" by Denver officials. **Exhibit 21**, *Michael McCown Deposition*, 32:4-23.

100.     After seizing and discarding Plaintiff Class Members' property during Operation Riverdance 3, Denver officials held a barbeque across the street from, and in plain view of, Plaintiff Class Members. **Exhibit 21**, *Michael McCown Deposition*, 33:15-34:21.

101.     The Operation Riverdance 3 was the third sweep of the Platte River that was performed by Denver and its officials. **Exhibit 21**, *Michael McCown Deposition*, 51:5-11.

102.    Even if there was notice posted prior to Operation Riverdance 3, the notice posted did not contain any information regarding where those who had their property seized could retrieve their property and looked like this:



**Exhibit 20**, *Eric Knopinski Deposition*, 51:17-25; **Exhibit 32**, *Eric Knopinski Declaration*, Ex. A.

*The November 15, 2016 Sweep*

103.    There were approximately one hundred and fifty Plaintiff Class Members present during the November 15, 2016 sweep. **Exhibit 10**, *Terese Howard Deposition*, 95:19-96:7.

104.    On November 15, 2016, approximately twenty Denver police officers arrived outside of the Denver Rescue Mission in the morning to conduct a sweep. **Exhibit 10**, *Terese Howard Deposition*, 98:11-100:10.

105.     The Denver police officers stood by and provided security while a private waste removal company, Custom Environmental Services, and inmates from the Denver Jail who were supervised by the Denver Sheriff's Office took any property that Plaintiff Class Members could not carry and threw it into garbage trucks. **Exhibit 10**, *Terese Howard Deposition*, 98:24-100:11.

106.     During the November 15, 2016 sweep, Denver police officers told Plaintiff Class Members that they needed to leave the area immediately and take their belongings or else they were going to have all of their belongings seized and potentially face a ticket, or the active enforcement of the camping ban. **Exhibit 10**, *Terese Howard Deposition*, 99:22-100:11.

107.     During the November 15, 2016 sweep, Denver officials did not hand out any type of claim form, which would have allowed for those who had their property taken to retrieve it from storage. **Exhibit 10**, *Terese Howard Deposition*, 123:21-25.

### The November 28, 2016 Sweep

108.     During the fall and winter of 2016, particularly during the end of November 2016, Denver police officers forced Plaintiff Class Members who were camped outside of Samaritan house at the corner of Park Avenue and Lawrence Street to pack up their belongings and move daily. Every morning two Denver police officers would come and wake up Plaintiff Class Members and tell them to pack up their belongings. If a Plaintiff Class Member could not pack up all of his or her belongings, the Denver police officers would seize them. **Exhibit 1**, *Roy Vincent Browne Deposition*, 48:6-49:8.

109.     When officers would seize items from Plaintiff Class Members, they would place the items into trash cans. **Exhibit 1**, *Roy Vincent Browne Deposition*, 49:9-50:11.

110.     During the November 28, 2016 sweep, Denver police officers told Plaintiff Class Members that they had a choice: either leave right now and have all of your belongings taken or

go to jail and have all of your belongings taken. **Exhibit 10**, *Terese Howard Deposition*, 117:1-118:8.

111.    Jerry Burton, was one of the many Plaintiff Class Members who had their property taken on November 28, 2016; Mr. Burton had his tent, sleeping bag, and blankets seized by Denver officials. **Exhibit 10**, *Terese Howard Deposition*, 117:1-118:8, 221:18-21.

112.    Denver police officers seized property from Mr. Burton and told him that they were seizing it from him as evidence that he had violated the Camping Ban. **Exhibit 10**, *Terese Howard Deposition*, 125:9-16.

113.    When Denver officials seized Plaintiff Class Members property on November 28, 2016, some of the property was placed into green bins that were loaded onto flatbed trucks, some property was thrown into garbage trucks and discarded, and some of the property was collected by Denver police officers as evidence of violation of the Camping Ban. **Exhibit 10**, *Terese Howard Deposition*, 125:20-126:4.

114.    What property was placed into storage and what property was discarded was completely arbitrary and Denver officials had sole discretion as to what was discarded and what was stored. **Exhibit 10**, *Terese Howard Deposition*, 126:10-19.

        *The Policies Regarding Systemic Sweeps Along Cherry Creek and Platte River*

115.    Denver park rangers regularly seize and discard property along Cherry Creek and the Platte River that is seemingly unattended. **Exhibit 30**, *Eric Knopinski Deposition*, 12:13-13:9.

116.    If property is unattended when the Denver park rangers who patrol Cherry Creek and the Platte River come across it two days in a row, at the same time of day, they discard the property. **Exhibit 30**, *Eric Knopinski Deposition*, 13:17-14:10.

117.    The only time that Denver park rangers will store property that is seemingly unattended is if they make a discretionary determination that the property has value. **Exhibit 30**, *Eric Knopinski Deposition*, 13:6-16.

118.    The most common property that Denver park rangers have confiscated and discarded along Cherry Creek and the Platte River are clothes, blankets, and sleeping bags. **Exhibit 30**, *Eric Knopinski Deposition*, 15:7-23.

119.    The notices posted by Denver park rangers along Cherry Creek and the South Platte River state that all items not removed in 24 hours will be "remove[d] and dispose[d] of" by Denver officials; they say nothing about storage or how to retrieve seized items. **Exhibit 30**, *Eric Knopinski Deposition*, 15:24-16:1, 11:21-12:1; **Exhibit 32**, *Knopinski Declaration*, Ex. A.

120.    If Denver park rangers had previously observed an individual at a site along Cherry Creek or the Platte River with his or her property and, upon returning to the site, that individual was no longer present but his or her property was still there, Denver park rangers would seize and destroy the property. **Exhibit 30**, *Eric Knopinski Deposition*, 17:17-18:2.

121.    When Denver park rangers seize property along Cherry Creek and the Platte River, they do not leave a notice that indicates to those whose property has been seized where they can retrieve the seized property. **Exhibit 30**, *Eric Knopinski Deposition*, 54:4-8.

*Plaintiff Class Members' Inability to Retrieve Items After the Sweeps*

122.    Even though Plaintiff Class Members were told after a few of the sweeps that they could come to retrieve their items from 12:00 p.m. to 2:00 p.m. at a specific location, when Plaintiff Class Members showed up to retrieve their items no city officials were present. **Exhibit 1**, *Roy Vincent Browne Deposition*, 40:15-20.

123.    Even when Plaintiff Class Members had tickets that had been given to them by Denver officials, they were unable to retrieve their property because there was no one working

during the times that Plaintiff Class Members were told by Denver that they could come to retrieve their seized property. **Exhibit 1**, *Roy Vincent Browne Deposition*, 48:6-16.

124.    The storage facility was supposed to be open from 12:00 p.m. until 2:00 p.m. daily from Monday through Friday. **Exhibit 23**, *David Peachey Deposition*, 36:12-21.

125.    Two Plaintiff Class Members, Roy Browne and Mary Dotson, who had their property seized by Denver officials, attempted to retrieve their seized property approximately twelve to thirteen times during the hours Denver had posted as the proper time to retrieve property. Mr. Browne went to the address listed on the ticket given to him by Denver officials when they seized his property, which was located near Arkins and 31st in Denver, approximately a week after his property had been seized. Each time, Mr. Browne showed up, there was no one present to give him his property. Mr. Browne would knock on the door and ring the doorbell of the building that Plaintiff Class Members were told to go to in order to retrieve their property, but no one ever answered the door. Eventually, after attempting to retrieve his property twelve to thirteen times over the course of approximately thirty days, Mr. Browne gave up as there was no other way listed on the ticket for Mr. Browne to retrieve his seized property. **Exhibit 1**, *Roy Vincent Browne Deposition*, 51:11-25, 54:25-56:21, 57:9-58:9; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 16:10-17:7, 94:14-20.

126.    The property that Denver officials seized from Mr. Browne, which they did not make available for retrieval, filled two large bins and included blankets, tarps, and a rolling suitcase. **Exhibit 1**, *Roy Vincent Browne Deposition*, 53:23-54:24; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 95:1-9.

127.    Even when staff was present at the retrieval facility, Plaintiff Class Members were unable to retrieve their belongings. **Exhibit 3**, *Thomas Peterson Deposition*, 111:18-116:6; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*.

128.    Thomas Peterson, a Plaintiff Class Member, attempted to retrieve his belongings that were taken during the March 8, 2016 sweep on March 25, 2016. **Exhibit 10**, *Terese Howard Deposition*, 166:15-167:12; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*.

129.    When Mr. Peterson was attempting to retrieve his belongings, he described them in detail to the worker at the facility. At one point, Mr. Peterson saw a backpack that appeared to be his being retrieved by the individual working at the storage facility. Mr. Peterson told the individual working at the storage facility that he believed that this was his backpack. However, the individual at the storage facility would not return Mr. Peterson's backpack to him. Mr. Peterson eventually left the facility without any of his belongings, because the Denver officials working at the facility told him that they did not have his belongings. **Exhibit 10**, *Terese Howard Deposition*, 170:15-171:8; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*.

130.    After the November 28, 2016 sweep, one Plaintiff Class Member, Jerry Burton, attempted to retrieve his belongings from the storage facility designated by Denver. **Exhibit 10**, *Terese Howard Deposition*, 110:10-14.

131.    When Mr. Burton attempted to retrieve his belongings, he was asked for identification, which he did not have because he is a homeless individual. **Exhibit 10**, *Terese Howard Deposition*, 110:15-24.

132.    Mr. Burton was then asked to describe every item that was taken from him in perfect detail, where it was taken, and when it was taken. **Exhibit 10**, *Terese Howard Deposition*, 110:16-111:6.

133.    Even after giving all of this information, Mr. Burton did not receive all of his property back from Denver. **Exhibit 10**, *Terese Howard Deposition*, 110:16-111:6.

> *Plaintiff Class Members' Property Was Not Seized Incident to Arrest or Criminal Activity*

134.     It is not a crime for Plaintiff Class Members to occupy a public sidewalk, as long as they are not blocking pedestrians right of way. **Exhibit 19**, *Ligeia Craven Deposition*, 68:24-69:6.

135.     While members of the Plaintiff Class were camped on the sidewalks throughout Denver, and particularly at the corner of Park Avenue and Lawrence Street, they camped in a way that ensured passage along the sidewalk was not blocked (always making sure to leave a path for those using the sidewalk to walk on) and kept their area clean and neat. **Exhibit 1**, *Roy Vincent Browne Deposition*, 47:3-19, 50:23-51:3.

### The Property Seized by Denver Had Value and Was Not Refuse

136.     Members of the Plaintiff Class lost irreplaceable property during the sweeps, including family heirlooms and pictures of deceased immediate family members. **Exhibit 1**, *Roy Vincent Browne Deposition*, 20:17-24.

137.     It is often difficult to replace lost or seized property necessary for survival, such as blankets, tarps, and tents. **Exhibit 1**, *Roy Vincent Browne Deposition*, 41:7-11.

## 3. **Argument**

The Plaintiff Class moves for summary judgment. Denver is municipally liable for the violation of Plaintiff Class Members' Fourth and Fourteenth Amendment rights. Denver has a custom, policy, and practice of seizing homeless individuals' property without providing sufficient notice, destroying seized property, leaving the discretion as to what property should be destroyed and what property should be stored up to low-level officials, and failing to provide an adequate process for Plaintiff Class Members to retrieve seized property that has not been destroyed. Additionally, by conducting sweeps aimed at pushing homeless individuals out of the city and targeting the homeless, Denver's policies, customs, and practices have caused the violation of Plaintiff Class Members' Fourteenth Amendment rights. Denver's discriminatory

treatment of the homeless does not pass constitutional muster. Plaintiff Class asks that their motion for summary judgment be granted because, viewing the uncontroverted evidence in the light most favorable to Denver, there is no genuine issue of material fact and the Plaintiff Class is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### 3.1 *The standard of review applied to motions for summary judgment.*

As the moving party, the Plaintiff Class has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden has been met, the nonmoving party, Denver, must come forward and establish specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "Although a party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact, a nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Rose-Matson v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998). The undisputed facts in this matter show that Denver customarily violated the constitutional rights of its homeless residents, the Plaintiff Class.

### 3.2 *Denver is municipally liable for the violation of Plaintiff Class Members' constitutional rights.*

Municipalities are "persons" subject to suit under 42 U.S.C. § 1983 for civil rights violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality or other local government unit is liable for constitutional torts if the alleged unconstitutional acts implicate a policy, practice, or custom of the local government. *Id.* at 690-94. A municipality, like Denver, is responsible under § 1983 when the execution of a policy or custom actually caused an injury of constitutional dimensions. *Id.* at 694; *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176, 1187 (10th Cir. 1990). To ultimately prevail on their claim against Denver, Plaintiff Class

Members must establish "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Commr's*, 151 F.3d 1313, 1316 (10th Cir. 1998). Based on the undisputed facts in the record, taken in the light most favorable to Denver, Plaintiff Class Members have established both elements of *Monell* liability.

### 3.3 *Denver officials violated the Plaintiff Class' Fourth Amendment rights.*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend IV. The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'. . . A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

### 3.3(a) <u>Plaintiff Class Members have a possessory interest in their unabandoned property</u>.

Fourth Amendment protections attach to unattended property and the Supreme Court has clearly held that an individual has a possessory interest in unattended personal property located in a public area. *Soldal v. Cook Cty.*, 506 U.S. 56, 63-64 (1992) (citation omitted). Numerous courts have held that "[t]he Fourth Amendment protects . . . homeless individuals' retreats, regardless how ramshackle." *Cobine v. City of Eureka*, No. C 16-02239 JSW, 2016 U.S. Dist. LEXIS 58228, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016); *Lavan v. City of L.A.*, 693 F.3d 1022, 1030 (9th Cir. 2012) ("[B]y seizing and destroying [homeless individuals'] unabandoned legal papers, shelters, and personal effects, the City meaningfully interfered with Appellees' possessory interests in that property"); *Pottinger v. Miami*, 810 F. Supp. 1551, 1570-73 (S.D. Fla. 1992) ("In sum, the property of homeless individuals is due no less protection under the fourth

amendment than that of the rest of society."); *See v. City of Fort Wayne*, No. 1:16-cv-00105-JVB-SLC, 2016 U.S. Dist. LEXIS 185598, at *21 (N.D. Ind. June 16, 2016) ("The personal property of See, a homeless person, is entitled to Fourth Amendment protection."); *Acosta v. City of Salinas*, No. 15-cv-05415 NC, 2016 U.S. Dist. LEXIS 50515, 2016 WL 1446781, at *5 (N.D. Cal. April 13, 2016). Denver officials' customary seizure of Plaintiff Class Members' property during the sweeps implicates the Fourth Amendment.

   3.3(b) <u>Denver officials unreasonably seized, discarded, and destroyed Plaintiff Class Members' property.</u>

   Seizures of property are unlawful if they are unreasonable. *Jacobsen*, 466 U.S. at 113. A seizure is deemed unreasonable if the government's legitimate interest in the search or seizure does not outweigh the individual's interest in the property seized. *See Edmundson v. City of Tulsa*, 152 F. App'x. 694, 698 (10th Cir. 2005) ("In determining whether a government seizure violates the Fourth Amendment, the seizure must be examined for its overall reasonableness."). Numerous courts have held that seizing homeless individuals' property, whether attended or unattended, without notice and discarding (or destroying) it is unreasonable and violates the Fourth Amendment. *See e.g., Lavan*, 693 F.3d at 1029; *Acosta*, 2016 U.S. Dist. LEXIS 50515, at *5; *See*, 2016 U.S. Dist. LEXIS 185598, at *21; *Pottinger*, 810 F. Supp. at 1570-73; *Kincaid v. City of Fresno*, No. 1:06-cv-1445 OWW SMS, 2006 U.S. Dist. LEXIS 93464, at *94 (E.D. Cal. Dec. 8, 2006).

   The evidence shows that it was pervasive for Denver officials to conduct sweeps of the homeless without notice, wherein any property Plaintiff Class Members could not carry was discarded (or summarily destroyed). *See* **Exhibit 30**, *Eric Knopinski Deposition*, 27:5-10, 46:13-15; *Roy Vincent Browne Deposition*, 74:14-17; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 74:9-22, 74:23-75:9. And no one was arrested during these sweeps, so these seizures of Plaintiff

Class Members property cannot be accounted for as incident to arrest.[10] *See* **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 87:18-19, 151:20-22; **Exhibit 30**, *Eric Knopinski Deposition*, 46:16-17.

For example, there was no notice posted or distributed prior to Operation Riverdance 3. **Exhibit 30**, *Eric Knopinski Deposition*, 27:5-10, 46:13-15. Then, as the sweep commenced, Plaintiff Class Members were given little time to gather their belongings; a number of Plaintiff Class Members were only able to save a handful of their property. **Exhibit 1**, *Roy Vincent Browne Deposition*, 78:2-7. Denver officials then either: threw Plaintiff Class Members' property directly into garbage trucks[11] or used flamethrowers to burn their property. **Exhibit 1**, *Roy Vincent Browne Deposition*, 37:15-20, 39:17-40:20, 72:15-22, 73:18-74:10, 74:18-75:3; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 42:8-43:18, 77:22-78:2, 74:9-22, 75:2-9, 80:20-85:11;

---

[10] Even if the Court were to assume, that Plaintiff Class Members had violated the obstruction ordinance by neatly keeping their property on city sidewalks (a conclusion that is contradicted by the evidence, *see* **Exhibit 1**, *Roy Vincent Browne Deposition*, 47:3-19, 50:23-51:3), the seizure and destruction of Appellees' property remains subject to the Fourth Amendment's reasonableness requirement. Violation of a city ordinance does not vitiate the Fourth Amendment's protection of one's property. Indeed, the Supreme Court has recognized protected possessory interests even in contraband. For example, in *Jacobsen*, the Court found that the government's testing of illegal cocaine (which resulted in the destruction of a portion of the cocaine) was a "seizure" that "affect[ed] respondents' possessory interests protected by the [Fourth] Amendment, since by destroying a quantity of the powder it converted what had been only a temporary deprivation of possessory interests into a permanent one." 466 U.S. at 124-125. Moreover, the Fourth Amendment protected the cocaine from unreasonable seizures despite the lack of any reasonable expectation of privacy in concealing the contraband nature of the powder. *See id.* at 123 ("Congress has decided . . . to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine . . . compromises no legitimate privacy interest."). Here, by seizing (and discarding or destroying) Plaintiff Class Members' unabandoned property, Denver meaningfully interfered with Plaintiff Class Members' possessory interests in that property. No more is necessary to trigger the Fourth Amendment's reasonableness requirement.

[11] Garbage trucks were the only trucks on scene. **Exhibit 23**, *David Peachey Deposition*, 45:9-46:1; **Exhibit 1**, *Roy Vincent Browne Deposition*, 70:13-19; **Exhibit 19**, *Ligeia A. Craven Deposition*, 68:3-10. There were no flatbed trucks on scene, which had previously been used to (in theory, but not in practice) store Plaintiff Class Members property. **Exhibit 23**, *David Peachey Deposition*, 45:9-46:1; **Exhibit 19**, *Ligeia A. Craven Deposition*, 68:3-10.

**Exhibit 31**, *Mary Dotson Declaration*, ¶ 2; **Exhibit 21**, *Michael McCown Deposition*, 15:7-12. No Plaintiff Class Member was so much as cited for a violation of law during Operation Riverdance 3, let alone arrested. **Exhibit 20**, *Eric Knopinski Deposition*, 46:16-17.

It was also customary for Denver officials who seized and discarded the property of Plaintiff Class Members outside of their presence to not leave any notice that the property had been seized, who had seized it, and whether it could be retrieved. **Exhibit 30**, *Eric Knopinski Deposition*, 54:4-8; **Exhibit 8**, *Jose Cornejo Deposition*, 62:20-63:11; **Exhibit 8A**, *Jose Cornejo Deposition Exhibit 24*; **Exhibit 19**, *Ligeia A. Craven Deposition*, 35:24-26:2. The times that Denver officials did leave notice, the notice was deficient; it simply stated that all seized items would be discarded and summarily destroyed, but provided no opportunity for Plaintiff Class Members to contest the seizure or retrieve their possessions. **Exhibit 30**, *Eric Knopinski Deposition*, 15:24-16:1, 11:21-12:1; **Exhibit 32**, *Knopinski Declaration*, Ex. A.

Moreover, even when property was seized by Denver officials under the pretense that it would be stored and made available for retrieval, this pretense turned out to be false and Plaintiff Class Members were not allowed to retrieve their belongings (presumably because they had been destroyed). **Exhibit 1**, *Roy Vincent Browne Deposition*, 40:15-20, 48:6-16; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*.

Given the totality of the above-outlined actions by Denver officials, the seizure of Plaintiff Class Members property violated the Fourth Amendment. "The destruction of property by state officials poses as much of a threat, if not more, to people's right to be secure in their effects as does the physical taking of them." *San Jose Charter of Hells Angels Motorcycle Club v. San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) (internal quotation marks and citations omitted); *see Jacobsen*, 466 U.S. at 124-125 ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory

interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'").The government cannot simply destroy property that it deems is in violation of some law or ordinance because "[w]ere it otherwise, the government could seize and destroy any illegally parked car or unlawfully unattended dog without implicating the Fourth Amendment." *Lavan*, 693 F.3d at 1029.

Adding to the unreasonableness of Denver officials' seizure of Plaintiff Class Members' property is that the discretion of what property was trash (and should be summarily destroyed) and what property should be stored was completely in the discretion of Denver officials. **Exhibit 23**, *David Peachey Deposition,* 23:7-25, 31:13-25; **Exhibit 10**, *Terese Howard Deposition*, 126:10-19; **Exhibit 22**, *Alexandra Lawson Declaration*, ¶ 3. The evidence in the record shows that what Denver officials considered garbage many Plaintiff Class Members considered valuable possessions. *See* **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 114:8-118:17; **Exhibit 15**, *Sophia Lawson Declaration*, ¶ 2; **Exhibit 16**, *Carmon Romauro Declaration*, ¶ 1; **Exhibit 12**, *Raymond Lyall Declaration*, ¶ 9.

Furthermore, Denver officials' seizure of Plaintiff Class Members property has been (and continues to be) particularly unreasonable because of the heightened possessory interest Plaintiff Class Members, as homeless individuals, have in their possessions. The loss of personal effects may pose a minor inconvenience for many citizens, but "the loss can be devastating for the homeless." *Pottinger*, 810 F. Supp. at 1559. As such, courts have recognized that homeless persons "have a compelling ownership interest in their personal property, especially given the vulnerability of [] homeless residents[.]" *Acosta*, 2016 U.S. Dist. LEXIS 50515, at *8 (alteration in original) (citation and internal quotation marks omitted); *see also Lavan*, 693 F.3d at 1031-32; *Martin v. City & Cty. of Honolulu*, No. 15-00363 HG-KSC, 2015 U.S. Dist. LEXIS 135071, 2015 WL 5826822, at *8 (D. Haw. Oct. 1, 2015). The property seized during a sweep may be all

that a homeless individual has, and may include personal papers, social security cards, and medicines, as well as unique and irreplaceable property, such as photographs of deceased family members. *See Kincaid*, 2006 U.S. Dist. LEXIS 93464, at *33. The seizure of shelter, bedding, and clothing makes it more difficult for a homeless person to survive and also affects his ability to obtain and maintain employment, which in turn, is key to his effort to end his condition of homelessness. *Id.* Other courts balancing the hardships in similar cases have further observed that the "destruction of the property of the homeless has a devastating effect on the dignity of homeless people, who live a precarious existence and then are knocked down even lower from this destruction." *Id.*

Ultimately, it is clear from the incontrovertible evidence that Denver officials violated Plaintiff Class Members' Fourth Amendment rights by unreasonably seizing and discarding (or destroying) their attended (and unattended) property.

### 3.4 *Denver officials violated Plaintiff Class Members' Fourteenth Amendment due process rights.*

The Fourteenth Amendment provides that no government actor shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Any significant taking of property by the State is within the purview of the Due Process Clause." *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).

> Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of "life, liberty or property"; if protected interests are implicated, we then must decide what procedures constitute "due process of law."

*Ingraham v. Wright*, 430 U.S. 651, 672 (1977); *see also Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006).

The Supreme Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents v. Roth*, 408 U.S. 564, 571-72 (1972). As demonstrated *supra* Section 4.3(a), Plaintiff Class Members had a property interest in their possessions, both attended and unattended. *See also Lavan*, 693 F.3d at 1031-33 ("[T]his case concerns the most basic of property interests encompassed by the due process clause: [homeless individuals'] interest in the continued ownership of their personal possessions."); *Hooper v. City of Seattle*, No. C17-0077RSM, 2017 U.S. Dist. LEXIS 20829, at *23-24 (W.D. Wash. Feb. 14, 2017) ("The Court further recognizes that because unhoused persons' unabandoned possessions are "property" within the meaning of the Fourteenth Amendment, the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them.").

When Denver officials seized Plaintiff Class Members' property, they violated Plaintiff Class Members' due process rights in four separate ways: (1) Denver officials provided no (or deficient) notice prior to seizing their property, (2) Denver officials failed to provide any prior opportunity for Plaintiff Class Members to contest the seizure of their property, (3) Denver officials summarily discarded (and destroyed) Plaintiff Class Members' property without any process for challenging the discarding (or destruction), and (4) post-deprivation, Denver officials did not provide an adequate process for Plaintiff Class Members to challenge the seizure of their property or, alternatively, to retrieve their property.

> 3.4(a) <u>Denver officials failed to provide Plaintiff Class Members constitutionally adequate notice prior to seizing their property.</u>

If there is a basic tenet of due process it is that "the government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir.

2008). "This simple rule holds regardless of whether the property in question is an Escalade or an EDAR, a Cadillac or a cart." *Lavan*, 693 F.3d at 1032.  Supreme Court precedent "establish[es] the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993).

Customarily, Denver officials provided no notice to Plaintiff Class Members prior to seizing their property during the sweeps. **Exhibit 20**, *Eric Knopinski Deposition*, 27:5-10, 46:13-15; **Exhibit 1**, *Roy Vincent Browne Deposition*, 74:14-17; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 74:9-22, 74:23-75:9; **Exhibit 8**, *Jose Cornejo Deposition*, 62:20-63:11; **Exhibit 8A**, *Jose Cornejo Deposition Exhibit 24*. The failure to provide any notice prior to seizure of the unabandoned property, even when that property belongs to homeless individuals, violates due process guarantees. *See Lavan*, 693 F.3d at 1032.

Even when Denver officials did provide notice, however, the notice explicitly stated that Plaintiff Class Members' property would be removed and disposed of, and provided no information about a procedure for contesting the seizure or retrieving property. **Exhibit 20**, *Eric Knopinski Deposition*, 15:24-16:1, 11:21-12:1; **Exhibit 32**, *Knopinski Declaration*, Ex. A. Courts have found that, even when notice was provided, when that notice does not allow for post-deprivation process or a means of retrieving the property, the notice violates the Fourteenth Amendment. For example, in *Russell v. City and County of Honolulu*, No. 13-cv-00475 LEK (RLP), 2013 U.S. Dist. LEXIS 169114, 2013 WL 6222714, *6-*7, (D. Haw. Nov. 29, 2013), the City of Honolulu had provided notices to the homeless plaintiffs prior to seizing their property but the court found that the

> Summary Removal Notices that [the plaintiffs] received after the removal of their property . . . did not inform them that they could reclaim their necessities without paying the fee and without a hearing, nor did the notices inform them that they

could seek a waiver of the fee from the hearings officer if the fee was onerous for them.

*Id.*, at *14. The Court found that such notices did not meet the requirements of the Fourteenth Amendment's due process guarantee. *Id.*, at *14-18. Likewise, the notices given to Plaintiff Class Members in this case provided no method to contest the seizure of their property or to seek retrieval; in fact, the notices informed Plaintiff Class Members that their property would be summarily destroyed. The notice used by Denver officials was and is deficient and provides an independent basis for this Court to determine that Denver officials violated Plaintiff Class Members' Fourteenth Amendment rights.

        3.4(b) <u>Denver officials failed to give Plaintiff Class Members an opportunity to be heard prior to seizing their property.</u>[12]

"The root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest" *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985).[13] Exceptions to this rule are only justified in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Fuentes,* 407 U.S. at 82 (quotations omitted). In *Fuentes,* the Supreme Court held that the loss of kitchen appliances and household furniture was significant enough to warrant a pre-deprivation hearing. 407 U.S. at 70-71. And in *Connecticut* v. *Doehr*, 501 U.S. 1 (1991), the Court held that a state statute authorizing prejudgment attachment of real estate without prior notice or hearing was unconstitutional, in the

---

[12] Due process requires more than the availability of post-deprivation state law remedies where the actions of officials are authorized (as they are here) by the customs, policies, and practices of a government. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); *Easter House v. Felder*, 879 F.2d 1458, 1467 (7th Cir. 1989).

[13] *See also Zinermon v. Burch*, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.").

absence of extraordinary circumstances, even though the attachment did not interfere with the owner's use or possession and did not affect, as a general matter, rentals from existing leaseholds. The Ninth Circuit in *Stypmann v. City & County of San Francisco*, 557 F.2d 1338 (9th Cir. 1977), held that an ordinance regarding the towing and storage of illegally parked cars was unconstitutional, in part because it provided that someone who could not pay the towage fee could obtain a post-deprivation hearing.

The seizure of a homeless individuals' property produces a far greater deprivation than the loss of furniture, a vehicle, or even attachment. Homeless individuals' property, which includes items necessary for survival on the streets (such as blankets, tents, tarps, and jackets), is most analogous to real property, which the Supreme Court has held cannot be seized (absent exigent circumstances) without first holding a pre-deprivation hearing. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 54 (1993); *see also* 26 U. S. C. §§ 6212, 6213, 6851, 6861 (prohibiting the government from levying upon a deficient taxpayer's property without first affording the taxpayer notice and an opportunity to a hearing).

Plaintiff Class Members were not provided with a pre-deprivation hearing prior to the seizure and discarding (or destruction) of their property during every documented sweep. *See* **Exhibit 1**, *Roy Vincent Browne Deposition*, 68:4-24, 72:2-14, 76:6-18, 15:7-12, 74:14-17; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 74:9-22, 75:2-9, 80:20-85:11; **Exhibit 21**, *Michael McCown Deposition*, 21:18-24, 22:21-23:4, 30:14-31:4; 32:4-23, 33:6-14; **Exhibit 30**, *Eric Knopinski Deposition*, 47:8-18; **Exhibit 25**, *Garry Anderson Declaration*, ¶ 4; **Exhibit 2**, *Sophia Nathalie Lawson Deposition*¸ 147:6-9, 149:10-150:151:19, 175:7-176:17; **Exhibit 14**, *Jerry Roderick Declaration*, ¶ 5-7.

Denver's decision to forego any process before permanently depriving Plaintiff Class Members of protected property interests is especially troubling given the vulnerability of its

homeless residents: "For many of us, the loss of our personal effects may pose a minor inconvenience. However, . . . the loss can be devastating for the homeless." *Pottinger*, 810 F. Supp. at 1559. Denver's failure to provide pre-deprivation process to Plaintiff Class Members violated (and continues to violate) their Fourteenth Amendment Due Process rights.

> 3.4(c) <u>Denver officials' summary disposal (or destruction) of Plaintiff Class Members property violated Plaintiff Class Members' due process rights.</u>

"[T]he State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan*, 455 U.S. at 434. The incontrovertible evidence in the record demonstrates that Denver officials customarily disposed of (and destroyed) Plaintiff Class Members' property after seizing it, without providing Plaintiff Class Members with any opportunity to be heard. **Exhibit 21**, *Michael McCown Deposition*, 21:18-24, 22:21-23:4, 30:14-31:4; 32:4-23, 33:6-14.[14] Allowing such egregious action would "create an exception to the requirements for belongings of homeless persons," *Lavan*, 693 F.3d. at 1039, and relegate them to second-class citizens which other courts have rejected. *See id.*; *see also See*, 2016 U.S. Dist. LEXIS 185598, at \*21; *Pottinger*, 810 F. Supp. at 1570-73. Denver officials' summary destruction of Plaintiff Class Members' property is blatantly unconstitutional.

> 3.4(d) <u>Denver officials did not provide Plaintiff Class Members with an adequate procedure for challenging the seizure of their property, or to retrieve their property, after it had been taken.</u>

Due process requires law enforcement "to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999). Customarily, Defendant's officials did not provide any way for Plaintiff Class Members to challenge the seizure of, or retrieve, their belongings

---

[14] [Jason Flores-Williams] Q: So to be clear, your crew picked up the things that were left behind? // [Michael McCown] A: Yes. // Q: And what did you do with them? // A: We threw them in the back of a trash truck. Q: No storage or anything? // A: No.

post-deprivation. The notice that was distributed stated that all property found unattended would be destroyed. And in practice even property that was attended was destroyed.

Even when Plaintiff Class Members were informed that their property would be stored and available for retrieval, in practice Plaintiff Class Members had no recourse to retrieve their property. At least one Plaintiff Class Member attempted to retrieve his belongings, only to be told that they were not in storage. **Exhibit 3**, *Thomas Peterson Deposition*, 111:18-116:6; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*. Another Plaintiff Class Member went multiple times to the location that Defendant's officials said was designated for storage, and during the hours he was given to retrieve his property, only to find that there was no one at the facility. **Exhibit 1**, *Roy Vincent Browne Deposition*, 40:15-20.

Denver official's actions are not in compliance with Due Process guarantees. For example, in *Russell*, 2013 U.S. Dist. LEXIS 169114, at *27, the court found that a system that provided for a post-seizure hearing procedure was unconstitutional. Denver does not even have a post-deprivation procedure; instead, Denver officials seize property and destroy it or seize it under the auspices of storing it while in reality discarding it, making this case analogous to *Lavan*, where Los Angeles officials seized homeless individuals' property and summarily destroyed them with no post-deprivation process. Denver, like Los Angeles, "failed utterly to provide any meaningful opportunity to be heard. . . after it seized and destroyed property belonging to [the] homeless population." 693 F.3d. at 1033; *see also See*, 2016 U.S. Dist. LEXIS 185598, at *21 ("This lack of a post-deprivation process where homeless persons have the opportunity to reclaim seized property, when coupled with just a 48-hour advance notice of a cleanup, raises serious due process questions, particularly where there is no designation of a "safe area" to which homeless persons could move their property during a cleanup[.]").

By not providing Plaintiff Class Members with a means to retrieve their property, Denver officials violated their Fourteenth Amendment Due Process rights.

### 3.4(e) DENVER MUN. CODE § 38-86.2 ("the Camping Ban") does not provide for the forfeiture of property.

Simply put, the Camping Ban does not provide for the forfeiture of property. *See* DENVER MUN. CODE § 38-86.2.  Even if Denver had seized Plaintiff Class Members' possessions in accordance with the Fourth Amendment, which it did not, due process requires law enforcement "to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return." *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999). Without a forfeiture provision, Denver cannot simply seize Plaintiff Class Members' property on the basis of the Camping Ban.

And even if DENVER MUN. CODE § 38-86.2 provided for forfeiture of property, which it does not, Denver is required to provide procedural protections before permanently depriving Plaintiff Class Members of their possessions. *See Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) ("An agency . . . violates the Due Process Clause of the Fourteenth Amendment when it prescribes and enforces forfeitures of property '[w]ithout underlying [statutory] authority and competent procedural protections.'") (quoting *Vance v. Barrett*, 345 F.3d 1083, 1090 (9th Cir. 2003)). Because homeless persons' unabandoned possessions are "property" within the meaning of the Fourteenth Amendment, Denver must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them. *See James Daniel Good Real Prop.*, 510 U.S. at 48 ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property."). Enforcement of DENVER MUN. CODE § 38-

86.2 does not shield Denver officials from liability for their violation of Plaintiff Class Members'

Fourteenth Amendment rights.

      3.5 ***Denver officials violated the Fourteenth Amendment's Equal Protection clause.***

      The Equal Protection clause of the Fourteenth Amendment prohibits any state from

"denying to any person within its jurisdiction the equal protection of the laws." U.S. Const.

amend. XIV. In other words, it requires that all persons similarly situated be treated alike. *City of*

*Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985). It is clear that the sweeps have

targeted homeless individuals and that the sweeps have been just one means that Denver has used

in its attempt to drive the homeless from the city. *See e.g.*, **Exhibit 4**, *Dr. Anthony Robinson*

*Expert Affidavit,* p. 6, 8-9; **Exhibit 28**, *July 12, 2016 – Jeff Shoemaker Email*. There is ample

evidence in the record of Denver officials open disdain for the homeless and the intended effect

of the sweeps.[15] The evidence demonstrates that Denver chose to pursue the sweeps "at least in

part 'because of' . . . its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v.*

*Feeney*, 442 U.S. 256, 279 (1979).

      When government actions discriminate on the basis of a suspect classification, they are

subject to strict scrutiny and will be sustained only if they are "suitably tailored to serve a

compelling state interest." *City of Cleburne,* 473 U.S. at 439. A classification is suspect if it is

directed to a "discrete and insular minority." *United States v. Carolene Products Co.,* 304 U.S.

144, 152 (1938).

---

[15] For example, when homeless individuals asked Denver police officers where they should go with their possessions, the officers responded with "Who cares where you go... I don't care... Why did you even come to Denver?" **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 152:19-153:5. Also, police officers would continually taunt Plaintiff Class Members by telling them, while taking their property, that "if the homeless were gone, this would all end." **Exhibit 3**, *Thomas Peterson Deposition*, 116:2-6.

3.5(a) <u>Homeless individuals are a suspect or quasi-suspect class.</u>[16]

The creation of quasi-suspect and suspect classes in Equal Protection jurisprudence is based on a judicial recognition that certain groups have suffered historical discrimination under American law and need special constitutional protection from the majoritarian political processes that may continue to disfavor them. In accordance with Supreme Court precedent, when determining whether a classification should be treated as "suspect" or "quasi-suspect" the four factors that courts traditionally analyze are:

> A) whether the class has been historically "subjected to discrimination,"; B) whether the class has a defining characteristic that "frequently bears [a] relation to ability to perform or contribute to society[]"; C) whether the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group;" and D) whether the class is "a minority or politically powerless."

*United States v. Windsor*, 699 F.3d 169, 181 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotation marks and citations omitted). Of these considerations, the first two are the most important. *See id.* ("Immutability and lack of political power are not strictly necessary factors to identify a suspect class."). Plaintiff Class meets these requirements.

First, the homeless have suffered a long history of deep-seated discrimination. *See e.g., Papachristou v. City of Jacksonville*, 405 U.S. 156, 161-62 (1972) (charting the development of vagrancy laws); Harry Simon, *Towns Without Pity: A Constitutional and Historical Analysis of Official Efforts to Drive Homeless Persons from American Cities,* 66 TUL.

---

[16] *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969) ("[A] careful examination on our part is especially warranted where lines are drawn on the basis of wealth or race, two factors which would independently render a classification highly suspect and thereby demand a more exacting scrutiny.") (citations omitted); *James v. Valtierra*, 402 U.S. 137, 144 (1971) (Marshall, J., dissenting) ("It is far too late in the day to contend that the Fourteenth Amendment prohibits only racial discrimination; and to me, singling out the poor to bear a burden not placed on any other class of citizens tramples the values that the Fourteenth Amendment was designed to protect.").

L. REV. 631, 635-45 (1992) (tracing the history of "official attempts to punish and control the displaced poor," noting that between the seventh and beginning of the twentieth century, more than two-hundred statutes against vagrancy existed in England); Robert Teir, *Maintaining Safety And Civility In Public Spaces: A Constitutional Approach To Aggressive Begging,* 54 LA. L. REV. 292-300 (1993) (chronicling anti-vagrancy and like laws from classical Athens to modern times). The homeless are also likely to be segregated because of their condition into "remote, stigmatizing institutions," *Cleburne Living Ctr.,* 726 F.2d at 197, like public shelters. The homeless have been subject to discrimination and should be afforded heightened protection under the law.

Second, homeless status does not bear on an individual's ability to perform in or contribute to society. This is borne out by the facts of this case. Plaintiff Class Members hold jobs, are military veterans, and pay taxes. They are fathers, brothers, sisters, and sons. Denver has not identified any other context in which it might be appropriate for the government to treat people differently based on their homeless status.

Third, homelessness is an "obvious, immutable, or distinguishing" characteristic of personal that defines homeless people as a discrete group. *Windsor*, 699 F.3d at 181. There is no requirement that a characteristic be immutable in a literal sense in order to trigger heightened scrutiny. Heightened scrutiny applies to classifications based on alienage and "illegitimacy," even though "[a]lienage and illegitimacy are actually subject to change." *Windsor*, 699 F.3d at 183 n.4; *see Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting the argument that alienage did not deserve strict scrutiny because it was mutable). In a capitalist society that is by definition ordered around property ownership and wealth, homelessness is an obvious, immutable, and distinguishing characteristic.

Fourth, homeless people lack political power to "adequately protect themselves from the discriminatory wishes of the majoritarian public." *Windsor*, 699 F.3d at 185. In today's version of American democracy one thing is clear: money is power. *See Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010). Homeless individuals lack both. *See* Tom McGhee, *Colorado House committee rejects Homeless Bill of Rights*, DENVER POST (February 24, 2016). Further, if the limited successes homeless people have had in the political arena were sufficient to disqualify a group from the protection of heightened scrutiny, then the Supreme Court would not have applied such scrutiny to sex-based classifications in 1973. By then, Congress had already passed Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963 to protect women from discrimination in the workplace. *Frontiero v. Richardson*, 411 U.S. 677, 687-88 (1973). Yet, the plurality applied heightened scrutiny in *Frontiero*, and the Court has continued to do so. The repeated use of majoritarian direct democracy to disadvantage a single minority group is extraordinary in our nation's history. Barbara S. Gamble, *Putting Civil Rights to a Popular Vote*, 41 AM. J. POL. SCI. 245, 257-60 (1997); *see also* Donald P. Haider-Markel et al., *Lose, Win, or Draw? A Reexamination of Direct Democracy and Minority Rights*, 60 POL. RES. Q. 304, 307 (2007). As political power has been defined by the Supreme Court for purposes of heightened scrutiny analysis, homeless people do not have it.

In short, classifications based on homelessness demand heightened scrutiny, not just under the two most critical factors, but under all four factors that the Supreme Court has used to identify suspect or quasi-suspect classifications.[17] The homeless have been subjected to a history

---

[17] Bolstering this conclusion are two Supreme Court decisions holding that it is a well-established violation of Equal Protection clause to deny the poor basic procedural protections because of their inability to pay. *See Douglas v. California*, 372 U.S. 353, 357-58 (1963); *Griffin v. Illinois*, 351 U.S. 12, 17-20 (1956).

of unequal treatment and Plaintiff Class Members ask that this case take one small step to rectify that history.

3.5(b) <u>Denver's potential justifications will fail any standard of review</u>.

Laws that burden a fundamental right or treat citizens differently based on a suspect or quasi-suspect classification are subject to heightened scrutiny and presumed unconstitutional. Other classifications are upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993). Plaintiff Class Members will not presume Denver's reasons for targeting homeless individuals and unlawfully seizing their property, but no reasons that could be advanced by Denver could pass constitutional muster. Plaintiff Class Members plan to address Denver's inevitable justifications for its conduct in their Reply.

### 3.6 *Denver's customs and practices were the moving force behind the violation of Plaintiffs' constitutional rights.*

A policy, custom, or practice for purposes of *Monell* liability can be established in many ways, including demonstrating the existence of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted). The evidence demonstrates that Denver had multiple customs that violated Plaintiff Class Members' constitutional rights. The multiple unconstitutional actions undertaken at each sweep are illustrative of the customs and practices of Denver. Each sweep was a long-planned

44

coordination of multiple agencies (including the Denver Police Department, Denver Public Works, Denver Waste Management, Denver Park Rangers, and the Denver Sheriff's Office). None of the actions taken during the sweeps was the result of an official operating outside of official custom or policy. The sweeps were systematic and the actions taken by Denver officials in the execution of the sweeps constitutes official Denver custom, policy, and practice.

4.6(a) <u>Denver's multiple unconstitutional customs and practices.</u>

To show that a challenged practice is a "custom," the practice must be so "persistent and widespread" that it "constitutes the standard operating procedure of the local governmental entity." *Mitchell v. City & Cnty. of Denver*, 112 F. App'x 662, 672 (10th Cir. 2004) (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)) (internal quotation marks omitted). A municipal custom may also be comprised of "a series of decisions by a subordinate [governmental] official of which the supervisor [was] aware." *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) (plurality opinion)). As established by the evidence, Denver has multiple unconstitutional customs and practices.

First, Denver has a custom and practice of seizing homeless individuals' property and summarily (or subsequently) discarding (or destroying) it. Multiple Denver officials testified that during Operation Riverdance 3, an operation that was planned by Denver and carried out according to that plan, Plaintiff Class Members property was seized and summarily destroyed. **Exhibit 21**, *Michael McCown Deposition*, 15:7-12, 32:4-23, 33:6-14; **Exhibit 30**, *Eric Knopinski Deposition*, 47:8-18. Denver officials did not even bring flatbed trucks, which had been used for the storage of property, to Operation Riverdance 3, which demonstrates that the plan was to summarily discard and destroy property. **Exhibit 23**, *David Peachey Deposition*, 45:9-46:1. This is especially concerning given that this was the third sweep Denver had conducted along the riverfront. **Exhibit 21**, *Michael McCown Deposition*, 51:5-11. Denver had not evolved or altered

the sweeps to comply with the mandates of the constitution and, in fact, the sweeps have become less constitutional as they have progressed: one official testified that during Operation Riverdance 3, which was conducted after the March 8th and 9th sweeps, Denver officials affirmatively decided not to store any property that was seized because they had been (wrongly) informed that no one had attempted to retrieve their property after previous sweeps. *Id.*, 30:14-31:4.

Second, Denver has a custom and practice of seizing homeless individuals' property without adequate notice or a post-deprivation process for retrieving their property. One Denver official testified that he had handed out "thousands" of deficient notices, **Exhibit 30**, *Eric Knopinski Deposition*, 16:8-12, which did not provide for either a pre-deprivation or post-deprivation opportunity for Plaintiff Class Members to be heard prior to their property being destroyed. *Id.*, 15:24-16:1, 11:21-12:1, 51:17-25; **Exhibit 32**, *Knopinski Declaration*, Ex. A. A Denver official even admitted that there had been no notice distributed prior to one of the meticulously planned sweeps conducted by Denver. **Exhibit 30**, *Eric Knopinski Deposition*, 27:5-10, 46:13-15. Even when Denver officials seized property under the auspices of storing it, based on the evidence in the record it is clear that there was no way for Plaintiff Class Members to retrieve the property. **Exhibit 1**, *Roy Vincent Browne Deposition*, 40:15-20, 48:6-16; **Exhibit 27**, *Thomas Peterson Attempted Retrieval Video*. It was and is clearly Denver custom and practice to seize homeless individuals' property without providing adequate notice or a post-deprivation process for retrieving their property.

Third, Denver has a custom and practice of giving complete discretion to its low-level officials as to what constitutes property that should be stored and what property should be discarded (or destroyed). Multiple Denver officials testified that they had complete control in determining what property of Plaintiff Class Members is trash and what property of Plaintiff

Class Members should be stored (during the sweeps that seized property was allegedly being placed into storage). **Exhibit 30**, *Eric Knopinski Deposition*, 13:6-16; **Exhibit 21**, *Michael McCown Deposition*, 32:4-23; **Exhibit 23**, *David Peachey Deposition,* 23:7-25, 31:13-25; **Exhibit 22**, *Alexandra Lawson Declaration*, ¶ 3. Denver officials had complete discretion to determine if Plaintiff Class Member's property was "useless" or not "serv[ing] a purpose" and, if it was deemed as such, to discard it. **Exhibit 21**, *Michael McCown Deposition*, 32:4-23. This custom or practice caused the seizure and summary destruction of Plaintiff Class Members' valuable, and priceless, property.

Fourth, Denver has a custom and practice of intentionally targeting the homeless by seizing their property and only utilizing "move along" orders towards them. Denver's sweeps are pervasively utilized as a strategy of policing homelessness. **Exhibit 4**, *Dr. Anthony Robinson Expert Affidavit,* p. 6, 8-9.

High-level Denver officials, including the Mayor, City Attorney, and City Council President, were involved in the planning of the sweeps and were aware of the actions taken during the sweeps, including the above outlined customs and practices. *See* **Exhibit 5**, *January 15, 2016 – Evan Dreyer Email*; **Exhibit 6**, *March 8, 2016 – Jose Cornejo Email*; **Exhibit 7**, *January 21, 2016 – Evan Dreyer Email*; **Exhibit 9**, *March 9, 2016 - Evan Dreyer Email.* The sweeps were patterned and systematic. **Exhibit 2**, *Sophia Nathalie Lawson Deposition¸* 86:8-21. Denver officials in seizing and discarding homeless individuals' property, allowing low-level officials complete discretion to determine what is trash, providing inadequate notice, and intentionally targeting the homeless were doing so in accordance with the deliberate plan put into place by Denver to sweep the homeless out of downtown. In fact, Denver officials told Plaintiff Class Members during the sweeps that they were simply following the order of Mayor Hancock when seizing and discarding Plaintiff Class Members' property. **Exhibit 1**, *Roy Vincent Browne*

*Deposition*, 101:24-102:5. It is indisputable that each sweep was carried out in accordance with a plan that Denver itself, through its high-level officials, put into place and approved of.

3.6(b) <u>Denver's illegal customs and practices caused the violation of Plaintiff Class Members constitutional rights.</u>

It is also clear that these methodically planned operations caused the violation of Plaintiff Class Members constitutional rights. Operation Riverdance 3, wherein Denver officials seize and summarily destroyed homeless individuals' property without providing any notice, is the prime example of a deliberate plan of action by Denver that caused the violation of Plaintiff Class Members' Fourth and Fourteenth Amendment rights.[18]

Further, multiple Denver officials testified that they acted precisely as Denver trained them to act, and in accordance with Denver's practices, during the sweeps. **Exhibit 21**, *Michael McCown Deposition*, 30:14-31:4; **Exhibit 30**, *Eric Knopinski Deposition*, 27:5-10, 46:13-15. This alone shows that Denver's customs and practices caused the violation of Plaintiff Class Members constitutional rights. *Ortega v. City & Cnty. of Denver,* 944 F. Supp. 2d 1033, 1039 (D. Colo. 2013) (Martinez, J.); *Moore v. Miller*, Civil Action No. 10-cv-00651-JLK, 2014 U.S. Dist. LEXIS 72452 (D. Colo. May 28, 2014).

3.6(c) <u>Single incident liability</u>

Finally, liability may be imposed on Denver based solely on Operation Riverdance 3, even if this Court finds that the other sweeps were constitutional. First, Operation Riverdance 3 did not constitute a "single" incident. Multiple Denver officials seized hundreds of items of

---

[18] *See* **Exhibit 1**, *Roy Vincent Browne Deposition*, 37:15-20, 39:17-40:20, 65:22-66:25, 68:4-24, 70:13-19, 71:2-8, 72:2-14, 72:15-22, 72:23-73:9, 73:18-74:10, 74:14-17, 74:18-75:3, 76:6-18, 78:2-7; **Exhibit 29**, *Mary Elizabeth Dotson Deposition*, 41:10-18, 42:8-43:18, 45:10-15, 74:9-22, 74:9-22, 74:23-75:9, 75:2-9, 77:22-78:2, 80:20-85:11, 97:16-98:11; **Exhibit 23**, *David Peachey Deposition*, 45:9-46:1; **Exhibit 21**, *Michael McCown Deposition*, 15:7-12, 18:4-11, 21:18-24, 22:21-23:4, 30:14-31:4, 32:4-23, 33:6-14, 51:5-11; **Exhibit 30**, *Eric Knopinski Deposition*, 27:5-10, 31:11-32:13, 46:13-15, 46:16-17, 47:8-18, 51:17-25.

property from Plaintiff Class Members and summarily discarded or incinerated them without providing Plaintiff Class Members notice or an opportunity to contest the seizure in any way, which constitutes hundreds of constitutional violations. However, even if this Court determines that Operation Riverdance 3 is a "single" incident, Denver's liability is still properly pled because "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998)) (internal citation omitted), *superseded by statute on other grounds*; 42 U.S.C. § 1997e. Denver officials sustained and willful seizures of Plaintiff Class Members' property shows that Denver's customs, policies, and practices resulted in the violation of Plaintiff Class Members' constitutional rights.

Further, Operation Riverdance 3 was a coordinated effort made by multiple Denver agencies (including Denver Public Works, the Denver Police Department, and the Denver Park Rangers) that was carried out by dozens of Denver officials and was authorized by the highest echelons of Denver's government. These facts support Denver's liability on the sole basis of the unconstitutionality of Operation Riverdance 3. *See Pinder v. Commissioners of Cambridge*, 821 F. Supp. 376 (D. Md. 1993) (holding that a single incident of unconstitutional conduct may serve as a basis of liability when a particular course of action is made by a municipality's authorized decision makers). *Bordanaro v. McLeod*, 871 F.2d 1151, 1156–57 (1st Cir.), *cert. denied,* 493 U.S. 820 (1989) ("While it is true that evidence of a single event alone cannot establish a municipal custom or policy, … where other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent of municipal employees, the event itself provides some proof of the existence of the underlying policy or custom."); *Lavoie v. Town of Hudson*, 740 F. Supp. 88 (D.N.H. 1990) (finding that while

generally more than a single incident is necessary to establish the existence of a municipal policy, a policy may be found where other evidence of the policy has been presented and the single incident in question involves the concerted action of a large contingent of individual municipal employees); *Andujar v. City of Boston*, 760 F. Supp. 238 (D. Mass. 1991) (stating that where incident in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides some proof of the existence of the underlying policy or custom).

Finally, the egregiousness of Denver officials conduct during Operation Riverdance 3 is probative that Denver is liable on the sole basis of that unconstitutional sweep. *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991) ("Where ... a plaintiff attempts to establish the existence of a municipal policy of deliberate indifference [to police use of excessive force] through a concatenation of similar, but isolated, events, egregiousness is a hallmark of probative value; the more outrageous the occurrences, the more probable that a policy of tolerance was in place"); *Hodge v. Ruperto*, 739 F. Supp. 873 (S.D.N.Y. 1990) (find that although a municipal policy ordinarily may not be inferred from a single incident, particularly egregious conduct by a group of municipal officers may warrant an inference of official acquiescence even though only one unconstitutional act is alleged).

4. **Conclusion**

For the foregoing reasons, Plaintiff Class Members respectfully ask this Court to enter summary judgment in their favor on Claims I, II, and III. Plaintiff Class Members ask that this Court set a trial on the issue of an appropriate remedy for the violation of their constitutional rights.

Respectfully submitted this 14th day of August 2017.

*s/Jason Flores-Williams, Esq.*

50

Phone: 303-514-4524
Email: Jfw@jfwlaw.net
1851 Bassett St.
#509
Denver, Colorado 80202

KILLMER, LANE & NEWMAN, LLP

*/s/ Andy McNulty*

_____
David A. Lane
Andy McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com

*Attorneys for Plaintiff Class*

## CERTIFICATE OF SERVICE

I certify that on this 14th day of August, 2017 I filed a true and correct copy of this Motion for Summary Judgment via CM/ECF which will generate notice to the following via e-mail:

Wendy J. Shea
Conor D. Farley
Geoffrey C. Klingsporn
Cristina Peña Helm
Denver City Attorney's Office
Litigation Section
201 W. Colfax Ave.
Denver, CO 80203
wendy.shea@denvergov.org
conor.farley@denvergov.org
geoffrey.klingsporn@denvergov.org
cristina.helm@denvergov.org
*Counsel for Defendants*

*s/ Jamie Akard*
Jamie Akard

51