**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2155-WJM-CBS

RAYMOND LYALL,
GARRY ANDERSON,
THOMAS PETERSON,
FREDRICK JACKSON,
BRIAN COOKS, and
WILLIAM PEPPER,

      Plaintiffs,

v.

CITY OF DENVER, a municipal corporation,

      Defendant.

---

## ORDER ON PENDING MOTIONS

---

      Plaintiffs are homeless persons living on Denver's streets. Proceeding via 42

U.S.C. § 1983, they bring this class action lawsuit against Defendant "City of Denver"

(actually, the City and County of Denver; hereinafter, "Denver"), arguing that Denver

clears homeless encampments through unconstitutional means.

      Currently before the Court are three motions: (1) Plaintiffs' Motion for Summary

Judgment (ECF No. 124); (2) Denver's competing Motion for Summary Judgment (ECF

No. 125); and (3) Denver's Motion to Strike Evidence Submitted by Plaintiffs in Support

of their Motion for Summary Judgment ("Motion to Strike") (ECF No. 137, *as amended

by* ECF No. 152-1). For the reasons explained below, the Motion to Strike is largely

denied as moot, and otherwise denied. As for the parties' summary judgment motions,

they are both denied save for Denver's challenge to Plaintiffs' equal protection cause of

action.  The Court will order the parties to proceed with trial preparations.

## I.  SCOPE OF THE PRESENT DISPUTE

At the outset, the Court surprisingly must resolve a disagreement between the parties over what this lawsuit is actually about.

Plaintiffs brought this lawsuit to challenge the alleged method by which Denver enforces its "urban camping ban," *i.e.*, Denver Municipal Code § 38-86.2.  (ECF No. 54 ¶¶ 1–9.)[1]  Plaintiffs say that under that ordinance and sundry others, Denver "began [in 2015] to systematically . . . seiz[e] and destroy[] their property in what has sadly come to be known as 'The Homeless Sweeps.'"  (*Id.* ¶ 9.)  Plaintiffs specifically focused on "mass sweeps w[h]ere Plaintiff[s'] and Plaintiff Class's rights civil rights [*sic*] have been eviscerated," and Plaintiffs cabined the idea of "mass sweeps" as follows:

> Since the enactment of the "Camping Ban," there have been innumerable instances of unreasonable searches of homeless persons and seizure of their property by Defendants.  But for purposes of these Common Alleged Facts, we are focusing on instances of mass sweeps where more than 10 Denver Police, workers at the Dep't of Public Works and, sadly, inmates at the local county jail, are sent in by the City of Denver to seize the possessions of Plaintiffs and Plaintiff Class without regard for their rights.

(*Id.* ¶ 55 & n.7.)

At the class certification stage, however, Plaintiffs proposed a broader class definition: "All persons in the City of Denver who were, are, or will be homeless at any time after [August 26, 2014], whose personal belongings have been or may in the future

---

[1] Plaintiffs state that the municipal ordinance itself "is not expressly challenged here," but Plaintiffs oddly and repeatedly encourage the Court to "*sua sponte* . . . review [its] constitutionality."  (*Id.* ¶ 4 n.2; *see also* ECF No. 143 at 3, ¶ 1.)  The Court has no jurisdiction to *sua sponte* consider the constitutionality of a law that Plaintiffs have not challenged.

be taken or destroyed by one or more of the Defendants." (ECF No. 15 at 15.)[2] The

Court rejected this definition because it would undermine Federal Rule of Civil

Procedure 23(a)(2)'s "commonality" requirement: "A class of homeless persons 'whose

personal belongings have been or may in the future be taken or destroyed by one or

more of the Defendants' encompasses persons who may have never been subject to

the Homeless Sweeps, thus eliminating commonality." *Lyall v. City of Denver*, 319

F.R.D. 558, 564 (D. Colo. 2017) (citation omitted) (ECF No. 106 at 10). The Court

therefore exercised its discretion to narrow the proposed class to track Plaintiffs'

definition of "mass sweeps" involving ten more Denver officials or their agents. *See id.*

(ECF No. 106 at 10–11). The Court ultimately approved the following class definition:

> All persons in the City and County of Denver whose personal
> belongings may in the future be taken or destroyed without
> due process on account of the City and County of Denver's
> alleged custom or practice (written or unwritten) of sending
> ten or more employees or agents to clear away an
> encampment of multiple homeless persons by immediately
> seizing and discarding the property found there[.]

*Id.* at 571 (ECF No. 106 at 26).[3] This was explicitly a Rule 23(b)(2) class for purposes

of resolving whether Denver in fact had a policy, custom, or practice of carrying out the

_____

[2] Plaintiffs originally proposed that the class period begin on May 14, 2012, which would
be well outside the two-year statute of limitations for a damages claim under 42 U.S.C. § 1983.
*See* Colo. Rev. Stat. § 13-80-102(1)(g); *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1286 (D. Colo.
2009). Plaintiffs' Amended Complaint, filed after their certification motion, clarified that they are
only seeking relief on behalf of "all homeless persons in the City of Denver from August 26,
2014 forward" (ECF No. 54 ¶ 46 (emphasis removed)), which is apparently tied to Plaintiffs'
original filing date of August 25, 2016.

[3] The Court did not incorporate the portions of Plaintiffs' "mass sweep" definition
regarding the specific actors involved ("Denver Police, workers at the Dep't of Public Works and,
sadly, inmates at the local county jail," ECF No. 54 ¶ 55 n.7) because the Court understood that
Plaintiffs were narrowing the scope of their claims based on the "mass" nature of these sweeps,
and not necessarily the specific actors—thereby avoiding what they announced that they wished
to avoid: a lawsuit about all of Denver's interactions with homeless persons in which property
may have been seized. (*See id.*)

alleged mass sweeps; and, if so, to determine the appropriate injunctive relief. *Id.* at 564, 566–67, 571 (ECF No. 106 at 10, 16–17, 26).[4]

Plaintiffs' summary judgment motion explicitly seeks to hold Denver liable to the class members (ECF No. 124 at 1 & n.2), and not, for example, to a specific named plaintiff. But according to Plaintiffs, the unconstitutional policy now at issue is Denver's alleged *de facto* custom of generally disregarding homeless persons' property rights. (ECF No. 124 at 28–39; ECF No. 143 at 39–40.) Plaintiffs do not specifically argue that Denver has a policy of "mass sweeps" as defined in their complaint and as adopted in the class definition. In other words, they make no explicit argument that the common question justifying class treatment—"whether Denver is engaging in the Homeless Sweeps in the manner alleged," *Lyall*, 319 F.R.D. at 564 (ECF No. 106 at 10)—should be answered in their favor.

Attempting to justify this approach, Plaintiffs assert that the portion of the class definition about "sending ten or more employees or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there" is "merely *one aspect* of the alleged custom alleged here, and is derived not from the Complaint, but rather from the class definition the Court crafted in certifying the class." (ECF No. 143 at 40 n.50 (emphasis in original).) This is, of course, wrong on all counts. The class definition itself is no "mere aspect" of the case. The Court "crafted" the class definition—and saved it from a lack of commonality—specifically with reference to the parameters Plaintiffs self-imposed *in their complaint*

---

[4] The Court rejected Plaintiffs' proposed Rule 23(b)(3) damages class because Plaintiffs failed to articulate a method of calculating damages that did not violate the Supreme Court's prohibition on "Trial by Formula." *Id.* at 567–68 (ECF No. 106 at 17–19).

(presumably to avoid a much more complicated lawsuit about all of Denver's interactions with the homeless and their property).

Plaintiffs nonetheless go on to say that this Court's

> class certification order specifically noted [that it] was subject to further refinement throughout the litigation. Indeed, amendment of the class definition is something that is well within the discretion of the district court up until final judgment. Accordingly, requiring Plaintiffs to adhere to the Court's high-level summary of the Complaint's "policy or custom" from the class definition as the full description of the alleged custom would be both prejudicial and arbitrary; this definition was crafted without the benefit of the summary judgment briefings and full discovery, and it could very well be amended at a later point.

(*Id.*) This is irrelevant. The Court indeed left open the possibility that it could revisit class certification in certain circumstances,[5] and the Court would have power to do so even if it had never said so. *See* Fed. R. Civ. P. 23(c)(1)(C); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir. 2010). And yes, considered in the abstract, the class definition "could very well be amended at a later point," just as in any class action lawsuit.

But Plaintiffs have not *moved* to amend it. Unless and until Plaintiffs do so (and the Court expresses no opinion on whether such a motion would have merit), the class

---

[5] To be precise, the Court stated that it might revisit the issue of whether to certify a Rule 23(b)(3) damages class "if Denver in fact seized and destroyed Plaintiffs' belongings, including forms of identification (as Plaintiffs allege)," because "Denver should not then be able to claim that no Plaintiff can adequately prove his or her membership in the class for purposes of seeking damages." *Lyall*, 319 F.R.D. at 567–68 (ECF No. 106 at 18–19). In their reply in support of their summary judgment motion, Plaintiffs reference this portion of the class certification order and then state, without elaboration, "Given the evidence that Plaintiffs have gathered through the discovery process, and that was presented in Plaintiffs' Motion for Summary Judgment, it has become apparent that Denver has violated the constitutional rights of an innumerable portion of its homeless residents." (ECF No. 151 at 8 n.3.) It is not clear how this assertion addresses the Court's concern expressed in its class certification order, and in any event, it is not a request to revisit class certification—much less to revisit the Rule 23(b)(2) definition.

definition requires the Court to focus on the common question that justified class certification in the first place. That common question was not "a high-level summary of the Complaint's 'policy or custom.'" (ECF No. 143 at 40 n.50.) It was, again, a very specific narrowing of the lawsuit to focus on Denver's alleged large-scale efforts to break up homeless camps, to the exclusion of "innumerable" smaller-scale alleged violations. (ECF No. 54 ¶ 55 n.7.) Accordingly, the only potential classwide summary judgment relief in Plaintiffs' favor that the Court can appropriately consider at this time is a ruling that Denver indeed has a policy, custom, or practice of sending ten or more officials or agents to clear away an encampment of multiple homeless persons by immediately seizing and discarding the property found there. The Court's rulings, below, reflect this limitation.

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).[6]

## III. EVIDENTIARY OBJECTIONS

Before the Court can distill the undisputed facts, the Court must first resolve

Denver's Motion to Strike, which presents numerous challenges to Plaintiffs' summary

judgment evidence.[7]

## A.   Unsigned/Unsworn Declarations

Plaintiffs have re-submitted declarations they filed early on in this case that

display e-filing signatures, *i.e.*, "s/" followed by the declarant's typewritten name.

Denver argues that "unsigned and unsworn statements are not competent summary

judgment evidence." (ECF No. 152-1 at 3.) What Denver really means to argue is a

---

[6] Given that Plaintiffs seek injunctive relief, this case will be tried to the Court rather than to a jury. In such a circumstance, some circuits allow their district courts to resolve disputed factual questions at the summary judgment phase if the court can confidently say that presentation of live evidence would make no difference. *See, e.g., Int'l Bancorp, LLC v. Societe des Bains de mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003); *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 400–01 (1st Cir. 1988). Other circuits hold that the summary judgment standard remains the same regardless. *See, e.g., Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1315 (8th Cir. 1987); *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.- Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). As far as this Court could locate, the Tenth Circuit has never addressed this question directly, but it appears to lean in favor of the latter view. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) ("Although a district court can make factual findings related to laches after a bench trial, the court should not make factual findings when addressing a summary judgment motion based on laches . . . ." (citation omitted)). This Court will therefore apply the same summary judgment standard it would apply if the case was set for a jury trial.

[7] The undersigned does not allow separate motions to strike summary judgment evidence. *See* WJM Revised Practice Standard III.B. However, Denver's objections are systemic and, as it turns out, the Court has found Denver's separate motion helpful in understanding the extent and significance of its various objections. Therefore, in these unique circumstances, the Court finds it in the interest of justice to accept Denver's Motion to Strike.

statement either must be "sworn" (made in a notarized affidavit) or signed under penalty of perjury (which is considered "unsworn").  *See* 28 U.S.C. § 1746 (establishing that any federal legal requirement to submit a "sworn" document may be satisfied by an "unsworn declaration" that states it is made under penalty of perjury).

The Court has routinely rejected this argument in the context of unsworn expert reports submitted as evidence of what an expert would say at trial.  *See Olivero v. Trek Bicycle Corp.*, ___ F. Supp. 3d ___, ___, 2017 WL 5495817, at *4 (D. Colo. Nov. 16, 2017); *Sanchez v. Hartley*, ___ F. Supp. 3d ___, ___, 2017 WL 4838738, at *12 (D. Colo. Oct. 26, 2017); *Pertile v. Gen. Motors, LLC*, 2017 WL 4237870, at *2 & n.3 (D. Colo. Sept. 22, 2017); *Miller v. BNSF Ry. Co.*, 2017 WL 1880603, at *2 (D. Colo. May 9, 2017); *Gunn v. Carter*, 201 6 WL 7899902, at *2 (D. Colo. June 13, 2016).  But expert reports are potentially a special case, "because an expert's report is usually a mandatory disclosure that must contain, among other things, 'a complete statement of all opinions the witness will express and the basis and reasons for them,' and because an expert's trial testimony generally may not exceed the scope of this report."  *Id.* (quoting Fed. R. Civ. P. 26(a)(2)(B)(i); citing Fed. R. Civ. P. 26(e)(2), 37(c)(1)).

Before the 2010 amendments to Rule 56, the Rule essentially assumed that an affidavit was the primary vehicle for presenting summary judgment evidence, although it could "be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits."  Fed. R. Civ. P. 56(e)(1) (2009); *see also id.* 56(f) (regarding "when affidavits are unavailable" (capitalization normalized)).  The rule further required that an affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  *Id.*

56(e)(1).

The 2010 amendments created the version of Rule 56 still operative today. The amended language removes any obvious preference for affidavits and instead states that a moving or responding party may "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, rather than requiring that an affidavit set out facts that would be admissible in evidence, the amended rule states only that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," *id.* 56(c)(2)—of course meaning "admissible in evidence *at trial.*"

Most affidavits and declarations are not themselves admissible at trial because such documents are usually hearsay, unless the affiant or declarant is a party to the lawsuit. Thus, there is a fair argument that the 2010 amendments eliminated the need for an affidavit or declaration. Or to put it slightly differently, neither a sworn affidavit, a signed declaration, nor an unsigned witness statement is *itself* admissible at trial (usually), but that says nothing about whether the facts asserted can or cannot be presented in a form that would be admissible at trial. The latter inquiry would seem to turn on whether there is some basis to believe that the source of the asserted facts will be available and willing to testify at trial consistent with those assertions. The formalities of affidavits and declarations tend to provide such assurance, but nothing in Rule 56 makes those formalities the exclusive method.

That said, given pre-2010 practice, many cases naturally continue to assume that

any statement prepared for summary judgment purposes as evidence of what a witness will say at trial must at least be a "declaration" as defined in 28 U.S.C. § 1746. *See, e.g.*, *Richardson v. Gallagher*, 553 F. App'x 816, 827 (10th Cir. 2014); *Estrada v. Cook*, 166 F. Supp. 3d 1230, 1238 (D.N.M. 2015); *Leathers v. Leathers*, 2013 WL 1873275, at *3 (D. Kan. May 3, 2013).

The Court need not resolve this issue here. The Court finds that, with one exception, the relevant facts needed to resolve the parties' motions are not confined to a challenged declaration, but are supported by deposition testimony and by Denver's own facts and evidence. As to these declarations, Denver's Motion to Strike is denied as moot.

The exception is an allegation that, during a cleanup operation on March 8–9, 2016, no one from Denver was ensuring that important personal or otherwise valuable items were preserved. (*See* ECF No. 124 at 12, ¶ 52.) This allegation is supported only by declarations from named Plaintiff Lyall and non-party Alexandra Binder. (*Id.*)[8] Both of these declarations begin with, "Pursuant to 28 U.S.C. § 1746, I hereby declare as follows." (ECF Nos. 124-13 (Lyall), 124-23 (Binder).) Lyall's declaration also concludes, "I declare under penalty of perjury that the foregoing is true and correct." (ECF No. 124-13 ¶ 11.) Binder does not specifically mention "penalty of perjury" but she states in the first paragraph of her declaration, "I hereby swear to the following statements and am willing to swear to them at trial." (ECF No. 124-23 ¶ 1.) The Court finds that this substantially complies 28 U.S.C. § 1746's requirement to make a declaration under penalty of perjury.

[8] Plaintiffs sometimes erroneously refer to Binder's declaration as the "Alexandra Lawson Declaration."

Thus, the only remaining question is the validity of Lyall's and Binder's e-signatures. The Court could locate no binding authority on the question of whether an e-signature is appropriate for a declaration made under 28 U.S.C. § 1746. Unpublished authority among the district courts is generally against it, even if the party directed the attorney to write the declaration, had the declaration read back to him, and authorized the attorney to affix the signature. *See Dietle v. Miranda*, 2017 WL 387253, at *3 (E.D. Cal. Jan. 26, 2017) (citing cases), report and recommendation adopted, 2017 WL 714390 (E.D. Cal. Feb. 22, 2017). But Denver has not made this specific argument (*i.e.*, that a handwritten signature is always required), nor cited any cases about this specific problem. (*See* ECF No. 152-1 at 3.) Accordingly, the Court will not address the issue. *Cf. Richardson*, 553 F. App'x at 828 ("we decline to address the issue of the use of e-signatures, given Mr. Richardson's failure to contest the use of such signatures before the district court or adequately address the issue on appeal").

Given this lack of a proper and well-supported objection, the Court finds that Lyall's and Binder's declarations are admissible for present purposes. Through discovery it became clear that Lyall dictated his declaration to Plaintiffs' lead attorney (Mr. Flores-Williams), and Lyall reviewed the declaration after it was typed. (ECF No. 137-6.) Binder typed her declaration and then e-mailed it to Mr. Flores-Williams (ECF No. 137-2), who apparently typed Binder's signature, although he mistakenly typed it as "Alex Lawson" (ECF No. 124-23 at 2).[9] Denver does not point to any discrepancy between Lyall's declaration and his deposition testimony, or Binder's declaration and her deposition testimony, in contrast to other declarants. (*See* ECF No. 152-1 at 4.)

---

[9] There is another declarant named Sophia Lawson.

For these reasons, and under the specific circumstances of this case, Lyall's and Binder's declarations are admissible for summary judgment purposes, and so Denver's Motion to Strike is denied as to these two declarations.[10]

**B.    Jerry Burton's Declaration, the Thomas Peterson Retrieval Video, and Various Other Objections Based on Hearsay, Personal Knowledge, Etc.**

Denver argues that former Plaintiff Jerry Burton's declaration should be stricken because Burton failed to show up for his deposition.  (ECF No. 152-1 at 5–7.)  Denver also argues that a video of a man named Thomas Peterson attempting to retrieve his property from a Denver storage location should be stricken as unauthenticated.  (*Id.* at 10–12.)  And Denver states various objections—mostly hearsay and personal knowledge objections—to certain of Plaintiffs' assertions of fact.  (*Id.* at 12–14.)

The Court has examined all of these objections and finds, similar to most of the declarations discussed above, that the facts asserted are either irrelevant or are supported by evidence to which Denver does not object.  Accordingly, as to all of these arguments, Denver's Motion to Strike is denied as moot.

**C.    Incidents Not Alleged in the Complaint**

Denver complains that Plaintiffs' summary judgment motion includes assertions regarding alleged sweeps that took place on March 25, November 15, and November 28, 2016, none of which was mentioned in the complaint (the November 2016 incidents post-date the complaint).  (ECF No. 152-1 at 7.)  Denver says that allowing evidence of these three incidents would cause prejudice because

---

[10] The Court further notes that, while considering the Motion to Strike, it requested the complete transcripts of Binder's and Lyall's depositions.  The Court thereby confirmed that they both testified—albeit briefly—to their impression that property which should have been preserved was thrown away.  Thus, it is clear that Binder and Lyall are prepared to testify consistent with their declarations.

> Denver has relied on the [complaint] as defining the scope of this action and has shaped its defense accordingly. Had Denver known that Plaintiffs intended to claim that these incidents violated their rights and formed the basis for their municipal liability claim, Denver would have altered its discovery and disclosed defense witnesses to testify about those events along with supporting documents. Denver also would have moved for summary judgment on these additional incidents. Denver is now precluded from doing so, as discovery is closed and the dispositive motion deadline has passed. Denver has already been prejudiced by the need to respond to Plaintiffs' new allegations, re-interviewing witnesses and otherwise gathering evidence regarding dates and incidents that, until now, were not at issue in the case.

(ECF No. 152-1 at 9.) Denver also argues that post-complaint conduct is simply irrelevant to whether a constitutional violation occurred as alleged in the complaint. (ECF No. 160 at 5.)

Denver's argument somewhat misapprehends what is currently at stake. As the Court will discuss in greater detail below, the questions currently before it are "whether Denver [has a custom, practice, or policy of] engaging in the Homeless Sweeps in the manner alleged," *Lyall*, 319 F.R.D. at 564, and whether such sweeps are likely to recur such that Plaintiffs have standing to seek a permanent injunction, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("*Lyons*"). All alleged sweeps, whenever they happened, are relevant to that inquiry. Indeed, later-in-time incidents, including incidents that post-date the complaint, are particularly relevant to the standing question. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (in the prison conditions context, noting that availability of an injunction "should be determined in light of the prison authorities' current attitudes and conduct: their attitudes and conduct at the time suit is brought and persisting thereafter"). In other words, Plaintiffs have not inserted new theories of liability or new claims for relief through which they hope to be awarded

damages. They have instead asserted evidence that they believe demonstrates what they sought to prove in the first place—an ongoing pattern or practice of unconstitutional sweeps that should be enjoined.

Even so, if this evidence truly came as a surprise to Denver, Denver may still have a claim of prejudice. Plaintiffs assert, however, that all three of the newly inserted incidents were discussed in various depositions through questioning elicited by Denver's attorney. (ECF No. 148 at 8–9.) Denver, in reply, does not deny this, but simply claims that discussion at a deposition is not sufficient. (ECF No. 160 at 6.) Moreover, Denver indeed gathered evidence to rebut Plaintiffs' allegations concerning these three incidents. (See ECF No. 138 at 11, 15–21.) And, notably, Denver has not submitted a Rule 56(d) affidavit or declaration that "it cannot present facts essential to justify its opposition."

Denver admittedly did not receive an opportunity to attempt to affirmatively demonstrate, through its own summary judgment motion, that these incidents were not mass sweeps. However, the Court's review of the evidence, discussed more fully below, convinces it that Denver could not have eliminated all genuine disputes of material fact as to these incidents.

For all of these reasons, Denver's motion to strike is denied as to allegations concerning sweeps that took place on March 25, November 15, and November 28, 2016.

## IV. FACTS

The following facts are undisputed unless attributed to a party, or otherwise noted.

**A.      December 15, 2015: Denver Rescue Mission**

The first notable sweep, according to Plaintiffs, occurred in the early morning of a particularly cold day, December 15, 2015, and affected at least fifteen homeless persons sleeping outside the Denver Rescue Mission.  Plaintiffs' testimony regarding the sweep itself is hearsay; their only eyewitness arrived after it ended.  (*See* ECF No. 124 at 6–9, ¶¶ 16–33; ECF No. 138 at 4–7, ¶¶ 16–33.)  But it is undisputed that a Denver police officer from the police department's Homeless Outreach Unit, Ligeia Craven ("Officer Craven"), was present, and at some point a garbage truck arrived to dispose of items outside of the Denver Rescue Mission.  (*See, e.g.*, ECF No. 124-2 at 4; ECF No. 138-5 ¶¶ 3–12.)

The parties have very different versions of all of the other details.  According to Plaintiffs' version (again, based almost entirely on hearsay), Officer Craven arrived and brusquely ordered everyone sleeping outside the Denver Rescue Mission to pick up what they could carry and immediately go inside the shelter, after which she had the persons operating the garbage truck dispose of everything else, including valuables, medicines, tents, and blankets.  According to Officer Craven, she invited everyone to go inside the shelter because it was so cold and gave them plenty of time to do so.  When all homeless persons had entered the shelter or otherwise left the area, she determined that everything left behind (trash and soiled items) was a health and safety risk and therefore called for a garbage truck to clean it up.

Ultimately, however, Plaintiffs do not allege that this event was a mass sweep as they defined that term, and as incorporated into the class definition.

**B.      March 8–9, 2016: Triangle Park Area**

Lawrence Street, Park Avenue, and Broadway in Denver converge around a triangular piece of public property aptly known as Triangle Park.  Triangle Park sits immediately across the street from the Denver Rescue Mission shelter and the Samaritan House shelter, and the St. Francis Center shelter is about a block away. Other locations that provide services to the homeless are only a few blocks further. Thus, Triangle Park and its surroundings are a common gathering spot for Denver's homeless community.

In the fall of 2015, "Denver started receiving frequent complaints related to safety concerns, unsanitary conditions, and continuous build-up of trash on the right-of-way in the Triangle Park area and the unsafe and unsanitary conditions for all."  (ECF No. 125 at 12, ¶ 62.)  "Complaints included reports of violent crime against the female homeless population, open drug dealing, and other safety issues, including concerns that the encampments were hiding these issues so they could not be adequately addressed." (*Id.* at 13, ¶ 65.)  "In response, numerous Denver agencies and homeless service providers met over the course of several months to determine how to best address the safety and sanitation issues, including how to connect people who were experiencing homelessness with services."  (*Id.* ¶ 69.)  "These discussions resulted in the decision to conduct a coordinated cleanup of the Park Avenue and Lawrence area [which eventually] took place on March 8 and 9, 2016."  (*Id.* ¶ 70.)[11]

---

[11] Plaintiffs deny for lack of knowledge whether the admitted "several months" of conversations between Denver agencies and homeless service providers "resulted in" a decision to conduct the March 8–9, 2016 sweep.  (ECF No. at 15, ¶ 70.)  At this phase of the case, denial for lack of knowledge is not permitted, *see* WJM Revised Practice Standard III.E.4.d, and so the Court deems Denver's assertion undisputed.

Denver's plan for the March 2016 sweep included developing a process to collect, bag, tag, and store "personal items" that homeless persons did not take with them, or that appeared abandoned. (*Id.* at 15, ¶ 76.)[12] Denver rented a storage space for the items that would be bagged and tagged. (*Id.* ¶ 77.)[13]

The parties present an odd dispute over whether Denver gave notice in the Triangle Park area ahead of time, announcing the city's forthcoming action. Citing testimony from two Denver employees, Plaintiffs claim no signs were posted or other notice distributed. (ECF No. 124 at 9, ¶ 35.) Denver counters with testimony from five of Plaintiffs' witnesses, including Plaintiff Lyall himself, all of whom testified to seeing a sign or flyer ahead of time, or (in one case) by March 8 itself. (ECF No. 125 at 14, ¶ 75.) In short, according to Plaintiffs, Denver admits it did not post signs or distribute flyers; but, according to Defendants, Plaintiffs admit that Denver *did* post signs and distribute flyers.

The testimony from Plaintiffs' witnesses cited by Denver is unequivocal, with each witness being asked if he or she saw signs or flyers, and all of them answering affirmatively. The testimony from Denver employees is much less clear. One of those employees was Officer Craven, who testified only that she, personally, did not distribute flyers or post "metal signs or anything like that." (ECF No. 124-20 at 2.) The other employee was Jose Cornejo, director of Denver's Public Works department, who was asked at his deposition about an e-mail he sent on the morning of March 9 directing

---

[12] Plaintiffs deny this assertion, but their denial rests on the fact that, according to them, the process was carried out differently than planned. (ECF No. 143 at 16, ¶ 76; *see also id.* at 15, ¶ 70.) Plaintiffs do not deny that the plan existed.

[13] At one place in their response brief, Plaintiffs deny this. (ECF No. 143 at 16, ¶ 77.) At a later point, they admit it. (*Id.* at 18, ¶ 94.) The Court deems the assertion admitted.

persons involved in the sweep to post signs before continuing the sweep on March 9, and based on that e-mail he agreed with opposing counsel's question that "signs were not up by the time you sent [the e-mail] on the 9th."  (ECF No. 124-8 at 7–8; ECF No. 124-9.)

Having reviewed this evidence, the Court finds that there is no genuine dispute of fact, and even if there were, no reasonable jury could resolve the dispute except in Denver's favor.  The Court finds, for summary judgment purposes, that Denver posted notice in the Triangle Park area ahead of the March 8 sweep.  These notices announced that Denver would remove items "encumbering" public spaces beginning on March 8, 2016; it encouraged the homeless population to remove personal items; and it notified residents that seized property could be reclaimed at a particular storage location for up to thirty days following seizure.  (ECF No. 58-7 at 9–10.)[14]

Not surprisingly, the parties' have very different stories of how March 8–9 actually unfolded.  According to Plaintiffs, police officers, Public Works employees, and work-release inmates from the Denver County Jail descended *en masse* on the Triangle Park area, gave homeless persons there only a very short time to gather what they could carry, cordoned off the area so that persons who were away from their property when the sweep began (*e.g.*, looking for work) could not get into the area to claim their belongings, and then indiscriminately bagged up some items for storage and threw others (including valuable personal items) into garbage trucks.  (ECF No. 124 at 9–13, ¶¶ 34–62.)  Denver claims, by contrast, that it gave homeless persons plenty of time to gather their belongings and that it followed the procedures it had developed, including

---

[14] Plaintiffs deny this for the same defective reasons explained in n.12, above, and so the content of the notice is deemed admitted.

sorting trash and hazardous materials from personal property and discarding the former but bagging, tagging, and storing the latter. (ECF No. 125 at 15–18, ¶¶ 80–97.)

Denver ended up storing seized belongings for sixty days, rather than thirty, to provide more time for retrieval. (*Id.* at 15, ¶ 79.)[15] Denver also provided a list to homeless outreach workers of individuals who had voluntarily stored their property and failed to retrieve it within the initial thirty days, in hopes that the outreach workers could contact those individuals and remind them. (*Id.* n.5.) In the end, only four persons appeared at the storage facility to request property, and only one of those four actually retrieved any property—the other three sought specific items that the storage custodians could not locate among the stored property. (ECF No. 125 at 18, ¶ 98; ECF No. 58-7 ¶ 14.)

## C.    March 25, 2016: Thomas Peterson's Property

Named Plaintiff Thomas Peterson claims he left his personal belongings outside the Denver Rescue Mission on the morning of March 25, 2016; but, when he exited the Denver Rescue Mission a little later in the morning, his belongings were gone. He says that other homeless persons told him a "sweep" was ongoing and directed him to police officers and garbage trucks a couple of blocks away. According to Peterson, he eventually tracked down four police officers and four garbage workers, and the police officers admitted to taking Peterson's belongings and throwing them in the garbage truck. Peterson asserts that he never recovered those belongings. (ECF No. 124 at 13–14, ¶¶ 63–68.)

Denver contends that whatever happened on March 25, 2016 was part of a

---

[15] Plaintiffs deny this for the same defective reasons explained in n.12, above, and so assertions from this paragraph of Denver's statement of facts are deemed admitted.

"regularly-scheduled cleanup" (ECF No. 138 at 11, ¶ 63), referring to Public Works'
regularly scheduled right-of-way cleanings in that part of downtown Denver (*see* ECF
No. 125 at 7, ¶¶ 28–29).[16]  Denver nonetheless denies that its officials took any of
Peterson's property.  (ECF No. 138 at 11, ¶¶ 65–67.)

## D.    July 13, 2016: "Riverdance 3" & Arkins Court

For a number of years, Denver has received complaints about trash, discarded
drug needles, and other hazards "along areas of the South Platte River Corridor and the
Cherry Creek Greenway."  (ECF No. 125 at 8, ¶ 34.)  The South Platte riverbank is
public land managed by Denver's Parks & Recreation department.  (*Id.* ¶ 37.)  Parks &
Recreation therefore began coordinating with the Denver Police Department, Public
Works, and community members for an annual cleanup of the portion of the river
corridor around Commons Park.  (*Id.* ¶ 38.)  This event is known as "Operation
Riverdance."  (*Id.*)  It usually involves heavy equipment when trees or overgrown
bushes need removal, but community members and Denver employees pick up trash
and cut back weeds and other vegetation.  (*Id.* at 9, ¶ 39.)

The third annual Riverdance cleanup, "Riverdance 3," took place on July 13,
2016.  (*Id.* at 18, ¶ 100.)  Denver claims that its police officers and Parks & Recreation
staff gave five to seven days' notice to persons camping in the affected area, and that
they posted and handed out notices.  (*Id.* at 18–19, ¶¶ 101–02.)  It is undisputed that
members of a local homeless advocacy organization learned of Riverdance 3 ahead of
time and handed out flyers to homeless persons in the area to warn them.  (*Id.* at 19,

---

[16] Plaintiffs agree that "simple, regular cleanings" occur but they are different from
"unconstitutional homeless sweeps that are the subject of [their] Complaint."  (ECF No. 143 at 8,
¶¶ 29–30.)

¶ 104.)

One of the parties' major factual disputes is the scope of Riverdance 3. Denver says that Riverdance 3 was confined to the river corridor itself, and that a separate cleanup of a homeless encampment happened simultaneously on Arkins Court—a street which runs along the South Platte River in the same area. Plaintiffs dispute this, claiming that the Arkins Court sweep was part of Riverdance 3.

A trier of fact could find in favor of Plaintiffs on this question. In particular, Officer Craven—who was present on the day in question—submitted two declarations regarding her involvement that day, and they are somewhat in tension about the status of Arkins Court. In her first declaration (submitted long before summary judgment briefs were filed), she states that she "was present for [Riverdance 3] and was brought in as a resource to help the other City agencies involved with the cleanup effort and to keep the peace. On July 13, 2016, I was along the Platte River near Arkins Court." (ECF No. 58-4 ¶ 26.) She then goes on to describe how Riverdance 3 played out, with no suggestion that she or anyone else made a distinction between Riverdance 3 activities and the cleanup at Arkins Court. (*Id.* ¶¶ 27–28.) But, in her second declaration (submitted in opposition to Plaintiffs' summary judgment motion), Officer Craven states that she made a separate, independent decision that day to "enforce the parking and unauthorized camping ordinances on Arkins Court," "because [she] knew Public Works would already have trucks and workers nearby for the previously-scheduled Riverdance 3 cleanup." (ECF No. 138-5 ¶ 16.) Given the implicit inconsistency, there is sufficient evidence to support Plaintiffs' view that Riverdance 3 encompassed Arkins Court.

In any event, Plaintiffs' account of what happened during Riverdance 3 comes

entirely from persons in the Arkins Court area, and particularly from Mary Dotson and Roy Browne, who were camping on the bank of the South Platte River near the intersection of 31st Street and Arkins Court. (ECF No. 124 at 15, ¶ 73.) According to Dotson and Browne, "roughly one dozen Denver police officers and park rangers" arrived around 6:00 a.m., woke up those sleeping in the area, and told them they had ten minutes to gather their property and leave. (*Id.* ¶ 75.) Dotson and Browne say that ten minutes was not nearly enough time to prepare to move all of their belongings, especially because Dotson is wheelchair-bound. (*Id.* ¶ 79.) At some point (the record is not clear if Dotson and Browne received the full ten minutes they say they were promised), work-release inmates from the Denver County Jail began seizing anything not picked up and throwing it into garbage trucks. (*Id.* at 16–17, ¶¶ 85–86, 92–93.)

Denver denies this account, other than admitting that work-release inmates participated in Riverdance 3 and that "items left behind were not stored." (ECF No. 138 at 13, ¶¶ 81, 86.) Denver maintains that Officer Craven carried out her allegedly separate cleanup of Arkins Court with herself, one other homeless outreach police officer, a clinician from a local mental health facility, and a small number of garbage workers. (ECF No. 125 at 19–20, ¶¶ 110–18.) Denver further says that affected individuals "were given a reasonable amount of time to clean up their property, much more than ten minutes." (ECF No. 138 at 12, ¶ 75.)

E.      **Regular Activities Along Cherry Creek and the South Platte River**

Apart from Riverdance 3, Plaintiffs claim that park rangers (Parks & Recreation employees) regularly patrol along Cherry Creek and the South Platte River, seizing and discarding items that are "seemingly unattended." (ECF No. 124 at 21, ¶ 115.) Park

rangers leave notice on unattended items that they will be removed in twenty-four hours.  (*Id.* at 22, ¶ 119.)  Typically, if a ranger comes across the same unattended items "two days in a row, at the same time of day," the ranger will seize and throw away the property.  (*Id.* at 21, ¶ 116.)

Plaintiffs do not allege that these regular patrols involve ten or more Denver employees or agents.

## F.    Late 2016: Samaritan House

In the latter months of 2016, two Denver police officers would routinely arrive every weekday morning, wake up those camping outside the Samaritan House shelter, and tell them to move their belongings to make way for regularly scheduled sidewalk cleanings.  (ECF No. 124 at 20, ¶ 108; ECF No. 124-1 at 6–7; ECF No. 138 at 16, ¶ 108.)  Plaintiffs say that these police officers would seize and discard any homeless person's belongings that the person could not pack up and take away.  (ECF No. 124 at 20, ¶ 108.)

## G.    November 15, 2016: Denver Rescue Mission

On the morning of November 15, 2016, approximately twenty Denver police officers arrived at the Denver Rescue Mission to ensure safety during a cleanup operation which Denver describes as "similar to the March 2016 cleanup protocol." (ECF No. 124 at 19–20, ¶¶ 104–05; ECF No. 138 at 16, ¶¶ 104–05.)  The cleanup was carried out by a private waste company and work-release inmates from the Denver County Jail.  (ECF No. 124 at 20, ¶ 105.)

Plaintiffs say that "Denver police officers told Plaintiff Class Members that they needed to leave the area immediately and take their belongings or else they were going

to have all of their belongings seized and potentially face a ticket, or the active enforcement of the camping ban." (*Id.* ¶ 106.)  Plaintiffs further claim that the jail inmates seized property that the homeless individuals "could not carry[,] and threw it into garbage trucks." (*Id.* ¶ 105.)  Denver denies that its officers made the alleged threats or that the jail inmates threw away personal property that homeless persons could not carry with them.  (ECF No. 138 at 16, ¶¶ 105–06.)

## H.    November 28, 2016: Arapahoe & 27th Street Encampment

On November 28, 2016, "Public Works employees, contractors, and [police] officers" approached a "large encampment" that had developed near Arapahoe Street and 27th Street, not far from Triangle Park.  (ECF No. 138 at 25, ¶ 32.)  Plaintiffs say that the police officers ordered those camping to "either leave right now and have all of your belongings taken or go to jail and have all of your belongings taken." (ECF No. 124 at 20, ¶ 110.)  Regardless of whether the police officers used those words or issued any threat to that effect, the parties agree that police officers "advised individuals who were in violation of the unlawful camping ordinance per the enforcement protocol and most people complied and took down their tents." (ECF No. 138 at 25, ¶ 34.)  Two individuals refused to leave the area, including former named Plaintiff Jerry Burton.  (*Id.* ¶ 35.)  The police then seized Burton's tent, sleeping bag, and blankets as evidence that he had violated the urban camping ban, and they stored those items in the Denver Police Department's property Bureau.  (ECF No. 124 at 21, ¶¶ 111–12; ECF No. 138 at 25, ¶ 36.)

Personal property remained at the encampment site after most of the erstwhile inhabitants had taken down their tents and (apparently) moved out of the way of

Denver's cleanup crew.  Plaintiffs say that, similar to the March 8–9 incident, some of the property was seized and stored while other property was immediately thrown into garbage trucks, and one witness to the event gained the impression that the decision whether to store or to throw away was "arbitrary."  (ECF No. 124 at 21, ¶¶ 113–14; ECF No. 124-11 at 14.)  Denver denies this, claiming that "[a] protocol similar to that for the March 2016 cleanup was followed."  (ECF No. 138 at 17, ¶¶ 113–14.)  In any event, some of Burton's property—apart from what the police had seized—ended up in storage, which he later retrieved from the storage facility.  (*Id.* at 26, ¶ 39.)

No party provides the total number of Denver employees or agents involved in the November 28, 2016 incident.

## I.    January 2017: Meeting with Mayor Hancock

In January 2017, certain homeless individuals and advocates for Denver's homeless community met as a group with Denver Mayor Michael Hancock and members of his staff.  (ECF No. 124 at 5, ¶ 10.)  They asked him to stop the sweeps, but, according to homeless advocate Terese Howard, Hancock's response was, "We're going to continue doing what we're doing."  (ECF No. 124-11 at 3.)  According to Howard, "his rhetoric is that he can't bear to see anybody on the streets and so he's going to take a compassionate approach by pushing people into the shelters, which is utterly ridiculous, if I may say so myself [because there are not enough shelters, and shelters are not good solutions overall]."  (*Id.*)

Evan Dreyer, the mayor's Deputy Chief of Staff, attended that meeting.  (ECF No. 138-4 ¶ 2.)  He says, somewhat vaguely, that Howard's account "is not how I would characterize the conversation that took place.  I observed the Mayor being very willing

to discuss the public health and public safety concerns that underlie the City's policies, and the different tools and methods that are available to support those policies." (*Id.* ¶ 3.)

## V.  ANALYSIS

Plaintiffs' complaint alleges that Denver's actions have violated their Fourth Amendment right to be free from unreasonable searches and seizures, their Fourteenth Amendment right to due process before seizure of property, and their Fourteenth Amendment right to equal protection.  All of these theories are at issue in the parties' summary judgment motions.

### A.    Lack of Injury

In a three-sentence paragraph (including a generic citation regarding § 1983 injury), Denver argues that it deserves summary judgment on Plaintiffs' Fourth Amendment and due process claims solely "because *none* of the [named Plaintiffs] had their property taken by Denver during any of the incidents alleged in their Amended Complaint." (ECF No. 125 at 26 (emphasis in original).)  Thus, says Denver, Plaintiffs cannot show that they have been injured.  (*Id.*)

Plaintiffs counter this argument with citations to evidence that, they believe, shows Denver seized their property in one of the mass sweeps.  (ECF No. 143 at 25–26.)  The parties' arguments thus demonstrate another failure to understand what this lawsuit is about.

The present inquiry is whether Denver has a custom, policy, or practice of unconstitutional mass sweeps to which Denver's inhabitants "may in the future be" subject.  *Lyall*, 319 F.R.D. at 571 (ECF No. 106 at 26).  Although past instances of injury

under this alleged policy are relevant as evidence of whether the policy exists, liability does not turn on whether any named Plaintiff—or any class member—has *already* been injured. The question, rather, is whether the alleged policy, custom, or practice exists; and, if so, whether any class member (named Plaintiff or otherwise) is *likely* to face injury in the future on account of the policy, custom, or practice, such that the class has Article III standing to seek an injunction. *Cf. Lyons*, 461 U.S. at 102 (noting that "[p]ast wrongs [are] evidence bearing on whether there is a real and immediate threat of repeated injury," but holding that "the prospect of future injury rested on the likelihood that [the plaintiff] will again be" subject to the practice he sought to enjoin).[17]

Given this, Denver's claim that no named Plaintiff had property taken during any of the alleged mass sweeps is relevant for its evidentiary value, if any, but it has no case-dispositive effect.[18] The Court now turns to the matters just noted: the existence of a custom, practice, or policy; and standing to seek an injunction.

**B.  Custom, Policy, or Practice**

1.  Liability for Fourth Amendment and Procedural Due Process Violations

The parties' arguments regarding the existence of a custom, policy, or practice largely focus on Plaintiffs' claims under the Fourth Amendment and the Fourteenth Amendment's Due Process Clause.

---

[17] Plaintiffs' argument that Riverdance 3/Arkins Court, by itself, should be enough to establish "single incident liability" against Denver similarly misunderstands this case's present posture. (ECF No. 124 at 48–50.) Single incident liability, if established, may entitle a plaintiff to damages under a failure-to-train *Monell* theory (*see* Part V.B.2, below), but damages are not at issue here in light of the class definition. (*See* n.4, above.)

[18] If damages *were* at stake, Denver's argument—assuming its truth—would probably require the Court to reconsider class certification. *See Rector v. City & Cnty. of Denver*, 348 F.3d 935, 950 (10th Cir. 2003) ("By definition, class representatives who do not have Article III standing to pursue the class claims fail to meet the typicality requirements of Rule 23.").

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures."  This prohibition against unreasonable seizures extends both to civil and criminal seizures.  *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312–13 (1978).  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  If "meaningful interference" took place, the question is whether such interference was reasonable, judged by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Id.* at 125 (internal quotation marks omitted).  It is possible for a seizure to be "lawful at its inception" but become unreasonable through "its manner of execution," such as by destroying the seized property.  *Id.* at 124.  However, destruction of seized property is not a *per se* Fourth Amendment violation—it may nonetheless be reasonable under all of the circumstances.  *Id.* at 125.

The Fourteenth Amendment also protects property: "No state shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  More particularly, under the doctrine known as "procedural due process," a court must ask two questions: first, "whether there exists a liberty or property interest which has been interfered with by the State"; and second, "whether the procedures attendant upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  However, the existence of a property interest is not in question here because Denver does not challenge Plaintiffs' argument that they have a property interest in the sorts of items they fear will be seized in future sweeps.

(*See* ECF No. 124 at 27–28.)

As to the second question, individuals generally must receive, at a minimum, "notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). The general rule may be disregarded in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Id.* at 53 (internal quotation marks omitted). Either way, the Court must consider the following factors to determine whether the government's procedures provided the individual with due process:

- the interests of the individual in retaining their property and the injury threatened by the official action;

- the risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; and

- the costs and administrative burden of the additional process, and the interests of the government in efficient adjudication.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The parties do not address the overlap between Plaintiffs' Fourth Amendment and procedural due process theories. For example, assuming seizure was reasonable under the Fourth Amendment, must the Court then turn to the procedural due process inquiry of whether the individual deserved pre-deprivation notice?[19] As it turns out, the

---

[19] In the pretrial criminal context, defendants may not invoke procedural due process to challenge their arrests or the seizure of their property. *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases . . . ."). But the Supreme Court has further established that the Fourth Amendment provides protections beyond

Court need not resolve this issue here—nothing below turns on it. The Court only notes it for the parties' consideration as the case progresses.

    2.    Municipal Liability

To hold Denver liable for a Fourth Amendment violation or a procedural due process violation, Plaintiffs must work through the municipal liability framework established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Monell* held that a municipality can be liable in 42 U.S.C. § 1983 for damages only when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694. Although damages are not at stake as the class is presently defined, Plaintiffs seek to enjoin future actions for which Denver could be liable in damages only if Denver's custom, policy, or practice caused its agents to take unconstitutional actions. Accordingly, Plaintiffs must prove a municipal custom, policy, or practice, which can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation

_____

the criminal context, *Marshall*, 436 U.S. at 312–13, thus potentially leading to conflict with procedural due process protections.

marks omitted; alterations incorporated).

Plaintiffs' arguments focus largely on the existence of, in the language of *Bryson*, an "informal custom amounting to a widespread practice." (ECF No. 124 at 45; ECF No. 143 at 41.) Plaintiffs also argue under ratification and failure-to-train theories. (ECF No. 124 at 45, 47–48; ECF No. 143 at 44–46; *see also id.* at 15, ¶ 70 ("assuming arguendo[] that Defendant planned the sweeps perfectly, the actual execution of the sweeps remains in dispute").)

The evidence needed to prove these various theories tends to be the same, or at least heavily overlapping. For example, in a case based on informal custom, a plaintiff must establish: (1) the existence of a continuing, persistent and widespread practice of unconstitutional misconduct by municipal employees; (2) deliberate indifference to, or tacit approval of, such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the municipality's custom; and (4) that the custom was the moving force behind the unconstitutional acts. *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cnty., Kan.*, 996 F.2d 1035, 1041 (10th Cir. 1993). A case based on failure to train requires essentially the same elements because it also turns on the deliberate indifference standard, and "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks omitted). And, although *Connick* speaks of "untrained employees," failure to train may also lead to liability when a training program exists but does not work. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997) ("If a program does not

prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.").

     3.    <u>Whether There Exists Evidence Sufficient to Merit a Trial on Plaintiffs' Allegation of Custom, Ratification, and/or Failure to Train</u>

Three alleged incidents or series of incidents do not qualify as the mass sweeps Plaintiffs challenge in this lawsuit, nor are they remotely probative of whether mass sweeps take place. Those are: the December 15, 2015 incident at the Denver Rescue Mission (Part IV.A, above); regular park ranger activities along Cherry Creek and the South Platte River (IV.E); and regular sidewalk cleanings at Samaritan House in late 2016 (IV.G).

There are also three alleged incidents that clearly qualify as mass sweeps, taking the facts in the light most favorable to Plaintiffs: the March 8–9, 2016 operation in and around Triangle Park (IV.B); the July 13, 2016 Riverdance 3/Arkins Court cleanup (IV.D); and the November 15, 2016 operation at the Denver Rescue Mission (IV.F).

There are two incidents whose evidentiary value is ambiguous. The first is the March 25, 2016 incident where Thomas Peterson's property went missing and he soon tracked down four police officers and four garbage workers who allegedly told him that they had taken his property. (IV.C.) This does not meet the ten-employee threshold Plaintiffs established as part of their definition of a mass sweep. However, drawing all reasonable inferences in Plaintiffs' favor, the Court finds that an alleged eight-employee operation has at least some tendency to prove that larger-scale operations with ten

persons or more are occurring.

The second ambiguous incident is the clearing of the encampment at Arapahoe & 27th Street on November 28, 2016. (IV.H.) The number of Denver employees or agents involved in this operation is not clear. On the other hand, it also appears this was a large-scale operation. Again, drawing all reasonable inferences in Plaintiffs' favor, the Court will assume that ten or more Denver employees or agents participated.

Accordingly, there is abundant evidence, viewed in the light most favorable to Plaintiffs, that Denver has repeatedly engaged in mass sweeps, at least in so far as those operations involved ten or more Denver employees or agents. The Court accordingly must examine Plaintiffs' accusations on unconstitutional conduct allegedly perpetrated by these Denver employees and agents, namely: (1) the alleged lack of notice (or effective notice) beforehand; (2) the alleged practice of giving affected persons only a brief time to gather what they can carry; (3) the alleged failure to discriminate between valuable personal items that should be preserved, on the one hand, and trash or hazardous materials that should be discarded, on the other; and (4) affected persons' inability to reclaim stored property.

The Court need not decide whether there exists a genuine dispute of material fact with respect to all four of these allegedly unconstitutional practices. The Court finds that the second and third allegations—giving affected persons only minimal time to gather what they can carry, and failure to discriminate between what should be preserved and what should be thrown away—are amply supported in the record when viewed in the light most favorable to Plaintiffs. In addition, Mayor Hancock and his staff were made aware of these issues at least as of January 2017, if not earlier. (Part IV.I,

above.)  The Mayor's response, according to Plaintiffs' witness, was that Denver would continue its urban camping enforcement efforts with no change.

A reasonable trier of fact could accept Plaintiffs' evidence and the inferences they draw from it, and if so, could find Denver municipally liable for deliberate indifference to a pattern of unconstitutional conduct.  Consequently, with respect to Plaintiffs' Fourth Amendment and procedural due process claims, Plaintiffs have established a genuine issue of fact which cannot be resolved through summary judgment.  On the other hand, Plaintiffs have failed to eliminate any dispute of material fact over their view of the evidence—or in other words, a reasonable trier of fact could also accept Denver's story.  Thus, neither Plaintiffs nor Denver are entitled to summary judgment on Plaintiffs' Fourth Amendment or procedural due process claims.

## C.     Standing to Seek an Injunction

Although Plaintiffs have shown that a trier of fact could rule in their favor on their Fourth Amendment and/or procedural due process claims, they must nonetheless establish standing to obtain an injunction, which is the only remedy available to them in this context.  Denver has not challenged Plaintiffs' standing, but it is a matter of Article III jurisdiction that this Court must self-assess and self-police.  *See, e.g.*, *Rice v. Office of Servicemembers' Grp. Life Ins.*, 260 F.3d 1240, 1244 (10th Cir. 2001) ("we have an independent duty to examine our jurisdiction").

As the dispute discussed in Part III.C makes clear, Plaintiffs have not been timid about accusing Denver of mass sweeps that post-date the complaint.  But all of the incidents discussed above, whether "mass sweeps" or not, occurred in 2015 and 2016. (*See also* ECF No. 69 (moving to amend the complaint to allege a December 2016

incident); ECF No. 101 (withdrawing that motion).)  Plaintiffs have not brought to the Court's attention any mass sweeps occurring in 2017 or 2018—not even a "Riverdance 4," which the Court presumes took place in Summer 2017.  This potentially raises to standing questions.

The first question is whether Denver has ended its alleged custom of mass sweeps.  If so, the case is potentially moot.  But Denver has not disclaimed further large-scale operations to clear homeless encampments, nor has it, for example, put forth new procedures intended prevent any of the allegedly unconstitutional aspects of previous sweeps (assuming anything unconstitutional occurred).  If it did, it would be Denver's "heavy burden" to demonstrate it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).  Because Denver has not attempted to make this showing, the Court will not inquire further as to mootness.

Standing specifically to seek an injunction, however, is separate from the mootness-by-voluntary-cessation analysis.  In *Lyons*, for example, the Supreme Court found that a controversy regarding the Los Angeles Police Department's practice of using chokeholds on suspects was not moot by voluntary cessation because a recently declared moratorium on those chokeholds was not permanent.  461 U.S. at 101.  Even so, the Supreme Court still found that the plaintiff lacked standing to seek an injunction against the chokeholds practice (as opposed to damages flowing from a previous chokehold incident) because he had not demonstrated that

> he was likely to suffer future injury from the use of the chokeholds by police officers. . . .  That Lyons may have been illegally choked by the police [previously], while presumably affording Lyons standing to claim damages

> against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would [be placed in a chokehold] again . . . .

*Id.* at 105.

The question, therefore, is whether any member of the class is likely to face an allegedly unconstitutional mass sweep in the future. Again, Denver has not argued that it has ceased large-scale operations to clear encampments. In addition, the record amply supports the idea that persons living on Denver's streets, including named Plaintiffs, will continue to gather and create encampments that could prompt Denver to conduct future mass sweeps.[20] Finally, even if some of the named Plaintiffs stay away from encampments, or stop living on the streets, or leave Denver altogether, standing would likely remain due to class certification. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (rejecting standing challenge based on *Lyons*: "by obtaining class certification [unlike in *Lyons*], plaintiffs preserved the merits of the controversy for our review"). On this record, then, the Court finds that standing exists to seek an injunction.

## D.     Equal Protection

Plaintiffs also assert a Fourteenth Amendment equal protection claim, arguing that the Court should declare homeless persons a suspect or quasi-suspect class, therefore requiring heightened scrutiny for laws and actions directed at them. (ECF No. 124 at 40–44.) This claim suffers multiple interrelated flaws.

Assuming *arguendo* that homeless persons are a suspect class, the least strained way of understanding Plaintiffs' equal protection claim is that the urban

---

[20] It is at least judicially noticeable, if not unfortunately beyond question, that a more-than-nominal number of persons in Denver will continue to live on the streets for the foreseeable future.

camping ban is actually a law specifically intended to push homeless persons out of Denver, analogous to zoning codes intended to create racially homogenous neighborhoods. (*See, e.g.*, ECF No. 54 ¶ 9 (describing the urban camping ban as a "justification to clear out undesirables"); ECF No. 124 at 25 (accusing Denver of "conducting sweeps aimed at pushing homeless individuals out of the city and targeting the homeless").) But Plaintiffs have explicitly avoided a direct challenge to the urban camping ban.[21] And, in a closely related vein, Plaintiffs have not argued that a sweep conducted with sufficient notice, with sufficient discrimination between personal items and trash, and with adequate storage and retrieval procedures would still create an equal protection problem because the sweep was targeted at the homeless. Plaintiffs also have not argued that the Equal Protection Clause simply prohibits Denver from clearing homeless encampments, through any means, absent a compelling justification and narrow tailoring. *Cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (laws based on suspect classifications "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest").

Having foregone such attacks, Plaintiffs are forced to argue that "there is no rational basis for *the exact manner in which the sweeps were implemented*, namely, without notice and in a manner that resulted in the summary destruction of important personal property and which exposed homeless individuals to life-threatening weather conditions." (ECF No. 151 at 17 (emphasis added); *see also* ECF No. 143 at 37 ("[T]he sweeps, *as perpetrated by Defendant*, are not rationally related to [the goal of preserving public health]. Cleaning the areas where Plaintiff Class Members rest most

---

[21] *See* n.1, above.

certainly relates to preserving public health, but seizing Plaintiff Class Members property does nothing to improve the sanitation of Denver." (emphasis added)).) In other words, Plaintiffs' equal protection claim is, at bottom, a restatement of their Fourth Amendment and procedural due process claims.

Moreover, in formulating the class definition, the Court specifically excluded Plaintiffs' proposed phrase "are or will be homeless": "Given the alleged injury and the proposed injunctive remedy, this definition need not turn on whether the affected individual is actually homeless at the time of any alleged Sweep." *Lyall*, 319 F.R.D. at 567 n.6 (ECF No. 106 at 17 n.6). The Court did so with an eye toward avoiding definitional disputes about who falls within the class denominated "the homeless." Given Plaintiffs' frequent rhetoric about the poverty and vulnerability of the homeless population, the Court presumes that Plaintiffs refer to those who live on the streets by necessity. This is probably what first comes to mind for most of us when we hear the word "homeless." But Denver's actions, as described by Plaintiffs, would violate any person's property rights regardless of whether that person had an option to sleep in their own home, or the opportunity to return to a "housed" life.[22]

For all of these reasons, Denver is entitled to summary judgment on Plaintiffs' equal protection claim.

---

[22] The record shows that many homeless advocates have a typical, roof-and-four-walls residence but occasionally sleep on the streets with those they serve. And, reading Plaintiff Lyall's deposition, one gains the impression that he became homeless out of necessity but has since chosen to remain homeless out of solidarity with the homeless community and a desire to serve other homeless persons as effectively as possible.

## VI.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiffs' Motion for Summary Judgment (ECF No. 124) is DENIED;

2.      Denver's Motion for Summary judgment (ECF No. 125) is GRANTED with respect to Plaintiffs' third claim for relief (equal protection) but otherwise DENIED;

3.      Denver's Motion to Strike (ECF No. 137, *as amended by* ECF No. 152-1) is DENIED in part and otherwise DENIED AS MOOT, as explained in Part III of this Order; and

4.      No later than March 29, 2018, the parties shall contact the chambers of Magistrate Judge Craig B. Shaffer to begin the process of preparing for a Final Pretrial Conference.[23]

Dated this 26th day of March, 2018.

BY THE COURT:

William J. Martinez
United States District Judge

---

[23] Magistrate Judge Mark L. Carman is handling magistrate judge duties in Judge Shaffer's absence, but, as noted in the reassignment order, "[p]arties shall continue to communicate with Magistrate Judge Shaffer's chambers regarding this case."  (ECF No. 162.)