# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-2155-WJM-CBS

RAYMOND LYALL, on behalf of himself and all other similarly situated, et al.,

    Plaintiffs,

v.

CITY AND COUNTY OF DENVER,

    Defendant.

---

## STIPULATED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND FOR FAIRNESS HEARING

---

The parties, by and through their counsel, pursuant to Fed. R. Civ. P. 23.1, respectfully submit this Stipulated Motion for Preliminary Approval of Class Action Settlement and for Fairness Hearing.

1. **Introduction**

Plaintiffs filed this class action to seek redress from what they contended was the City and County of Denver's (hereinafter "Denver") custom, policy, and practice of conducting unconstitutional homeless sweeps. In their First Amended Complaint, Plaintiffs sought, among other relief, class certification; an injunctive order permanently enjoining and restraining Defendants from continuing and repeating the homeless sweeps as alleged in the Complaint; a declaratory judgment that Defendants' policies, customs, and practices were in violation of Plaintiffs' constitutional rights compensatory damages; and attorney's fees and costs. *See* [Doc. #54]. Throughout this lawsuit, Denver has denied the allegations made against it and does not admit any constitutional violations nor does it admit that any policy, custom or practice existed

1

which violated the constitutional rights of people experiencing homelessness. On April 27, 2017, the Court certified the class for injunctive relief only and the case proceeded on that basis. [Doc. #106].

After over twenty-nine months of litigation, including extensive discovery, cross motions for summary judgment, and lengthy settlement negotiations, the parties have worked together to reach a proposed Full and Final Release and Settlement Agreement ("Agreement") to resolve this lawsuit in its entirety. A copy of the agreement is attached as **Exhibit 1**. The Agreement was fully executed as of February 26, 2019.[1]

The Agreement contemplates that the Plaintiffs' claims will be resolved on a Class basis and in their individual capacities. Because the Agreement, if approved, provides for comprehensive relief for members of the Class, including significant benefits to people who are experiencing homelessness such as storage of nonhazardous personal property removed from public sidewalks and parks for sixty days, additional notice from Public Works of regular cleanups in specific designated areas, and the use of recreation centers if certain conditions are met, and because it is the result of arms' length negotiation after years of adversarial litigation, the parties believe that it is fair, reasonable, and adequate. The parties thus respectfully request, pursuant to Fed. R. Civ. P. 23(e) that this Court:

- Grant preliminary approval of the attached Agreement;

---

[1] With profound sorrow, counsel informs the Court that Representative Plaintiff Brian Cooks has disappeared and his status is unknown. Mr. Cooks' family filed a missing person's report with the Denver Police Department in early February 2019. Plaintiffs' counsel is aware that Mr. Cooks was always on Facebook and typically responded to messages within an hour. Unfortunately, he has not responded to calls or messaging for many weeks. Plaintiffs' counsel continues to search for Mr. Cooks, but wanted to inform the Court of these developments as Mr. Cooks agreed to the terms of the proposed Agreement, but Plaintiffs' counsel were unable to obtain his signature on the Agreement prior to his disappearance.

- Find that the proposed plan to provide notice to the class and the proposed form of notice satisfy the requirements of due process and Fed. R. Civ. P. 23; and
- Schedule a Fairness Hearing for the earliest convenient date, no sooner than 120 Days after preliminary approval, to determine whether the proposed Agreement is fair, reasonable, and adequate and, therefore, should be approved.

2. **Background**

The lawsuit in this matter was brought by Jason Flores-Williams, who witnessed what he perceived to be unconstitutional actions happening in his neighborhood, and city, and sought to bring some semblance of justice to his neighbors on the streets. After a meeting involving a number of members of Denver's homeless population in August 2016, coordinated by Denver Homeless Out Loud,[2] Mr. Flores-Williams met personally with numerous potential representative Plaintiffs, selecting nine that could adequately represent the potential class, informing them of their obligations, executing attorney-client agreements, then generated the Complaint and the concomitantly-filed Motion for Class Certification, along with supporting declarations, that have served as the basis of this litigation.[3] In the Complaint, which was filed on August 25, 2016, Plaintiffs sought class-wide relief on claims that Denver allegedly violated

---

[2] At the end of July 2016, Mr. Flores-Williams reached out to a nonprofit group working on the front lines of homelessness in Denver, Denver Homeless Out Loud (hereinafter "DHOL"). DHOL had been routinely meeting with other attorneys for the past year regarding large scale seizure of homeless persons' property, i.e. the homeless sweeps, but those groups and attorneys had declined to take the case. In August of 2016, The Law Office of Jason Flores-Williams memorialized a partnership with Terese Howard, chief agent and founder of Denver Homeless Out Loud, in which DHOL the nonprofit, would serve as the investigative outreach arm of the litigation. This relationship—defined by mutual respect and collaboration—proved essential to this litigation.

[3] All major filings in the litigation were posted to the DHOL website.

their Fourth, Eighth, and Fourteenth Amendment rights by seizing their property without notice, due process, or ability to retrieve their property. [Doc. #1].

This case was litigated vociferously from the outset, and depositions and discovery began in earnest in January of 2017. The discovery phase always presents challenges, but additionally challenges arise when dealing with people experiencing homelessness, who are not typically readily available to contact. . During the discovery phase of this litigation, over twenty depositions were taken, thousands of pages of documents were produced, days of video were exchanged, and multiple discovery disputes were litigated and resolved. *See* [Doc. #19]; [Doc. #31]; [Doc. #32]; [Doc. #37]; [Doc. #52]; [Doc. #92]; [Doc. #93]; [Doc. #113].

Eventually the scope the of this case was narrowed. Plaintiffs amended their complaint to assert claims under the Fourth and Fourteenth Amendments for the unlawful seizure of their property and violation of their equal protection rights. [Doc. #44]. They also dismissed their claims against individually named defendants and proceeded only against Denver. [Doc. #44]. A number of named Plaintiffs were also voluntarily dismissed after failing to attend their depositions, leaving a total of five named Plaintiffs remaining in the case. [Doc. #75]; [Doc. #76]; [Doc. #84]; [Doc. #103]. As discussed above, at the time of this filing, one of the five remaining named Plaintiffs cannot be located.

After briefing on a motion to certify this case as a class action, [Doc. #15]; [Doc. #21]; [Doc. #58]; [Doc. #59], this Court granted Fed. R. Civ. P. 23(b)(2) class certification on April 22, 2017. [Doc. #106]. In July 2017, the parties filed cross-motions for summary judgment. *See* [Doc. #124]; [Doc. #125]. The parties litigated these motions over the course of the next two months. [Doc. #137]; Doc. #138]; [Doc. #143]; [#148]; [Doc. #151]; [Doc. #160]; [Doc. #161]. After the summary judgment briefing, the actual litigation slowed as the parties awaited

adjudication of the cross-motions. That said, communication and engagement with Plaintiff Class remained constant.

The Court granted Defendants' Motions for Summary Judgment on March 26, 2018 as to Plaintiffs' equal protection claims, leaving the remaining Fourth and Fourteenth Amendment claims to proceed to trial. [Doc. #157]. At the final pretrial conference on May 2, 2018, the Court set pre-trial filings deadlines and the trial was scheduled to commence on March 18, 2019. [Doc. #174]. Witness and exhibit lists were also created and disclosed, and as settlement discussions progressed the parties continued to work on all requisite documents to ensure that the parties would be ready to proceed to trial in the event that a proposed settlement could not be reached. *See* [Doc. #171] -- [Doc. #209].

In late 2018, the parties began discussing potential settlement. The parties agreed to, and fully participated in, a mediation that was held on January 17, 2019 with Judge Richard Caschette at the Judicial Arbiter Group. After the mediation, the parties continued to negotiate for the next month, with almost daily calls between counsel for Plaintiffs and counsel for Denver. After these arms-length, hard fought negotiations, the Agreement in principle was reached on February 25, 2019. *See* **Exhibit 1**. The parties informed this Court of the Agreement on the same day it was reached and the trial in this matter was vacated. [Doc. #212] -- [Doc. #214].

2. **Key Terms Of Proposed Settlement**

The Agreement, subject to Court approval, addresses and provides relief with respect to the Plaintiffs' remaining claims in the lawsuit, in the following ways:

- **Notice for Large-Scale Encumbrance Cleanup** - The City, to the extent reasonably possible, shall give at least seven days' notice prior to a large-scale encumbrance cleanup and shall include such language in its written protocol for large-scale encumbrance removal. The City may conduct large-scale cleanups with less than seven days' notice only if the City

determines that a public health or safety risk exists which requires it. If a large-scale cleanup is conducted with less than seven days' notice, the City shall provide reasonable notice of the cleanup, with the determination of reasonableness based upon the nature of the public health and safety risk present in the area. The City will document the public health and safety risk and such documentation will be kept by the City for one year. *See Agreement* (Exhibit 1), Exhibit A thereto, ¶ A.1.

- **Notice for Regular and Large-Scale Public Works Cleanups** - The City shall include the following information on any written notice provided for any Public Works regular cleanup or large-scale cleanup: Language indicating that stored property may be retrieved at no cost, without fear of arrest; A phone number for individuals to call who may have questions regarding property retrieval; The location and hours of the storage facility; The length of time that the property shall be stored at the facility and the length of time that the City shall store the property until it shall be disposed of. The City shall store any personal property that does not pose a public health or safety risk for at least 60 days. *Id*. at ¶¶ A.2 – A.3.

- **Written Notice for Encumbrance Removal in Areas Not Within Designated Regular Cleanup Area or Area Posted for Large-Scale Cleanup** - The City shall provide forty-eight hour written notice prior to the removal of personal property that does not pose a public health or safety risk, which is in violation of the Encumbrance Ordinance, and is not located in the area of regular Public Works cleanings or in an area where notice has been provided of a large-scale cleanup. In addition to specific language to be included by the notice, notice shall be securely affixed to the property and indicate the date the notice was affixed thereto. *Id*. at A.3-A.4.

- **Notice to Remove Property from Parks or Recreational Areas** - The City shall provide forty-eight hour written notice prior to the removal of personal property that does not pose a public health or safety risk, which is in violation of ordinances applicable to Parks and Recreational Areas. If the unattended personal property poses an immediate public health or safety risk, it may be disposed of. The notice shall also indicate the date the notice was affixed to the personal property. *Id*. at B.

- **Determination Regarding Whether Personal Property Poses a Public Health or Safety Risk** - The City shall continue with its current written protocol for determining what constitutes a public health or safety risk, which provides as follows:
    - Any items that present an immediate risk to public health or safety, such as illegal drugs, used syringes, medical waste, and perishable food items may be disposed of immediately.
    - Any trash or litter, such as used napkins, dirty diapers, food wrappers or used food containers, empty cans, used Styrofoam containers or paper cups, cigarette butts, may be disposed of immediately.
    - To ensure appropriate sanitation, the following items will be deemed to be trash and immediately disposed of: mattresses.
    - Public Works employees shall bring any weapons found to the attention of a police officer and it will be up to the police officer to determine how the weapon will be stored.

- o   Any items of personal property that could reasonably be assumed to have value to any person will be collected and stored. These items include: tents, sleeping bags, and any other camping equipment; backpacks, suitcases, duffle bags, and any other containers of personal items; clothing; bicycles; phones, electronic devices, and musical instruments; and other similar identifiable items of personal property, including furniture. Public Works Employees will take particular care to identify, collect and store sensitive personal items and documents, such as wallets and purses, prescription drugs, birth certificates, identification cards, drivers' licenses, and health care documents.
- o   If there is any question concerning whether an item should be considered as trash or valuable property, the City will assume the property has value and it should be stored.

*Id*. at ¶ A.5.

- **Storage of Property and Storage Facility Hours** - Personal property shall be stored for sixty days unless the property is determined by a City employee or contractor, pursuant to the above protocol, to pose a public health or safety risk. *Id*. at ¶ A.5.  Additionally, he City shall extend the hours the storage facility shall be open to 6:00 a.m. – 8:30 a.m. Monday, Tuesday, Wednesday, and Friday and 12:00 p.m. – 6:00 p.m. on Thursdays. The City shall reassess the need to continue these hours after forty-five days of operation and reserves the right to change the hours due to a lack of use or a public health or safety risk. *Id*. at ¶ A.6.

- **Formal Notification System** - The City shall create a formal system to provide public notification when unattended personal property has been removed by City employees or contractors and stored.  *Id*. at ¶ C.

- **Identification and Prescription Medication**s - The City shall continue its current practices concerning forms of identification and prescription medication found in property that has been removed and stored by City employees or contractors even after other personal property that is not reclaimed is disposed of. The City shall keep prescription medication until its expiration date and all forms of identification shall be kept indefinitely unless the identification has an expiration date. Forms of identification with an expiration date shall be kept until the form of identification has expired. Depending upon the circumstances, the forms of identification or prescription medications may be turned over to the Denver Police Department for investigation purposes. *Id*. at ¶ J.

The Agreement, subject to Court approval, also provides for resources relating to the

seizure of Class Members' property:

- **Storage Lockers** - The City shall place storage lockers in a location at the Minoru Yasui Plaza building. Combination locks shall be provided for the lockers and an estimated 200 lockers shall be available for use depending upon what the space shall accommodate. Lockers shall be accessible Monday through Friday from 7 a.m. to 9 a.m. and 3 p.m. to 7 p.m. Lockers may be used for up to thirty days. *See Agreement* (Exhibit 1), Exhibit A thereto, ¶ D.

**Trash Receptacles** - The City's Public Works Department shall place a total of fifteen additional trash receptacles in the Ballpark Neighborhood, including the areas of California and Park Ave., 22nd and Stout, and Lawrence and Park Ave. *Id*. at ¶ E.1.a.
The City's Parks and Recreation Department shall also expand the number of trash receptacles in the City's parks and recreational areas by 25% during spring and summer months. Expansion of trash receptacles shall include locations along the Cherry Creek Trail, Colorado Boulevard to Confluence Park, and Johnson Habitat to Globeville. *Id*. at ¶ E.1.b.

- **Port-o-Lets** - The City shall place two port-o-lets in Sonny Lawson Park in an area that is accessible twenty-four hours a day. The port-o-lets shall be serviced daily. The City shall also determine the feasibility of placing two port-o-lets in the area near the RiNo sign. If feasible, the City shall place two port-o-lets in this area that are accessible twenty-four hours a day. *Id*. at E.2.

- **Needle Disposal ("Sharps") Boxes** - The City shall place sharps disposal boxes in Governor's Park, Lincoln/La Alma Park, Macintosh Park, and consider whether it is feasible to also place a sharps disposal box in Sonny Lawson Park. *Id*. at ¶ E.3.

- **Advisory Group** – The City welcomes the opportunity for City officials to meet with an advisory group of people experiencing homelessness and their representatives on a quarterly basis to obtain feedback on City programs, listen to concerns, and to discuss proposals of additional possible solutions, etc. The City shall make its public libraries and day centers available for this purpose and shall post advance notice of such meetings in the day centers and libraries. The City shall also work with service providers, Denver's Road Home, and/or other advocacy groups to also provide notice of the meetings. At least one mayor staff member shall be present for the regularly scheduled meetings. The advisory group shall have the primary responsibility of providing input on topics to be discussed during the meeting. Meetings of the Advisory Group shall occur once every three months. *Id*. at ¶ F.

- **PLAY Program** - The City shall allow use of "homeless ID" cards as a form of picture identification and shall allow the use of labor pay stubs, letters from shelters, and letters from other homeless service providers as documentation for proof of income for participation. The City shall not place a limit on the total number of PLAY passes. *Id*. at ¶ G.

- **Mobile Health Unit** - The City shall seek requests for qualifications to operate a Mobile Health Unit ("Unit") and, with a qualifying response to the request for proposal, fund the operation of a Unit.

- **Training** - The City shall train employees and contractors on any changes in policy/procedures and on the procedures/protocols set forth in Exhibit A to the Agreement. Denver's Road Home shall also develop training on homeless sensitivity for City employees and contractors who regularly interact with people who are experiencing homelessness. Denver Homeless Out Loud and other advocacy groups may provide suggestions or recommendations concerning the sensitivity training, but Denver's Road Home shall retain

the ultimate responsibility for developing and providing the training. The sensitivity training shall take place on an annual basis. *Id*. at ¶ L.

As part of the proposed Agreement, the City has agreed to pay each of the six individually named Plaintiffs[4] $5,000 each. This payment has been approved by Denver City Council and has been issued to all Plaintiffs, except for Mr. Cooks, who has not executed the settlement agreement. Finally, the parties have agreed as part of the proposed Agreement that Denver will pay Plaintiffs' counsel reasonable attorneys' fees and costs to be determined through negotiation amongst counsel for the parties or, if that is not successful, by submission to the Court.

3. **This Court Should Grant Preliminary Approval To The Agreement**

Pursuant to Fed. R. Civ. P. 23(e)(1)(A), "[t]he parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." And pursuant to the revised subsection (B), "The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal.

"The purpose of preliminary approval is to determine whether the proposed settlement is within the range of possible approval, i.e., whether there is any reason not to notify the class members of the proposed settlement and proceed with a fairness hearing." *Freebird, Inc. v. Merit Energy Co.*, 2012 U.S. Dist. LEXIS 173075, at 11 (D. Kan. Dec. 6, 2012). As such, the Court's review is "less stringent than that applied to final approval." *Id.* at 12.

---

[4] Mr. Cooks is included as one of the individual Plaintiffs here. Should the parties be unable to locate Mr. Cooks, they will confer and determine the best course of action.

9

"Rule 23(e) provides that a proposed settlement may only be approved after a 'finding that it is fair, reasonable, and adequate.'" *Aragon v. Clear Water Products LLC*, 2018 U.S. Dist. LEXIS 212825, at *6 (D. Colo. December 18, 2018), *quoting* Fed. R. Civ. P. 23(e)(2). In order to determine whether a proposed settlement is fair, reasonable, and adequate, courts consider the following factors:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Id.* at 6-7 (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002)). "If the settling parties can establish these factors, courts usually presume that the proposed settlement is fair and reasonable." *Id.* at *7 (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3rd Cir. 2004)).

The Agreement in this case easily satisfies each of these four prongs established by the Tenth Circuit.

### 3.1 The Agreement was fairly and honestly negotiated.

The settlement negotiations in this case are the result of litigation that has been fair, honest, and adversarial from the beginning of this case to the present. The parties have "'vigorously advocated their respective positions throughout the pendency of the case.'" *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006) (quoting *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo. 1997)). Over the past three and a half years, the parties have been involved in an extensive amount of discovery, investigation, and motion practice.

Both parties were fully prepared to go to trial on March 18, 2019, but the parties also believed that it would be in the best interest of all to see if a settlement agreement could be

reached. Settlement talks began in earnest in January 2019 and took place over a full month. Each provision in the settlement was thoroughly analyzed, addressed, and negotiated by the parties. It was negotiated in good faith with the direct involvement of representatives of Plaintiff Class, including multiple named Plaintiffs (who have firsthand experience with the alleged homeless sweeps), and Denver officials. *See Decoteau v. Raemisch*, Civil Action No. 13-cv-3399-WJM-KMT, 2016 U.S. Dist. LEXIS 185151, at *21 (D. Colo. July 6, 2016) (holding that the fact that a settlement was a product of "arms' length" negotiation by experience counsel, with the help of "an experienced and respected mediator" with the input of "named plaintiffs. . . who have firsthand experience with the matters in question" weighed in favor of a class-wide settlement being "fair, reasonable, and adequate").

Because the Agreement resulted from arms' length negotiations between experienced counsel, after both parties conducted extensive discovery and after the litigation of multiple dispositive motions, the Agreement should be presumed to be fair and adequate. *See Aragon,* 2018 U.S. Dist. LEXIS 212825, at *7-8. In *Aragon*, the Court found "no evidence of collusion," and noted, "[t]his case has been pending for nearly three years, during which time the parties have briefed several motions and engaged in formal discovery, including written discovery and depositions." *Id.* The Court concluded, "[b]ased on the information provided, the Court is satisfied that the parties' settlement is the product of fair and honest negotiations between the parties." *Id.* at *8 (citing *Reiskin v. Reg'l Transp. Dist. Colo.*, No. 14-cv-03111-CMA-KLM, 2017 U.S. Dist. LEXIS 204242, 2017 WL 5990103, at *2 (D. Colo. July 11, 2017)) (finding that class settlement was fairly and honestly negotiated where "case involved intensive discovery," "expert witness reports," depositions, and "[n]umerous motions"); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2nd Cir. 2005) (holding that "'presumption of fairness,

11

adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery'") (quoting Manual for Complex Litigation (Third) §30.42 (1995)).

> 3.2 **Serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt.**

Although it is not appropriate at this stage of the litigation to evaluate the merits, *Wilkerson*, 171 F.R.D. at 284 (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981)), both Plaintiffs' and Defendant's summary judgment motions were denied by this Court largely due to the remaining issues of law and fact in this case. [Doc. #157]. This demonstrates that the contested issues of law and fact put the ultimate outcome of this litigation in serious doubt, for both sides. In addition to the contended issues of law and fact, which would have been hotly contested at trial, the complexities and uncertainties of representing a homeless class of persons cannot be overstated. With regard to trial, there are forces that are simply out of the Plaintiff Class members control, such as weather, cold, a snow storm in the month of March, or simply Plaintiff Class members deciding to or being forced to move to places where they could not be found. This further placed the ultimate outcome of this litigation in doubt. Additionally, as discussed below, through the Agreement, the Plaintiff Class will receive significant benefits that could not be accomplished through an injunction.

The Court in *Aragon* held that, "[g]iven the real prospect that plaintiffs would not have obtained any recovery had the case proceeded to trial, the Court finds that this factor weighs in favor of approving the parties' settlement agreement." *Aragon,* 2018 U.S. Dist. LEXIS 212825, at *9. Like *Aragon*, there was a real prospect that the Plaintiff Class would not have obtained the stipulated injunctive relief if this case had proceeded to trial, and so, like *Aragon*, the Court should find that the second factor has been satisfied.

### 3.3 The value of immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation.

*Aragon* held that the third factor was satisfied upon the parties' "indicat[ion] that continued litigation would lead to additional discovery, extensive motions practice, trial, and an appeal." *Id. Aragon* concluded, "Given the risks and costs of protracted litigation and uncertainty surrounding class members' ability to recover on a lump sum judgment, the Court finds that the immediate recovery provided for in the parties' settlement agreement outweighs the possibility of greater future relief." *Id.*

This litigation has already gone on for three years, should Plaintiffs have prevailed at trial, it would have gone on for more years and could have been remanded or overturned. The protections and resources provided by the Agreement "will come soon. . . rather than after a lengthy trial and appeals process." *Decoteau*, 2016 U.S. Dist. LEXIS 185151, at *22. And, again, this Agreement provides relief that a trial on the merits could not have provided, specifically the resources outlined in the Agreement.

### 3.4 It is the judgment of the parties that the Agreement is fair and reasonable.

With respect to this factor, "Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *Aragon,* 2018 U.S. Dist. LEXIS 212825, at *10, *quoting Hapka v. CareCentrix, Inc.*, 2018 U.S. Dist. LEXIS 68185, 2018 WL 1871449, at 5 (D. Kan. Feb. 15, 2018) (*quoting Lucas*, 234 F.R.D. at 695). Here, Plaintiffs' counsel, among whom are attorneys with substantial experience in civil rights litigation, unanimously recommend the Agreement and opine that it is fair, reasonable, and adequate. **Exhibits 2 and 3** (declarations of David A. Lane and Jason Flores-Williams, respectively). The Agreement accomplishes relief for the Plaintiff Class that could not have been achieved at a trial, namely a number of resources that will be provided to Class Members by Denver. Not only is the Agreement fair, but it is a win for both

sides. The job of government is to ensure the constitutional rights of its citizens, regardless of race, creed, or socioeconomic status. With this proposed settlement, Denver has taken its place as a national leader with regard to the treatment of people who are experiencing homelessness and will continue to work with them and their representatives.

4. **The Notice, Notice Program, and Objections Procedure Should Be Approved.**

As previously stated, the Fed. R. Civ. P. 23(e)(1)(B) provides that "The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." In *Aragon*, this Court cited Rule 23(c)(2)(B) for what reasonable notice to all class members means. *Aragon,* 2018 U.S. Dist. LEXIS 212825, at *3. This rule states:

> [T]he court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.

*Id. Aragon* continued, "In addition to the requirements of Rule 23, the Due Process Clause also guarantees unnamed class members the right to notice of a settlement." *Id.* at 3-4 (citing *DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 943-44 (10th Cir. 2005)). The court noted that

> due process does not require that each class member receive actual notice to be bound by the adjudication of a representative action. Instead, the procedural rights of absent class members are satisfied so long as 'the best notice practicable under the circumstances [is given] including individual notice to all members who can be identified through reasonable effort.

*Id.* at 4 (quoting *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1110 (10th Cir. 2001) (citation omitted)). "Thus, '[t]he legal standards for satisfying Rule 23(c)(2)(B) and the

constitutional guarantee of procedural due process are coextensive and substantially similar.'" *Id.* (quoting *DeJulius*, 429 F.3d at 944).

The requirement of giving "the best notice practicable under the circumstances" does not mean that every single class member receive notice, simply that counsel gives the best notice practicable under the circumstances to all class members that they can find. *DeJulius,* 429 F.3d at 944 (citing *Mullane v. Cent. Hanover Bank Trust Co.*, 339 U.S. 306, 313-314 (1950) ("A construction of the Due Process Clause which would place impossible or impracticable obstacles in the way could not be justified."); *Integra Realty Resources*, 262 F.3d at 1110-1111 (holding that Rule 23 and Due Process requisites satisfied where the record indicated that only seventy-seven percent of class members actually received notice of the settlement)). *DeJulius* held that the due process inquiry "focuses upon whether the district court gave the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." *Id.* (internal quotation marks omitted).

And, with respect to the content of the notice, this Court (and the Tenth Circuit) have approved notices that

> contained information regarding the nature of the lawsuit, the definition of the class, class members' anticipated recovery under the settlement, the amount of attorneys' fees and costs sought, and a summary of the class members' legal rights, including the right to object or exclude themselves from the settlement. The notice also directed class members to a toll-free number for additional information regarding the settlement.

*Aragon,* 2018 U.S. Dist. LEXIS 212825, at *5-6 (citing *Tennille v. W. Union Co.*, 785 F.3d 422, 437 (10th Cir. 2015)) (finding that "notice satisfied due process by informing class members of several ways they could obtain information about the claims that they would be releasing if they joined the settlement").

In this case, because of the procedure in the Agreement to establish attorneys' fees and costs, the parties propose a two-part notice program.

Plaintiffs propose to distribute the first notice, set forth in **Exhibit 4**, within one month of preliminary approval. Plaintiffs plan to do so as outlined in **Exhibit 5**, including taking the following steps:

- Denver Homeless Out Loud Street Teams will hand out the Notice on the streets and post the Notice at homeless shelters and other places that homeless people frequent.
- Two meetings will be held at the Downtown Denver Public Library, which is the *de facto* daytime homeless shelter for Denver. The Library has agreed to work with the Plaintiffs to post notices.
- The notice will be inserted into the Denver free weekly newspaper, *Westword* specifically distributed to areas where homeless people frequent., i.e. Capitol Hill and Downtown, for a total circulation of 26,000.

Following the procedure for establishing attorneys' fees, Plaintiffs will distribute a second notice, in the form set out in **Exhibit 6**, in the same manner as described above. This notice is substantially the same as the first notice, but will provide the Class the actual amount of fees and costs requested by Class Counsel.

Contained in each notice is the procedure for presenting objections. The proposal gives class members sixty days from the receipt of the second notice to object, and requires that class members file written objections to be heard at the Fairness Hearing. *See* **Exhibit 4**; **Exhibit 6**.

Plaintiffs respectfully request that this Court approve the notice, the procedures for providing the notice to the Class, and the procedures for the Class member to present any objections that they may have.

5. **Conclusion**

For the foregoing reasons, the parties respectfully request this Court:

- Grant preliminary approval of the Settlement Agreement;

- Find that the proposed plan to provide notice to the class and the proposed forms of notice satisfies the requirements of due process and Rule 23; and
- Schedule a Fairness Hearing for the earliest convenient date approximately six months after preliminary approval to determine whether the proposed Settlement Agreement is fair, reasonable and adequate and therefore should be approved.

Respectfully submitted this 22nd day of April 2019.

*s/Jason Flores-Williams, Esq.*
Phone: 303-514-4524
Email: Jfw@jfwlaw.net
1851 Bassett St.
#509
Denver, Colorado 80202

*Lead Counsel For Plaintiff Class*

AND

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*
David A. Lane
Andy McNulty
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com

*Attorneys for Plaintiff Class*

*s/ Wendy Shea*
Wendy J. Shea, Assistant City Attorney
Conor D. Farley, Assistant City Attorney
Denver City Attorney's Office
Civil Litigation Section

17

201 W. Colfax, Ave., Dept. 1108
Denver, CO 80202-5332
Telephone: (720) 913-3112
Email: wendy.shea@denvergov.org
conor.farley@denvergov.org
*Attorneys for the City and County of Denver*

# CERTIFICATE OF SERVICE

I certify that on this 22nd day of April 2019 I filed a true and correct copy of this **STIPULATED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND FOR FAIRNESS HEARING** via CM/ECF which will generate notice to the following via e-mail:

Wendy J. Shea
Conor D. Farley
Geoffrey Klingsporn
Assistant City Attorneys
Denver City Attorney's Office, Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, Colorado 80202
wendy.shea@denvergov.org
conor.farley@denvergov.org
cristina.helm@denvergov.org
geoffrey.klingsporn@denvergov.org

*s/ Charlotte Bocquin Scull*
Paralegal